UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

IN RE PAYMENT CARD INTERCHANGE   :
FEE AND MERCHANT DISCOUNT       :
ANTITRUST LITIGATION                 :
                                      :     14-md-1720(JG)(JO)
This Document Relates To:          :
                                      :
 ALL OPT-OUT CASES           :

-------------------------------------------------------------x

## 7-ELEVEN PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

CONSTANTINE CANNON LLP
Jeffrey I. Shinder
Ankur Kapoor
Gary J. Malone
A. Owen Glist
David A. Scupp
335 Madison Avenue
New York, New York 10017
(212) 350-2700
Email: jshinder@constantinecannon.com

*Attorneys for 7-Eleven Plaintiffs*

May 5, 2014

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................1

FACTUAL ALLEGATIONS ...............................................................................3

    A.   Visa and MasterCard Are Bank Cartels That Have Each Horizontally
         Restrained Trade in the Markets for Credit Network Services and Debit
         Network Services...............................................................................................3

    B.   The Restructuring of Visa's and MasterCard's Corporate Forms Does Not
         Immunize Them from Scrutiny as Horizontal Restraints of Trade ................5

    C.   Merchants Have Directly Paid Interchange Fees for Acceptance of Issuing
         Banks' Visa and MasterCard Credit and Debit Cards...................................7

ARGUMENT .......................................................................................................8

   I.   THE VISA CHECK RELEASE DOES NOT BAR PLAINTIFFS' CLAIMS...................8

  II.   ILLINOIS BRICK DOES NOT BAR PLAINTIFFS' CLAIMS.......................................17

    A.   Illinois Brick Does Not Bar Plaintiffs' Damages Claims Under the Sherman
         Act §§ 1 and 2 Because Plaintiffs Allege They Are Direct Purchasers .......17

    B.   Even Assuming, Contrary to Plaintiffs' Allegations, That Plaintiffs Paid
         Interchange Fees to Acquiring Banks, Illinois Brick Would Not Bar Plaintiffs'
         Sherman Act §§ 1 and 2 Damages Claims ..................................................21

      1.   The co-conspirator exception would allow Plaintiffs to recover...............22

      2.   The ownership-or-control exception would allow Plaintiffs to recover....24

 III.   BUFFALO BROADCASTING DOES NOT BAR PLAINTIFFS' SECTION 1
       CLAIMS .......................................................................................................27

 IV.   THE COMPLAINT SPECIFICALLY PLEADS BOTH HORIZONTAL
       AGREEMENTS AMONG THE BANK DEFENDANTS AND VERTICAL
       AGREEMENTS, THEREBY SATISFYING THE SHERMAN ACT § 1
       REQUIREMENT OF CONCERTED ACTION BY MULTIPLE ACTORS...................31

i

A.    The Complaint Pleads the Facts of Horizontal Agreements Among the Banks ............32

B.    Plaintiffs Allege Defendants Never Withdrew from Their Pre-IPO Conspiracy ..........35

C.    The Continuing Horizontal Conspiracy Can Be Inferred Even Absent Allegations of Direct Post-IPO Communications ..........................................................37

D.    Defendants' Flawed Assertions That Their Conduct Had Pro-Competitive Effects Are Inappropriate for Resolution on a Motion to Dismiss...............................39

E.    The Complaint Alleges Express Vertical Agreements ...................................................40

CONCLUSION...................................................................................................................................40

# TABLE OF AUTHORITIES

<u>Cases</u>

*American Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ................................................................................................... *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ...................................................................................................... 31

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
  459 U.S. 519 (1983) ...................................................................................................... 22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................................... 31

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998) ......................................................................................... 13

*Buffalo Broadcasting Co., Inc. v. American Society of Composers, Authors and Publishers*,
  744 F.2d 917 (2d Cir. 1984) ................................................................................. *passim*

*California v. ARC Am. Corp.*,
  490 U.S. 93 (1989) ............................................................................................ 1, 22-23, 27

*Consol. Edison, Inc. v. Ne. Utilities*,
  332 F. Supp. 2d 639 (S.D.N.Y. 2004) ........................................................................... 9

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002) ............................................................................... 30-31, 37

*Cont'l Ore v. Union Carbide & Cabon Corp.*,
  370 U.S. 690 (1962) ...................................................................................................... 30

*Fed. Paper Board Co., Inc. v. Amata*,
  693 F. Supp. 1376 (D. Conn. 1988) .............................................................................. 31

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
  617 F.2d 478 (7th Cir. 1980) ......................................................................................... 23

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
  392 U.S. 481 (1968) ................................................................................................. 17, 22

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) .......................................................................................... 40

iii

*Hunter Douglas, Inc. v. Comfortex Corp.*,
 No. 98-CV-0479 (LEK/DNH), 1999 U.S. Dist. LEXIS 10906 ............................................... 16

*Illinois Brick Co. v. Illinois*,
 431 U.S. 720 (1977) ........................................................................................................ *passim*

*In re ATM Fee Antitrust Litig.*,
 686 F.3d 741 (9th Cir. 2012) ..................................................................................... 21, 27

*In re Brand Name Prescription Drugs Antitrust Litig.*,
 123 F.3d 599 (7th Cir. 1997) ............................................................................................. 22

*In re Cardizem CD Antitrust Litig.*,
 105 F. Supp. 2d 618 (E.D. Mich. 2000) ........................................................................ 39-40

*In re Elevator Antitrust Litig.*,
 502 F.3d 47 (2d Cir. 2007) ................................................................................................ 33

*In re Flat Glass Antitrust Litig.*,
 385 F.3d 350 (3d Cir. 2004) .......................................................................................... 38-39

*In re G-Fees Antitrust Litig.*,
 584 F. Supp. 2d 26 (D.D.C. 2008) ..................................................................................... 25

*In re High Fructose Corn Syrup Antitrust Litig.*,
 295 F.3d 651 (7th Cir. 2002) ............................................................................................. 30

*In re Holocaust Victims Assets Litig.*,
 314 F. Supp. 2d 155 (E.D.N.Y. 2004) ............................................................................... 13

*In re Ins. Brokerage Antitrust Litig.*,
 618 F.3d 300 (3d Cir. 2010) .............................................................................................. 39

*In re Linerboard Antitrust Litig.*,
 305 F.3d 145 (3d Cir. 2002) .............................................................................................. 23

*In re Literary Works in Elec. Databases Copyright Litig.*,
 654 F.3d 242 (2d Cir. 2011) .............................................................................................. 15

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
 No. 05-md-1720, 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) ...................................... 8, 10, 12

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
 -- F. Supp. 2d --, No. 05-md-1720, 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013)............ 19, 20

*In re Sugar Indus. Antitrust Litig.,*
    579 F.2d 13 (3d Cir. 1978) ............................................................................ 23

*In re Visa Check/MasterMoney Antitrust Litig.,*
    192 F.R.D. 68 (E.D.N.Y. 2000) ..................................................................... 20

*In re Visa Check/MasterMoney Antitrust Litig.,*
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................... 10, 11

*In re Visa Check/MasterMoney Antitrust Litig.,*
    No. 96-cv-5238(JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003)................... 19, 20

*In re Vitamin C Antitrust Litig.,*
    279 F.R.D. 90 (E.D.N.Y. 2012)...................................................................... 24

*Interstate Circuit v. United States,*
    306 U.S. 208 (1939)................................................................................ 37, 38

*Kansas v. Utilicorp United, Inc.,*
    497 U.S. 199 (1990)..................................................................................... 22

*Kass v. Kass,*
    91 N.Y.2d 554 (1998) .................................................................................. 10

*Kendall v. Visa U.S.A., Inc.,*
    518 F.3d 1042 (9th Cir. 2008) ............................................................ 21, 27, 39

*Laumann v. NHL,*
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) ..................................................... *passim*

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) .......................................................................... 30

*Madison Square Garden, L.P. v. NHL,*
    No. 07 Civ. 8455(LAP), 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008)................. 15

*Matsushita Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.,*
    299 F. Supp. 2d 370 (D. Del. 2004)................................................................ 31

*MCM Partners v. Andrews-Bartlett & Assocs.,*
    161 F.3d 443 (7th Cir. 1998) ......................................................................... 16

*Meredith Corp. v. SESAC LLC,*
    No. 09 Civ. 9177(PAE), 2014 WL 812795 (S.D.N.Y. Mar. 3, 2014) ..................... 30

*Nat'l ATM Council, Inc. v. Visa Inc.*,
   -- F. Supp. 2d --, 2013 WL 6671660 (D.D.C. Dec. 19, 2013) .................................. 37

*Nat'l ATM Council, Inc. v. Visa Inc.*,
   922 F. Supp. 2d 73 (D.D.C. 2013) ......................................................... 37

*Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986) ............................................................ 31

*Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*,
   596 F. Supp. 1231 (S.D. Fla. 1984) ..................................................... 26

*Nat'l Super Spuds v. N.Y. Mercantile Exch.*,
   660 F.2d 9 (2d Cir. 1981) ................................................................ 14

*NCAA v. Board of Regents of the University of Oklahoma*,
   468 U.S. 85 (1984) ...................................................................... 29

*Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*,
   281 F.3d 629 (7th Cir. 2002) .......................................................... 22, 23

*Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*,
   467 F.3d 283 (2d Cir. 2006) ............................................................. 21

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002) ............................................................. 39

*PSKS, Inc. v. Leegin Creative Leather Products, Inc.*,
   615 F.3d 412 (5th Cir. 2010) ............................................................ 39

*Record Club of Am. v. United Artists Records*,
   611 F. Supp. 211 (S.D.N.Y. 1985) ...................................................... 16

*Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*,
   58 F.3d 1478 (2d Cir. 1995) ........................................................... 14-15

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
   442 F.3d 741 (9th Cir. 2006) ........................................................... 13

*Royal Printing Co. v. Kimberly-Clark Corp.*,
   621 F.2d 323 (9th Cir. 1980) ....................................................... 23, 24, 25

*Shane v. Humana, Inc.*,
   No. 00-MD-1334, 2009 U.S. Dist. LEXIS 130941 (S.D. Fla. Nov. 5, 2009) .............. 16

*Smith v. Dada Entm't, LLC,*
   No.11-cv-7066, 2012 WL 4711414 (S.D.N.Y. Sep. 27, 2012) ................................ 16

*Starr v. Sony BMG Music Entm't,*
   592 F.3d 314 (2d Cir. 2010) ......................................................................... 31, 38

*Stephenson v. Dow Chem. Co.,*
   273 F.3d 249 (2d Cir. 2001) ................................................................................. 13

*Temple v. Circuit City Stores, Inc.,*
   Nos. 06-CV-5303(JG), 06-CV-5304(JG), 2007 WL 2790154
   (E.D.N.Y. Sept. 25, 2007)........................................................................ 19, 20, 23

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.,*
   530 F.3d 204 (3d Cir. 2008) ................................................................................. 36

*Toys "R" Us, Inc. v. FTC,*
   221 F.3d 928 (7th Cir. 2000) ............................................................................37-38

*Twigg v. Sears, Roebuck & Co.,*
   153 F.3d 1222 (11th Cir. 1998) ............................................................................ 14

*United States v. Apple Inc.,*
   952 F. Supp. 2d 638 (S.D.N.Y. 2013) ................................................................. 31

*United States v. Berger,*
   224 F.3d 107 (2d Cir. 2000) ........................................................................... 35, 36

*United States v. Nerlinger,*
   862 F.2d 967 (2d Cir. 1988) ................................................................................. 36

*United States v. Panebianco,*
   543 F.2d 447 (2d Cir. 1976) ................................................................................. 36

*United States v. U.S. Gypsum Co.,*
   438 U.S. 422 (1978)............................................................................................... 36

*United States v. Visa U.S.A. Inc.,*
   163 F. Supp. 2d 322 (S.D.N.Y. 2001) ......................................................... *passim*

*United States v. Visa U.S.A. Inc.,*
   344 F.3d 229 (2d Cir. 2003) ......................................................................... *passim*

*Vassalle v. Midland Funding, LLC*,
  708 F.3d 747 (6th Cir. 2013) ................................................. 14

*Visa U.S.A. Inc. v. First Data Corp.*,
  No. C-02-01786, 2006 WL 1310448 (N.D. Cal. May 12, 2006)...................................... 26, 27

*VKK Corp. v. NFL*,
  244 F.3d 114 (2d Cir. 2001) ................................................. 16

*W. Alton Jones Found. v. Chevron U.S.A., Inc.*,
  97 F.3d 29 (2d Cir.1996) ................................................. 9

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) ................................................. 39

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) ................................................. *passim*

*Willsea v. Theis*,
  No. 98-cv-6773, 1999 WL 595629 (S.D.N.Y. Aug. 6, 1999) ................................................. 16

*Wolson v. Reed Elsevier Inc.*,
  No. 09 Civ. 4040 (DC), 2010 WL 334919 (S.D.N.Y. Jan. 29, 2010) ...................................... 16

<u>Other Authorities</u>

James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*,
  91 N.C. L. Rev. 387 (2013) ................................................. 16

viii

## PRELIMINARY STATEMENT

Plaintiffs in *7-Eleven, Inc. v. Visa Inc.*, 13-cv-05746(JG)(JO) ("Plaintiffs" or "7-Eleven Plaintiffs") include 56 absent class members who paid billions in supra-competitive interchange fees fixed by Visa, MasterCard, and colluding banks during the damages period, January 1, 2004, through November 27, 2012.  Plaintiffs' Complaint names Visa, MasterCard, and their largest member banks as defendants ("the Bank Defendants," together with Visa and MasterCard, "Defendants"), and asserts claims under the Sherman Act and 25 state laws.  Defendants move to dismiss on a variety of grounds, each of which is without merit.

*First*, Defendants' argument that the *Visa Check* Release bars damages from Defendants' anticompetitive conduct since January 1, 2004, ignores the plain terms of the Release and the Second Circuit's unambiguous holding rejecting Defendants' interpretation.  The Second Circuit has already held that, under the Release, "[c]onduct occurring after December 31, 2003 is not precluded from being the subject of a future suit."  *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 110 (2d Cir. 2005) ("[H]ere . . . class representatives . . . did not agree to preclude lawsuits arising out of similar conduct in the future.").

*Second*, Defendants' reliance on the indirect-purchaser rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), ignores Plaintiffs' well-pled factual allegations that merchants directly paid interchange fees, as this Court has previously noted against a fully developed factual background in *Visa Check* and a related case.  *Illinois Brick* also has no application to Plaintiffs' state-law claims or claims for injunctive relief.[1]

---

[1] *California v. ARC Am. Corp.*, 490 U.S. 93, 105-06 (1989) (state antitrust laws allowing recovery by indirect purchasers not preempted by federal antitrust law); *Laumann v. NHL*, 907 F. Supp. 2d 465, 481 n.80 (S.D.N.Y. 2012) ("*Illinois Brick* bars only damages . . . not injunctive relief . . . .").

290741.16

1

*Third*, Defendants argue that *Buffalo Broadcasting Co., Inc. v. American Society of Composers, Authors and Publishers*, 744 F.2d 917 (2d Cir. 1984), bars Plaintiffs' Sherman Act § 1 claims on the ground that Defendants' rules do not restrain trade because they do not "impair the freedom" of banks to negotiate bilateral agreements with merchants for lower interchange. Again, Defendants ignore Plaintiffs' well-pled allegations that Defendants' rules have completely eliminated incentives for banks to negotiate bilateral agreements with merchants and, thus, there have been no such agreements even though merchants have made overtures to banks regarding such deals. Also, as in *Buffalo Broadcasting* and the other authority cited by Defendants—to the extent they even apply—the question of whether there is a restraint of trade is a question of fact that cannot be resolved on a motion to dismiss.

*Fourth*, Defendants' argument that Plaintiffs have not adequately pled concerted action under the Sherman Act § 1 after the Visa and MasterCard initial public offerings (IPOs) ignores Plaintiffs' specific, factual allegations of concerted action, including that the banks that owned and controlled Visa and MasterCard permitted the IPOs only on the express condition that the restraints in question continue after the IPOs. Defendants' suggestion that the restructurings of Visa's and MasterCard's corporate forms shield them from § 1 is rebutted by the Supreme Court's holding in *American Needle, Inc. v. NFL*, 560 U.S. 183 (2010).[2]

---

[2] Plaintiffs incorporate the Target Plaintiffs' argument that the filed-rate doctrine does not apply because the Federal Reserve neither requires filing of rates nor assesses the reasonableness of specific rates charged.

2

## FACTUAL ALLEGATIONS

The following factual allegations state claims against Defendants for restraints of trade under the Sherman Act § 1 and 25 state antitrust and unfair-competition laws.[3]

### A.    Visa and MasterCard Are Bank Cartels That Have Each Horizontally Restrained Trade in the Markets for Credit Network Services and Debit Network Services

During the damages period, Visa and MasterCard were organized as membership corporations, the owners and members of which were virtually all of the competing banks that issued general purpose credit or debit cards to consumers ("issuing banks") and/or that signed merchants to accept such cards ("acquiring banks").  Compl. ¶¶ 3, 67-69, 72-73.[4]  Each membership corporation was governed by bank executives selected from Visa's and MasterCard's member banks, including the Bank Defendants whose executives sat on the boards of directors of Visa and MasterCard.  *Id.* ¶¶ 69, 73, 76-86.  As the Second Circuit held, Visa and MasterCard:

> are not single entities; they are consortiums of competitors.  They are owned and effectively operated by some 20,000 banks, which compete with one another in the issuance of payment cards and the acquiring of merchants' transactions.  These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These competitors have agreed to abide by a restrictive exclusivity provision to the effect that in order to share the benefits of their association by having the right to issue Visa or MasterCard cards, they must agree not to compete by issuing cards of Amex or Discover.  The restrictive provision is a horizontal restraint adopted by 20,000 competitors.

---

[3] Plaintiffs' first eight claims allege horizontal and vertical restraints under the Sherman Act § 1.  Plaintiffs' Twelfth Claim is asserted under 25 state antitrust and unfair-competition laws that allow indirect purchasers to recover damages.  Plaintiffs assert claims for relief against Visa for monopolization (Ninth Claim) or attempted monopolization (Tenth Claim), and for conspiracy to monopolize (Eleventh Claim), in the market for General Purpose Debit Card Network Services in violation of the Sherman Act § 2 and 25 state antitrust and unfair competition laws.  During the damages period, Visa engaged in anticompetitive conduct in the debit market that went beyond the restraints of trade detailed below and that has maintained and enhanced Visa's dominant share of the debit market.  *See* Compl. ¶¶ 164-175.  Defendants' motion is not directed against these allegations of Visa's anticompetitive conduct.

[4] The 7-Eleven Plaintiffs' Second Amended Complaint, 13-cv-4756 ECF No. 30, is attached as Exhibit 1 to the accompanying Declaration of Jeffrey I. Shinder ("Shinder Decl.").

*United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003).

During the damages period, these consortiums of competing banks agreed to restrain competition for merchants among themselves in two principal respects. First, there was no competition among the issuing banks to offer merchants lower interchange fees because, during the damages period, the banks agreed to impose the "Honor All Issuers" rules requiring that any merchant that accepted any *one* bank's credit (or debit) cards issued over the Visa or MasterCard network *must* accept *all* other banks' credit (or debit) cards on that network. Compl. ¶¶ 88, 97.[5]  It therefore made no economic sense for an issuing bank to compete with other issuing banks by negotiating interchange fees that were lower than the collusively fixed "default" interchange fees (so-called "bilateral agreements"), because competing banks' cards would be accepted anyway (and at the higher default interchange rate, so an issuer negotiating lower interchange fees would be disadvantaging itself vis-à-vis its competition). *Id.* ¶¶ 97-99.  In fact, issuing banks have rebuffed overtures from merchants to enter into bilateral agreements and there have been no bilateral agreements entered into by member banks of Visa or MasterCard. *Id.* ¶¶ 99, 102.

Second, the banks governing Visa and MasterCard agreed on the prices they would charge merchants for merchants' acceptance of each competing bank's credit and debit cards on that network:  the "default interchange" fee schedules. Compl. ¶¶ 89, 95, 101.  Merchants paid the same interchange fee on a given transaction regardless of which competing issuing bank's card was involved. *Id.* ¶ 89.  The Visa and MasterCard networks monitored each transaction to ensure application of the collusively set interchange fee for that transaction. *Id.* ¶ 103.

---

[5] Defendants refer to the Honor All Issuers rules as the "honor all cards" rules.  The Complaint refers to the Honor All Issuers rules because this formulation more accurately characterizes the key economic and competitive feature of these rules:  that they require the acceptance of all issuers' credit (or debit) cards and thus constitute an agreement not to compete among the Visa and MasterCard issuing banks.

Thus, the Honor All Issuers rules constituted horizontal agreements among the banks not to compete for merchants' acceptance of the banks' credit and debit cards, and the so-called "default" interchange fees became *the* collusively fixed prices for merchants to accept the banks' payment products.  Compl. ¶¶ 88, 98-99.  Defendants used their supra-competitive interchange fees as pay-offs for additional issuing banks to join the Visa/MasterCard cartels and further maintain and enhance these cartels and their market power over merchants.  *Id.* ¶ 91.  See Complaint ¶¶ 107-124 for factual allegations of Visa's and MasterCard's market power, and *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 340, 342 (S.D.N.Y. 2001) (finding that Visa and MasterCard jointly and separately possess market power), *aff'd* 344 F.3d 229, 239 (2d Cir. 2003).  These twin cartels forced merchants to pay ever higher interchange fees to fund these price-fixing schemes and thereby maintain and enhance the cartels' market power through the present day.  Compl. ¶¶ 91, 110-19.[6]

## B.   The Restructuring of Visa's and MasterCard's Corporate Forms Does Not Immunize Them from Scrutiny as Horizontal Restraints of Trade

During the damages period, the banks that sat on the Visa and MasterCard boards, and controlled them, approved MasterCard's and Visa's restructurings into corporate entities that offered a portion of their shares to members of the public through IPOs.  Compl. ¶ 125.  Plaintiffs' well-pled allegations of horizontal agreements among the Visa and MasterCard member banks continuing post-IPO to this day include that the banks agreed to the restructurings *only* on the condition that the Honor All Issuers and default interchange rules would continue post-IPO.  *Id.* ¶ 85 ("[G]iven the banks' control over pre-IPO Visa, they explicitly agreed to proceed with Visa's

---

[6] Plaintiffs further allege that the Honor All Issuers and default interchange rules were not reasonably necessary to operate Defendants' payment-card networks.  Compl. ¶¶ 94, 100, 139-57.

IPO on the condition that Visa's post-IPO structure would enable substantive continuation of the agreement not to compete and price fixing detailed in this Amended Complaint."); ¶ 86 (same allegation concerning MasterCard); ¶ 127 ("[T]he Bank Defendants and the other members of Visa and MasterCard agreed prior to the IPOs that post-IPO Visa and MasterCard would continue to support the agreements not to compete and to fix prices.").

Plaintiffs plead additional facts in support of their allegations of horizontal agreements. First, in the restructurings, the Bank Defendants and the other members of Visa and MasterCard readopted each network's rules for the post-IPO world, including the Honor All Issuers and default interchange rules.  Compl. ¶ 130; Shinder Decl. Ex. 2, *Amended and Restated Global Restructuring Agreement* (Aug. 24, 2007), Annex A at A-7 ("[T]he Parties shall . . . cause the Board of Directors of Visa USA to cause the By-Laws of Visa USA to be amended and restated in their entirety . . . .").  Thus, part of the banks' agreements to restructure Visa and MasterCard was an agreement that all Visa and MasterCard member banks' interchange fees would continue to be set by Visa and MasterCard without competition among issuing banks after the IPOs.  Compl. ¶ 130.  Plaintiffs further allege that this is in fact what happened after the IPOs, *id.* ¶ 132, and, as such, there was a conscious commitment to an ongoing common scheme by horizontal competitors and therefore a continuing violation of §1 of the Sherman Act, *id.* ¶ 130.

Second, per each bank's card-issuing agreement with post-IPO Visa and MasterCard, each issuing bank agreed to be bound by the Honor All Issuers and default interchange rules, thereby delegating its pricing for card acceptance to Visa and MasterCard, knowing its competitors were doing the same.  Compl. ¶¶ 129, 137-138.  Precisely as the banks intended for post-IPO Visa and MasterCard, each network thus became the centralized pricing and rules enforcement agent for

6

otherwise horizontally competing banks and, as such, subject to challenge under the Sherman Act
§ 1.  *Id.*  Visa and MasterCard continue to set interchange fees for thousands of competing banks
that, but for these agreements, would have independently competed for merchant acceptance.  *Id.* ¶
130.  Indeed, the IPOs increased the effectiveness of Defendants' price-fixing conspiracies as well
as Visa's and MasterCard's substantial market power by consolidating decision-making and
coordinating communications among the banks.  Compl. ¶ 131.  Defendants' economists opined in
1993—well before these IPOs were being considered—that "[t]here would be far less competition
in this industry if Visa and MasterCard had chosen to operate as single companies."  *Id.*

C.  **Merchants Have Directly Paid Interchange Fees for Acceptance of Issuing
    Banks' Visa and MasterCard Credit and Debit Cards**

Plaintiffs allege they directly paid interchange fees.  Compl. ¶¶ 93, 105, 176, 177.  When a
consumer makes a purchase using a Visa or MasterCard credit or debit card, the issuing bank
deducts the interchange fee from the purchase price owed to the merchant.  *See id.* ¶ 105.  The net
transaction amount, i.e., the purchase price *minus the interchange fee*, is sent from the issuing
bank to the merchant's account at the acquiring bank.  *Id.*  From the net transaction amount, the
acquiring bank deducts *other* fees from the merchant's account as payment for services the
acquiring bank provides to the merchant.  The payment for the merchant's acceptance of the
issuing bank's credit card, i.e., the interchange fee, is made by the merchant to the issuing bank in
the form of the issuing bank's deduction of the interchange from the purchase price due to the
merchant.  *Id.*  Accordingly, issuing banks account for interchange as revenue, and merchants
account for interchange as an expense.  *Id.*  In contrast, acquiring banks do not account for

interchange as an expense, because acquiring banks are not purchasing the ability to accept the issuing bank's credit card.[7]

## ARGUMENT[8]

### I.   THE *VISA CHECK* RELEASE DOES NOT BAR PLAINTIFFS' CLAIMS

The argument that the *Visa Check* Release bars claims for damages after December 31, 2003 is a brazen attempt to rewrite the *Visa Check* Settlement,[9] a "bargain that is both carefully calibrated in its details and intentionally broad in scope:  in return for relief that marked the Settlement as 'the largest in the history of antitrust law,' the *Visa Check* plaintiff class released Visa and MasterCard from liability for all conduct *up through the end of the year in which the agreement was reached*"—2003.  *In re Payment Card Interchange ("Interchange")*, 2008 WL 115104, at *10 (E.D.N.Y. Jan. 8, 2008), ECF No. 740 (emphasis added; citation omitted).

At argument on their first motion to dismiss, Defendants assured the Court they were not taking the "extreme position" that Defendants "could engage in price fixing in . . . 2003 and . . . get immunity for continuing illegal conduct in 2004, 5, and [6]."  11/21/06 Tr. at 35, *Interchange*, No. 05-md-1720, ECF No. 738.  Defendants now press this position—an argument not only extreme as a matter of law, but extraordinary in fact.  It is extraordinary because the *Visa Check* Settlement provides that if Visa or MasterCard raise the Release as a defense in any other

---

[7] Acquirers do pay certain network assessments, which are billed by Visa and MasterCard to the acquirers and paid directly to Visa and MasterCard like any other cost of doing business, *e.g.*, electricity bills. Acquirers treat these assessments as expenses, unlike their treatment of interchange fees.  Compl. ¶ 106.

[8] The 7-Eleven Plaintiffs join in the standard of review section set forth in the Target Plaintiffs' brief.

[9] "*Visa Check* Settlement" or "Settlement" refers collectively to the separate settlement agreements entered into between Visa, MasterCard, and the *Visa Check* Class on June 4, 2003.  "Release" refers to the identical release paragraphs of these separate settlements.  Visa Settlement ¶ 28, *Visa Check*, No. 96-cv-5238, 2003 WL 25704042 (June 6, 2003); MasterCard Settlement ¶ 30, *Visa Check*, No. 96-cv-5238, 2003 WL 25658169 (June 6, 2003).

lawsuit—as they did in *Interchange* in 2006—they "shall be entitled to a stay of that suit" until this Court decides whether the Release should apply.  Settlement ¶ 39(b); ¶ 41(b).  Yet Defendants never sought to stay the case—which they now claim should have been dismissed in its entirety—at any time after it was filed in 2005.  Instead, they expended countless hours of court and attorney time to litigate and agreed to pay billions of dollars to settle supposedly released claims.  Even if Defendants' argument were not foreclosed by the plain words of the *Visa Check* Settlement—which, as explained below, it is—Defendants' post-Release silence speaks volumes about the merits of this motion.  *See W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29, 34 (2d Cir.1996) (delay in asserting release defense "powerful evidence" that settlement did not bar claims and that party asserting release had merely "contrived that theory long after the fact"); *Consol. Edison, Inc. v. Ne. Utilities*, 332 F. Supp. 2d 639, 650-51 (S.D.N.Y. 2004) (failure to raise "release" defense for more than a year "is persuasive evidence that the Settlement Agreement was never intended to affect this action and that [defendant's] interpretation of the release was contrived for this litigation").

Defendants' contrived new interpretation of the Release is without merit.  Both the plain terms and the structure of the *Visa Check* Settlement show that the Release is limited to conduct before January 1, 2004, as the Second Circuit and every other court has considered it to be.  By its plain terms, the Release is limited to claims "relating in any way to any conduct prior to January l, 2004, concerning any claims alleged in the Complaint or . . . claims which have been asserted or could have been asserted in this litigation . . . ."  Settlement ¶ 28; ¶ 30.  The Second Circuit held in *Visa Check* that "[c]onduct occurring after December 31, 2003"—even if related to the conduct in *Visa Check*—"is not precluded from being the subject of a future suit."  396 F.3d at 110; *see also*

9

*id.* ("[H]ere . . . class representatives possessed the released [interchange and Membership Rules] claims and did not agree to preclude lawsuits arising out of similar conduct in the future.").

Further, the structure of the *Visa Check* Settlement demonstrates that the Release's temporal limitation means that only damages incurred with respect to pre-2004 conduct are released. As Judge Orenstein held when ruling on Defendants' previous motion to dismiss, the Release "must be considered against the backdrop of substantive New York law, which the parties to the *Visa Check* Settlement agreed would govern." *Interchange*, 2008 WL 115104, at *10. New York law "contemplates consideration of the precise clause in dispute and the overall context of the agreement in which that clause appears." *Id.*; *see Kass v. Kass*, 91 N.Y.2d 554, 566 (1998) (courts "should examine the entire contract") (internal quotation marks omitted).

The reason that the class released damages only from pre-2004 conduct is that the *Visa Check* Settlement provided monetary relief only for pre-2004 conduct, most notably the $3 billion settlement fund, to class members that included only those who accepted Visa or MasterCard through June 21, 2003. The *Visa Check* Settlement provided for: (1) "the cessation, as of January 1, 2004, of defendants' 'Honor All Cards' rules, by which the defendants' debit card services to merchants were tied to their credit card services," *Visa Check*, 297 F. Supp. 2d at 508 (citations omitted); and (2) a reduction in debit interchange rates from "August 1, 2003, and continuing through December 31, 2003," Settlement ¶ 8, "in order to compensate merchants for continued bundled acceptance of debit products prior to the unbundling on January 1, 2004," Shinder Decl. Ex. 3, Mem. of Law in Supp. of Prelim. Approval at 7, *Visa Check* (filed jointly by MasterCard and the Class on June 5, 2003). Defendants explained this to the Court on their first motion to dismiss, noting that "as a class member who sits there in August 2003 and strikes a deal that he is

10

releasing claims all the way up to January 1, 2004—and that's not simply a date picked out of thin air, it's because the defendants had agreed to reduce debit pricing to the end of 2003."  11/21/06 Tr. at 20.  Defendants further explained, "we bargained for that.  *We get the release out to January 2004* and we pay $3 billion for that release."  *Id.* (emphasis added).  When pressed by the Court for an answer to the question "how [the *Visa Check* Class Plaintiffs could] settle claims for additional illegal conduct . . . in the future?" Defendants responded:  "They settle it only through January 2004.  So we're talking about a six-month window where the defendants are engaged in all sorts of injunctive relief to their policies."  *Id.* at 22.[10]

Paragraph 8 of the *Visa Check* Settlement, which required reduced debit interchange rates through December 31, 2003, provided:  "On January 1, 2004 the requirement in the preceding sentence shall terminate, and Visa [and MasterCard] shall be free to set interchange rates without restriction after that date, *as otherwise permitted by law*."  Thus, Visa and MasterCard were not given immunity for continued conduct that violated the antitrust laws *after* December 31, 2003, consistent with the temporal limit in the Release.  Defendants relied on this provision on appeal of final approval of the *Visa Check* Settlement, replying to the objectors' argument that the Settlement "perpetuates illegal price-fixing by providing that after January 1, 2004, Visa and MasterCard will be free to fix interchange rates without restriction, 'as otherwise provided by law.'"  Reply Brief of Appellees-Respondents Visa & MasterCard at V.D., *Visa Check*, No. 2004-03, 2004 WL 5707440 (June 4, 2004).  Defendants argued that "nothing in paragraph 8 condones

---

[10] In addition to lowering debit interchanges rates in this interim period, Defendants were obligated "on or before January 1, 2004," to adopt rules to "immediately unbundle" each network's credit and debit cards, and "on or before January 1, 2004," to adopt rules to require issuers to "clearly and conspicuously identify all" debit cards, Shinder Decl. Exs. 4-5 (Orders & Final Judgments as to Visa Settlement and as to MasterCard Settlement ¶¶ 4-5, *Visa Check* (Jan. 23, 2004)); *see Visa Check*, 297 F. Supp. 2d at 527-30 (card proofs showing "debit" identifier).

illegal price-fixing:  The provision by its own terms does not authorize any action that is not 'permitted by law.'"[11]

As Defendants pointed out, the *Visa Check* Release "is not just a contract, this is not like any other contract claim.  It's a contract that was supervised by a Federal District Court and determined to be fair and [affirmed by] the Second Circuit and it is binding on the class members." 11/21/06 Tr. at 73.  As Judge Orenstein observed, "Every court to consider the scope of the [*Visa Check*] Settlement has similarly concluded that it released all claims arising out of conduct *occurring before January 1, 2004* related to the claims at issue in the *Visa Check* litigation." *Interchange*, 2008 WL 115104, at *11 (emphasis added).  These courts reached this conclusion based on the text of the Release and the contemporaneously expressed intent of the *Visa Check* settlement proponents (as both the class and defendants Visa and MasterCard interests were then aligned, *see Visa Check*, 396 F.3d at 110 n.18), in responding to objections about the scope of the Release and the adequacy of the class's representation.  The *Visa Check* Class stated repeatedly and clearly that they were not releasing claims for conduct unrelated to pre-2004 conduct *or* claims for "related" conduct "occurring on or after January 1, 2004."[12]

---

[11] The limited scope of the *Visa Check* Release is further revealed by a comparison to the *Interchange* class release, which states clearly that it applies to future conduct, including claims "relating to the period *after* the date of the Court's entry of the Class Settlement Preliminary Approval Order, regardless of when such claims accrue," and including the "future effect" of the same or "substantially similar" conduct.  Class Settlement Agreement ¶ 68, 68(h), *Interchange*, No. 05-md-1720, ECF No. 1656-1 (emphasis added). Likewise, within a few months of the *Visa Check* Settlement, MasterCard and Visa settled with *Visa Check* opt-outs, and some agreed to release future conduct.  Dell Computer, for example, released MasterCard from all claims "based on conduct occurring *on or after January 1, 2004.*"  Shinder Decl. Ex. 6, Ind. Pls. Opp. to Defs. Mots. for S.J. at 83, *Interchange*, No. 05-md-1720, ECF No. 1540; Ex. 7, Class Pls.' Mem. of Law in Opp. to Defs. Mot. for S.J. at 16, (Unannotated), *Interchange*, No. 05-md-1720, ECF No. 1533. These releases clearly show that Defendants intended to include future claims "based on conduct occurring on or after January 1, 2004," in stark contrast to the *Visa Check* Release.

[12] Shinder Decl. Ex. 8, Mem. in Supp. of Plaintiffs' Mot. for Final Approval at 37 & n.42 and 49 n.55, (responding directly to objections that "some future claims which are related" would be released); Shinder

Defendants never objected to this expression of the parties' intent and both this Court and the Second Circuit construed the Release in accordance with the parties' expressed intent and the Release's plain terms.  In rejecting arguments that objectors were not adequately represented and that due process prevented application of the release to future claims, the Second Circuit explicitly concluded that future claims were not at issue because the *Visa Check* Class representatives "did not agree to preclude lawsuits arising out of similar conduct in the future," and that "[c]onduct occurring after December 31, 2003 is not precluded from being the subject of a future suit."  *Visa Check,* 396 F.3d at 113; *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006) ("If Plaintiffs wish to state a claim based on Defendants' alleged price-fixing after January 1, 2004, their proper course is to file a fresh complaint.").[13]

The Second Circuit's reading precludes Defendants' effort to apply the Release against Plaintiffs for an additional reason.  Under the Due Process Clause, "[r]eleases are only enforceable to the extent of notice provided to class members."  *In re Holocaust Victims Assets Litig.*, 314 F. Supp. 2d 155, 164 (E.D.N.Y. 2004).  Here, nothing in the *Visa Check* notice advised class members that they were releasing, *in perpetuity*, all claims relating to Defendants' rule-based competitive restraints.  The notice simply quoted the Release, which addresses "conduct prior to

---

Decl. Ex. 9, Br. of Appellees/Class Representatives at II.B., *Visa Check*, 2004 WL 5707439 at 13 (underline emphasis added) ("[C]lass members are still free to pursue claims against defendants *unrelated to the conduct at issue in In re Visa Check.*  <u>They are also free to sue over conduct engaged in by defendants after January 1, 2004 that is related to the conduct at issue in *In re Visa Check*</u>."); *id.* at III (distinguishing *Stephenson v. Dow Chem. Co.*, 273 F.3d 249 (2d Cir. 2001), and emphasizing that "as the scope of the releases are limited in time to December 31, 2003, no class member will be barred from suing Visa and MasterCard for activity related to this case which is engaged in by defendants after that date.").

[13] Defendants' current argument about the Release is therefore barred by collateral estoppel.  Collateral estoppel applies when:  "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'"  *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citations omitted).

January 1, 2004."  The fact that the Second Circuit read that language to mean that "[c]onduct

occurring after December 31, 2003 is not precluded from being the subject of a future suit," *Wal-*

*Mart*, 396 F.3d at 124, is fatal to Defendants' argument that class members should have read that

same language differently.[14]  Because neither the notice nor the Release advised class members

that the Release could be read to bar future claims, forever, due process does not permit

Defendants' argument.

      The Second Circuit interpreted a similar release in *Remington Rand Corp. v. Amsterdam-*

*Rotterdam Bank, N.V.*, covering "all claims and causes of action whatsoever, which [the releasers]

ever had, now have, *or hereafter may have* against [the releasees] by reason of any matter

whatsoever from the beginning of time *to the effective date* of [the release]."  68 F.3d 1478, 1481

(2d Cir. 1995) (emphases added).  The Second Circuit construed this release as it construed the

*Visa Check* Release:  "On their face, the releases would appear to preclude any claims against the

Banks arising from conduct prior to their execution."  *Id.* at 1483.  The Second Circuit affirmed

dismissal *only* of pre-release damages and *not* post-release damages, notwithstanding that the

conspiracy began pre-release and continued thereafter:

> The Banks urge us to go further; they contend that the releases require dismissal of
> the entire action.  We disagree.  The Banks' position presupposes that the Banks

---

[14] The right to object is meaningless if the notice does not advise class members that their rights will be impaired and, as a result, does not allow them to protect their interests.  *Vassalle v. Midland Funding, LLC*, 708 F.3d 747, 759 & n.2 (6th Cir. 2013) (reversing approval of Rule 23(b)(3) settlement and holding that notice did not inform class members of release's effect on related lawsuits and failed to identify "principal ground" on which class member might object to settlement; right to opt out is "illusory" when notice failed to inform class members "of their most significant ground of objection"); *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1229 (11th Cir. 1998) (no claim preclusion because notice insufficient to inform plaintiff that claims akin to his were part of class claims); *Nat'l Super Spuds v. N.Y. Mercantile Exch.*, 660 F.2d 9, 16 (2d Cir. 1981) (lack of objection "means even less when, as here, the notice of settlement did not adequately apprise class members who also held claims in respect of unliquidated contracts that these too were being placed on the block although those class members were to receive nothing in return").

> committed no acts subsequent to the releases upon which their liability could be
> predicated.  Remington contends the Banks acted in complicity with BSI in a
> continuing wrongful use of Remington's trade secrets from June 1981 to the time
> of the complaint.  Although the releases shield the Banks from liability for any
> conduct through their effective dates, they do not protect the Banks from liability
> arising from any subsequent wrongful conduct.

*Id.* at 1485 (remanding for examination of post-release conduct).

Defendants rely heavily on *Madison Square Garden, L.P. v. NHL*, No. 07 Civ. 8455(LAP),
2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ("*MSG*"), for their argument that damages for
conduct after 2003 were released.  Defs.' Mem. 11-12.  But the terms of the release in *MSG* were
fundamentally different from those of the *Visa Check* Release because, in addition to not being a
class release, the *MSG* release expressly applied to conduct beyond the date of the release, i.e., to
"claims 'relating to, or arising from, any hockey *operations* or any [ongoing] NHL *activity*.'"
2008 WL 4547518, at *6 (alteration and emphases in original).  Here, by contrast and as detailed
above, the intent of the *Visa Check* parties was not to release claims for damages from conduct
occurring on or after January 1, 2004, even if that conduct was related to pre-2004 conduct.

Defendants also miscite *In re Literary Works in Electronic Databases Copyright
Litigation*, 654 F.3d 242, 248 (2d Cir. 2011), which held that future infringement claims could be
released precisely because—unlike in *Visa Check*—both the settled claims and the settlement
explicitly covered "future use" of the copyrighted works.[15]  The other cases on which Defendants
rely are also inapposite.[16]

---

[15] Defendants erroneously claim that "[t]here is no difference in principle between a release of future claims
based on allegedly continuing copyright violations, as in *In re Literary Works*, and a release of future
claims based on allegedly continuing antitrust violations, as in *Visa Check*."  Defs.' Mem. 10.  Not only
were the scope of the claims and settlements different, but releases are treated differently under antitrust
and copyright law.  As one commenter noted, while public policy condemns release of future antitrust
claims because antitrust law's "raison d'être is to prohibit forms of private ordering that have serious
negative effects for competition and consumers," copyright law does "not have a substantive policy against

Finally, even under Defendants' unfounded interpretation of the Release, determining

whether the Release applies to *all* of the allegations of the Complaint involves a fact-intensive

inquiry that cannot be performed on a motion to dismiss.  *See Wolson v. Reed Elsevier Inc.,* 09

Civ. 4040 (DC), 2010 WL 334919, at *2 (S.D.N.Y. Jan. 29, 2010) (declining to rule, on Rule

12(b)(6) motion, whether the prior class settlement in *Literary Works* released claims of

infringement continuing after the effective date of the release).  Plaintiffs have alleged many

instances of post-2003 conduct by Defendants, and there is no basis on which to conclude, on a

motion to dismiss, that *every* instance of post-2003 conduct is both related "to conduct prior to

January 1, 2004" and falls within the "identical factual predicate" of *Visa Check*.  For example,

Defendants elsewhere argue that their post-IPO activities have game-changing legal significance.

Defs.' Mem. 26-36.  Therefore, they cannot reasonably argue that their post-IPO activities should

---

future-conduct releases" because "a rule against future-conduct releases would make prospective licensing harder or impossible, to the great detriment of authors, publishers, and readers."  James Grimmelmann, *Future Conduct and the Limits of Class-Action Settlements*, 91 N.C. L. Rev. 387, 410 (2013).

[16] *VKK Corp. v. NFL*, 244 F.3d 114, 125-26 (2d Cir. 2001) (rejecting plaintiffs' argument that release itself should be voided under "part and parcel" doctrine and saying nothing about how release would apply to new conduct that occurred after date of release); *Smith v. Dada Entm't, LLC*, No.11-cv-7066, 2012 WL 4711414, at *3 (S.D.N.Y. Sep. 27, 2012) (release in question expressly released claims that a party might have in the future); *Willsea v. Theis*, No. 98-cv-6773, 1999 WL 595629, at *12 (S.D.N.Y. Aug. 6, 1999) (noting claims that previously existed and "were equally available" as counterclaims at time of release are properly barred); *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479 (LEK/DNH), 1999 U.S. Dist. LEXIS 10906, at [21], [22 & n.10] (N.D.N.Y. Mar. 11, 1999) (claim that policy was "facially illegal" barred as the invalidity "existed at the time" of the release and the claim had fully accrued); *Record Club of Am. v. United Artists Records*, 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (barring claim arising from an allegedly anticompetitive agreement when "plaintiff's cause of action arose before the release was signed"); *see also MCM Partners v. Andrews-Bartlett & Assocs.*, 161 F.3d 443, 448 (7th Cir. 1998) (affirming application of release to claims "clearly based on pre-[release] conduct" when no facts supported that defendants had engaged in post-release conduct that so much as reaffirmed their prior anticompetitive agreement); *Shane v. Humana, Inc.*, No. 00-MD-1334, 2009 U.S. Dist. LEXIS 130941, at *54 (S.D. Fla. Nov. 5, 2009) (applying release to claims "based on conspiratorial conduct and 'chain of events' that took place long before the execution and approval of these settlement agreements").

be viewed as "relating in any way to conduct prior to January 1, 2004" and thus properly covered by the Release.

## II. *ILLINOIS BRICK* DOES NOT BAR PLAINTIFFS' CLAIMS

In *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 488-89 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734-35 (1977), the Supreme Court respectively established that, under federal antitrust law, direct purchasers from antitrust violators have standing to sue for antitrust damages and indirect purchasers do not.

Defendants' motion to dismiss should be denied, first because Plaintiffs specifically allege that they directly paid interchange fees to issuing banks for Plaintiffs' acceptance of those banks' Visa and MasterCard credit and debit cards. Compl. ¶¶ 93, 105, 176, 177. Whether merchants in fact directly paid interchange is a question of fact—as Defendants maintained in the class case[17]— and therefore inappropriate for resolution on a Rule 12(b)(6) motion. Second, even assuming that Plaintiffs are indirect purchasers, *Illinois Brick* would not bar their Sherman Act damages claims because Plaintiffs would fall within recognized exceptions to *Illinois Brick*.

### A. *Illinois Brick* Does Not Bar Plaintiffs' Damages Claims Under the Sherman Act §§ 1 and 2 Because Plaintiffs Allege They Are Direct Purchasers

Plaintiffs specifically allege that they are direct purchasers, Compl. ¶¶ 93, 105, 176, 177, and plead further facts in support. As detailed above at 7-8, and in the Complaint, when a consumer makes a purchase from a merchant using a Visa or MasterCard credit or debit card, the

---

[17] Defs.' Mem. Law Opp. Class Cert. at 81, *Interchange*, No. 05-md-1720, ECF No. 1166 ("the application of *Illinois Brick* here requires extensive individual proof concerning whether each putative class member is, in fact, a direct purchaser"); *id.* at 84 ("Determining whether any given merchant purchases network services directly from a defendant or a middleman will require an individualized review of that merchant's acquiring and processing relationships throughout the putative class period."); *id.* at 89 ("Determining whether class members can seek relief despite *Illinois Brick*, therefore, requires analysis of complicated factual questions specific to each merchant").

17

bank that issued the card deducts the interchange fee from the purchase price owed to the merchant.  *See* Compl. ¶ 105.  This is a payment taken by the issuing bank directly out of the merchant's funds for the merchant's acceptance of the issuing bank's payment product.  Merchants purchase the acceptance of issuers' credit and debit cards, and issuers charge them for it.  Accordingly, issuing banks account for interchange as revenue, and merchants account for interchange as an expense.  *Id.*[18]  In contrast, acquiring banks do not pay interchange to issuing banks because acquiring banks are not purchasing the acceptance of issuing banks' payment cards.  Thus, it makes no sense to classify acquirers as direct purchasers and merchants as indirect purchasers.

Against a fully developed record in *Visa Check*, this Court twice reasoned that merchants directly pay interchange fees.  First, in the Court's opinion in *Visa Check* granting the merchant class partial summary judgment on the merchants' Sherman Act § 1 tying claims for supra-competitive interchange, and specifically where the Court denied Visa and MasterCard's motion for summary judgment on the merchants' Sherman Act § 2 claims for Visa and MasterCard's

---

[18] The economic reality that merchants pay interchange is also evident in the fact that the specific amount of the interchange from Defendants' default interchange schedules depends significantly on the type of merchant, e.g., a grocery store, and other merchant- and transaction-specific characteristics.  As the district court held in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d at 340-41:

> Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards.  (*See* Ex. P-0024 at 0685656 (adopting an interchange strategy under which "[h]igher increases are recommended in [merchant] segments where the strategic value of bankcards is higher."); *see also* Schmidt (Visa U.S.A.) Dep. at 100-02, 117-20 (Visa's interchange pricing strategy considers the price sensitivities of different merchant segments); Pascarella (Visa U.S.A.) Dep. at 282-83, 285-86.) Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick and mortar' merchants.  Defendants rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions.

18

attempt and conspiracy to monopolize the debit market, the Court held: "The merchants are direct consumers of the defendants' debit card services and are directly injured by their allegedly anticompetitive conduct." 2003 WL 1712568, at *6. That injury—supra-competitive interchange that merchants paid to issuing banks—is precisely the same as Plaintiffs allege here.

Four years later, in *Temple v. Circuit City Stores, Inc.*, this Court addressed Sherman Act claims asserted by consumers against merchants for higher merchant prices resulting from the supra-competitive interchange fees imposed by Visa and MasterCard on merchants through the credit/debit tie at issue in *Visa Check*. Nos. 06-cv-5303(JG), 06-cv-5304(JG), 2007 WL 2790154, at *1 (E.D.N.Y. Sept. 25, 2007). The Court granted the merchant defendants' motion to dismiss, reasoning that it was the merchants who were the direct purchasers harmed by supra-competitive interchange imposed by the credit/debit tie and therefore merchants were the best placed parties to "'vindicate the public interest in antitrust enforcement' by bringing an action against Visa and MasterCard themselves," which the merchants did in *Visa Check*. *Id.* at *5 (citation omitted).

These decisions reflect the stark reality that acquiring banks do not pay interchange, and the interchange fee is not passed from the acquiring bank to the issuing bank. This Court's most recent opinion and the Second Circuit acknowledge that only the net transaction amount, i.e., the purchase price owed the merchant minus the interchange fee, is sent from the issuing bank to the merchant's account at the acquiring bank. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, -- F. Supp. 2d --, 2013 WL 6510737, at *1 (E.D.N.Y. Dec. 13, 2013) ("The issuing bank . . . transmits to the acquiring bank the amount of the purchase price minus the 'interchange fee.'"); *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 235 (2d Cir. 2003) (affirming

19

findings of fact and conclusions of law after a bench trial) ("The issuer . . . pays the acquiring bank the amount requested, less what is called an 'interchange fee.'"); Compl. ¶ 105.

Defendants argue that this Court's statement in its much earlier *Visa Check* opinion certifying the class, that the acquiring bank pays the issuing bank the interchange fee, establishes as a matter of law that merchants indirectly pay interchange to issuers.  Defs.' Mem. 13-15 (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 72 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001)).  But the Court, 14 years ago, was not considering whether merchants directly pay interchange.  The Court subsequently did consider the issue on summary judgment in *Visa Check* in 2003 and found that merchants directly pay interchange, 2003 WL 1712568, at *6, as the Court again stated in *Temple*, 2007 WL 2790154, at *4-5.  And, in approving the *Interchange* class settlement in December 2013, the Court found that the interchange fee remains with the issuing bank.  *Interchange*, 2013 WL 6510737 at *1.

Defendants misquote Plaintiffs' Complaint that "the 'deduction of Interchange Fees' is made 'from the net transaction amount *received by the Acquirer*.'"  Defs.' Mem. 14 (citing 7-Eleven Compl. ¶¶ 105-06).  Defendants apparently intend to suggest that the interchange fee is paid out of the acquirer's funds.  The paragraph of Plaintiffs' Complaint that Defendants purport to quote, however, actually refers to the "*prior* deduction of Interchange Fees from the net transaction amount received by the Acquirer," Compl. ¶ 106 (emphasis added).  In other words, the acquirer never receives the interchange fee because it is deducted by the issuer *prior* to the acquirer's receipt of the funds.  Accordingly, acquiring banks account for interchange neither as revenue (because they do not receive it) nor as an expense (because acquiring banks are not purchasing the ability to accept the issuing bank's credit card).  *See id.* ¶¶ 105-06.

20

The three cases on which Defendants rely for their argument that merchants indirectly pay interchange are off point. None of them involved allegations that merchants directly paid interchange fees for credit or debit transactions. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 744, 746-47, 749-50 (9th Cir. 2012) (plaintiffs did "not dispute that they pay the purportedly unlawful interchange fee only indirectly");[19] *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1049 (9th Cir. 2008) (plaintiffs erroneously alleged that Visa and MasterCard charged interchange *to* issuing banks which then passed interchange to merchants); *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 285, 291 (2d Cir. 2006) (in challenge to penalties called "chargebacks," plaintiff alleged that "each issuing bank is free to decide on its own whether to issue a chargeback *to the acquiring bank* and the "acquiring bank then decides on its own whether to assess the chargeback against the merchant's account").

**B. Even Assuming, Contrary to Plaintiffs' Allegations, That Plaintiffs Paid Interchange Fees to Acquiring Banks, *Illinois Brick* Would Not Bar Plaintiffs' Sherman Act §§ 1 and 2 Damages Claims**

Defendants argue, contrary to the Complaint, that Plaintiffs are indirect purchasers because merchants pay interchange fees to acquiring banks and acquiring banks then pay interchange to issuing banks. Even if this argument were accurate, Plaintiffs would fall within two exceptions to the indirect-purchaser rule established by the courts in the 35-plus years since *Illinois Brick*: the co-conspirator exception and the ownership-or-control exception. If Plaintiffs come within either of these two exceptions, then Plaintiffs' federal damages claims are not barred by *Illinois Brick*.

---

[19] Defendants incorrectly claim, and without citation, that "the opt-outs rely on the same 'mark up' theory rejected as a matter of law in *In re ATM Fee*." Defs.' Mem. 18. Plaintiffs do not allege such a theory.

### 1.      The co-conspirator exception would allow Plaintiffs to recover

The co-conspirator exception to *Illinois Brick* allows buyers to recover for purchases made through intermediaries if the intermediaries are co-conspirators because, in that case, the buyers directly purchase from the conspiracy.  *See Paper Sys., Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 631-32 (7th Cir. 2002) (Easterbrook, J.) ("right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator 'exception' to *Illinois Brick*, but it would be better to recognize that *Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 604-05 (7th Cir. 1997) (Posner, J.) ("if the plaintiffs [retail pharmacies] went on to obtain a judgment against the wholesalers and manufacturers, any indirect-purchaser defense would go by the board, since the pharmacies would then be direct purchasers from the conspirators"); *Laumann v. NHL*, 907 F. Supp. 2d 465, 481 (S.D.N.Y. 2012) (footnotes omitted) ("holding that the first purchaser who is not party to the unlawful agreements to restrain trade has standing to sue is not an *exception* to *Illinois Brick*, but rather a recognition that *Illinois Brick* 'bans Clayton Act lawsuits by persons who are not direct purchasers *from the defendant antitrust violator[s]*'").

"The first buyer from a conspirator is the right party to sue."  *Paper Systems*, 281 F.3d at 631 (citing *Hanover Shoe*, *Illinois Brick*, and *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 208 (1990)).  The "immediate victims" of the anticompetitive conduct are directly injured.  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 541-42 (1983); *see also Utilicorp United*, 497 U.S. at 207 (defining indirect purchasers as those that are not "the immediate buyers from the alleged antitrust violators"); *accord California v. ARC Am. Corp.*, 490

22

U.S. 93, 97 (1989).  As this Court reasoned in dismissing consumers' claims based on supra-competitive interchange, interchange fees are "first imposed upon" merchants, and therefore merchants are the directly-injured parties entitled to enforce the Sherman Act with respect to anticompetitive interchange.  *Temple*, 2007 WL 2790154, at *4-5; *see also Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478, 481 (7th Cir. 1980) (*Illinois Brick* bar does not apply "where the manufacturer and the intermediary are both alleged to be co-conspirators in a common illegal enterprise resulting in intended injury to the buyer").

Plaintiffs have alleged that the Bank Defendants, as both issuing banks and acquiring banks, collusively set interchange rates through Visa and MasterCard.  Compl. ¶¶ 76-86.  Plaintiffs have also alleged that all acquirers are part of the conspiracy.  *Id.* ¶¶ 90, 103, 137.  Therefore, for purposes of this motion, Plaintiffs must be considered "the first buyer[s]" from the conspiracy and "the right part[ies] to sue" even if they paid interchange to acquiring banks.

Further, Plaintiffs have alleged as damages, and are entitled to recover, the full amount of the interchange fee overcharge created by the price-fixing conspiracy.  *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159-60 (3d Cir. 2002); *Paper Systems*, 281 F.3d at 631-32 ("*Hanover Shoe* and *Illinois Brick* allocate to the first non-conspirator in the distribution chain the right to collect 100% of the damages."); *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 327 (9th Cir. 1980) (reversing summary judgment for defendants as to plaintiff's purchases through defendant's subsidiary and holding that plaintiff was entitled to recover the entire overcharge and not just what was passed-on by the intermediary); *In re Sugar Industry Antitrust Litig.*, 579 F.2d 13, 17-18 (3d Cir. 1978) (vacating summary judgment for defendants and holding that *Illinois Brick* did not bar plaintiff's Sherman Act damages claims).  It is irrelevant that

23

Plaintiffs do not additionally allege "that banks and Visa or MasterCard conspired to fix the merchant discount fees that the opt-outs paid to their acquiring banks." *See* Defs.' Mem. 20. Plaintiffs need not make such an allegation to recover damages, because Plaintiffs are entitled to the full amount of the collusive interchange overcharge.

### 2.   The ownership-or-control exception would allow Plaintiffs to recover

"The Supreme Court expressly recognized an exception to *Illinois Brick* 'where the direct purchaser is owned or controlled by its customer,' and courts have 'expanded [the exception] to include instances where the defendant owns or controls the intermediary that sold the goods to the indirect-purchaser plaintiff.'" *Laumann*, 907 F. Supp. 2d at 481 (citing *Illinois Brick*, 431 U.S. at 736 n.16; *In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 101 (E.D.N.Y. 2012)). "The 'ownership or control' exception is now firmly established. . . ." *Vitamin C*, 279 F.R.D. at 101.

Where the direct purchasers are owned or controlled by the conspirators, the risk of apportioning damages between the direct and indirect purchasers is not a factor because "[t]here is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator." *Royal Printing*, 621 F.2d at 326 (reversing summary judgment for defendants as to plaintiff's purchases through defendant's subsidiary and holding that plaintiff was entitled to recover the entire overcharge and not just what was passed-on by the intermediary). Therefore, like the co-conspirator exception, the ownership-or-control exception is based on the logic that purchasers from owned or controlled intermediaries "are the first or *only* victims of alleged anticompetitive agreements [and] the rationale for the *Illinois Brick* bar disappears." *Laumann*, 907 F. Supp. 2d at 481.

Plaintiffs' factual allegations, which Defendants ignore, qualify Plaintiffs under the ownership-or-control exception to *Illinois Brick*.  Plaintiffs specifically allege ownership or control of each defendant acquiring bank by a Bank Defendant.  Compl. ¶¶ 76-77 (Bank of America), ¶¶ 78-79 (Chase), ¶¶ 80-81 (Citi), and ¶¶ 82-83 (Wells Fargo).  Plaintiffs allege that the Bank Defendants, including their owned or controlled acquiring banks, conspired among themselves and the Bank Defendants' subsidiary issuing banks "not to compete for merchants' acceptance of General Purpose Payment Cards, to require the payment of an Interchange Fee on every Visa and MasterCard transaction, and to fix the level of Interchange Fees that they charge to merchants to impose supra-competitive interchange on Plaintiffs."  Compl. ¶ 84.  Because the Bank Defendants' acquiring banks would neither sue their affiliated issuing banks, nor sue other Bank Defendants and thereby reveal their own corporation's participation in the conspiracy, *Royal Printing*, 621 F.2d at 326, merchants—even assuming that they paid interchange fees to acquiring banks—"are the first or *only* victims of [the] alleged anticompetitive agreements [and] the rationale for the *Illinois Brick* bar disappears," *Laumann*, 907 F. Supp. 2d at 481.

Plaintiffs further allege that the Bank Defendants, Visa, and MasterCard also control other acquirers by binding the other acquirers to the networks' anticompetitive rules.  Compl. ¶¶ 90, 137-38.  "[A]greements ceding operating control" or other contractual relationships can show control for purposes of the ownership-or-control exception.  *In re G-Fees Antitrust Litig.*, 584 F. Supp. 2d 26, 33 (D.D.C. 2008).  In *G-Fees*, the court denied the defendants' Rule 12(b)(6) motion to dismiss on indirect-purchaser grounds because "plaintiffs allege sufficient facts to justify an inference of control" by defendants of intermediary banks, where the defendants were "the source of 75% of the intermediary banks' liquidity that was necessary for conforming home mortgages,

and plaintiffs allege the methods of control by alleging the existence of agreements between defendants and lenders setting forth defendants' requirements for lenders to pass G-fees on to plaintiffs." *Id.* at 33-34. Similarly here, Defendants control other acquirers because, if other acquirers want to acquire merchants for Visa and MasterCard, they must comply with Defendants' anticompetitive rules.

Defendants argue that the ownership-or-control exception does not apply because it is possible that the acquiring banks would sue Visa or MasterCard, "given the history of acquirers bringing antitrust claims of the very type that the opt-outs assert." Defs.' Mem. 19 (citing *Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), and *Visa U.S.A. Inc. v. First Data Corp.*, No. C 02-01786, 2006 WL 1310448 (N.D. Cal. May 12, 2006)). The cited cases demonstrate that Defendants' argument is without merit. First, NaBanco was not an acquiring bank. 596 F. Supp. at 1239-40. Second, Visa argued in *NaBanco* that "[o]nly the merchant banks with which NaBanco contracts or, alternatively, the merchants themselves, are direct enough purchasers of IRF [issuers' reimbursement fee, i.e., interchange] to be eligible to sue under Section 4 [of the Clayton Act for antitrust damages]." *Id.* at 1242. In rejecting Visa's argument that the acquiring banks had standing to sue, the *NaBanco* court reasoned similarly to the justification behind the ownership-or-control exception: "Visa essentially invites its members to sue themselves for antitrust violations from which they in fact may benefit." *Id.* at 1247. Third, in *First Data*, Visa argued that merchants were directly harmed by the Honor All Cards rules' impact on interchange, and the *First Data* court held only that there was a question of fact as to whether First Data had standing to sue. 2006 WL 1310448, at *4. Even if transaction processors like NaBanco and First Data have standing to sue Visa, MasterCard, and the Bank Defendants,

26

that does not mean they would do so in these circumstances, or that merchants do not have standing. Both processors and merchants may have standing to sue for different injuries. The *First Data* court expressly acknowledged the merchant class action pending in this Court and rejected Visa's argument that First Data should be denied standing because of Visa's claimed risk of duplicative liability to First Data and the merchant class. 2006 WL 1310448, at *7.[20]

## III.   *BUFFALO BROADCASTING* DOES NOT BAR PLAINTIFFS' SECTION 1 CLAIMS

Defendants argue that Plaintiffs' Sherman Act § 1 claims are barred by *Buffalo Broadcasting*. Defendants premise their argument on the fact that the plain terms of the default interchange rules do not "impair the freedom of banks to establish interchange fees different from the default fees," i.e., to establish bilateral agreements between merchants and issuers for lower interchange fees. Defs.' Mem. 2, 21. Defendants' argument should be rejected for two reasons. First, Plaintiffs allege that Defendants' Honor All Issuers and default interchange rules do "impair the freedom of banks to establish interchange fees different from the default fees" and therefore that they are restraints of trade under *Buffalo Broadcasting*. Second, *Buffalo Broadcasting* and the other authority cited by Defendants demonstrate that Plaintiffs' claims involve factual questions incapable of resolution on a Rule 12(b)(6) motion.

---

[20] Defendants cite *In re ATM Fee Antitrust Litigation*, 686 F.3d 741 (9th Cir. 2012), and *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), for the proposition that the ownership-or-control exception does not apply to interchange. Defs.' Mem. 20. *ATM Fee* involved ATM interchange which, as discussed above, is a different price paid *by* ATM-card-issuing banks for different services provided by issuing banks to ATM cardholders. Moreover, in that case "neither Bank Defendants nor Star [the ATM network] [we]re divisions or subsidiaries of the other." 686 F.3d at 756. Therefore, the Ninth Circuit held that the *ATM Fee* plaintiffs could not invoke the ownership-or-control exception. *Id. Kendall* only tested the sufficiency of different and incorrect allegations concerning interchange fees. Unlike in those cases, Plaintiffs here have detailed allegations why the ownership-or-control exception applies.

In *Buffalo Broadcasting*, the Second Circuit held that there was no restraint only after trial, and concluded "that the evidence was insufficient" to show a restraint "in the legal and factual context in which it currently exists."  744 F.2d at 919, 924-33.  The Second Circuit's central holding, as Defendants' brief acknowledges, was that ASCAP's blanket music copyright license did not restrain trade because it "did not 'restrain willing buyers and sellers from negotiating'" for individual licenses and there were "'realistically available alternatives'" to the blanket license. Defs.' Mem. 24 (quoting *Buffalo Broadcasting*, 744 F.2d at 929, 932-33).  The Second Circuit reached this conclusion after analyzing evidence of the economic viability of alternatives to the ASCAP blanket license, 744 F.2d at 924-33, including the existence of the judicially enforceable consent decree which created the "rate court" in the Southern District that permits licensees "to apply to the District Court for the determination of a 'reasonable' fee, and in such a proceeding, 'the burden of proof shall be on ASCAP to establish the reasonableness of the fee,'" *id.* at 923, 927-28.  The Southern District rate court created a unique, realistically available alternative. *Id.* at 927-28.

Plaintiffs here allege that, while the default interchange rules nominally allow for bilateral agreements between issuing banks and merchants, the Honor All Issuers rules eliminate the economic incentive for issuing banks to negotiate lower-interchange bilateral agreements because the Honor All Issuers rules guarantee that issuers' cards will be accepted at the higher default interchange rates.  Compl. ¶¶ 97-99.  Unlike the optional blanket license in *Buffalo Broadcasting*, merchants have no choice but to accept all issuing banks' cards per Defendants' Honor All Issuers rules.  Thus, the more accurate analogy to *Buffalo Broadcasting* would be to ASCAP's requiring all licensees to accept the blanket license, which was held unlawful after antitrust challenges by

28

movie-theater operators and the Department of Justice.  744 F.2d at 922-23.  Plaintiffs further

allege that there have been no bilateral agreements entered into between merchants and Visa or

MasterCard issuing banks, Compl. ¶¶ 99, 102, and therefore such agreements are not "realistically

available alternatives."  The Honor All Issuers and default interchange rules thus do "impair the

freedom of banks" to negotiate with merchants and as such constitute restraints of trade.[21]

Defendants acknowledge Plaintiffs' factual allegations that Defendants' Honor All Issuers

rules make it so that "'it does not make economic sense'" for issuers to compete on interchange

through bilateral agreements and that issuers have not done so.  Defs.' Mem. 22-23 & n.7 (citing

7-Eleven Compl. ¶¶ 98-99).  In an attempt to avoid the consequences of these factual allegations

for purposes of this motion, Defendants attack a straw complaint and argue that the default

interchange rules by themselves do not restrain trade because the plain terms of the default

interchange rules do not prohibit bilateral agreements.

In *Buffalo Broadcasting*, the Second Circuit discussed how the Supreme Court rejected

such an argument in *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85

(1984), in which "the restraining effect of the challenged agreement arose not by virtue of its

terms alone, but because as a 'practical' matter no 'real' alternative existed whereby individual

negotiations could occur between member schools and television broadcasters."  744 F.2d at 925.

The Supreme Court in *NCAA* held, after trial, that there was no real alternative and therefore that a

---

[21] Defendants argue that the default interchange rules do not prohibit banks from providing other payment-card services, such as American Express and Discover.  Defs.' Mem. 23.  This is a red herring because the banks' alleged freedom to issue cards over other networks says nothing about whether the banks have agreed not to compete for merchant acceptance with respect to the dominant Visa and MasterCard networks.  In any event, during the damages period, the Visa and MasterCard rules condemned in *United States v. Visa* did prohibit member banks from issuing American Express and Discover cards for a period of time, and the overhang of these rules has limited those networks' access to the banks to this day.  To the extent relevant to this lawsuit, these are issues of fact.

29

restraint of trade existed, the "anticompetitive consequences" of which were "apparent." 468 U.S. at 88, 105-06. Similarly here, bilateral agreements are not a real alternative because of the Honor All Issuers rules, notwithstanding the lip service given to bilateral agreements by the language of the default interchange rules.

Defendants' attempt to isolate the terms of the default interchange rules from their effects in tandem with the Honor All Cards rules also runs afoul of the Supreme Court's mandate that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) (internal quotations and citations omitted).[22] The Honor All Issuers and default interchange rules' practical and economic effects cannot be assessed in isolation. They are the two sides of the same anticompetitive coin.

Moreover, assessing the effects of the Honor All Issuers and default interchange rules and whether merchants have any competitive alternatives are questions of fact. The *Buffalo Broadcasting* court reached its conclusion only after "[c]losely analyzing the factual record," *Meredith Corp. v. SESAC LLC*, No. 09 Civ. 9177(PAE), 2014 WL 812795, at *14 (S.D.N.Y. Mar. 3, 2014), and examining the evidence of economic and legal alternatives available to the plaintiffs in that case. 744 F.2d at 919, 924-33. Similarly, in the other authorities cited by Defendants, the availability of realistic alternatives was a question of fact requiring discovery or trial. *See Cont'l*

---

[22] *Accord In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655-56 (7th Cir. 2002) (reversing summary judgment; "The second trap to be avoided in evaluating evidence of an antitrust conspiracy for purposes of ruling on the defendants' motion for summary judgment is to suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment."); *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (affirming jury verdict for plaintiff on monopolization claim; allegations of "exclusionary practices [are to be] considered together").

*Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516-17 (4th Cir. 2002) (vacating summary judgment because of "multiple factual disputes" concerning existence of realistically available alternatives); *Matsushita Elec. Indus. Co., Ltd. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 373 (D. Del. 2004) (granting summary judgment only after discovery on availability of alternatives to pooled-patent license).[23]

## IV.   THE COMPLAINT SPECIFICALLY PLEADS BOTH HORIZONTAL AGREEMENTS AMONG THE BANK DEFENDANTS AND VERTICAL AGREEMENTS, THEREBY SATISFYING THE SHERMAN ACT § 1 REQUIREMENT OF CONCERTED ACTION BY MULTIPLE ACTORS

To allege concerted action under the Sherman Act § 1, "a plaintiff need only allege 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)) (denying Rule 12(b)(6) motion to dismiss complaint alleging price fixing by record labels); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").  "[P]roof of a conspiracy will rarely consist of explicit agreements.  Rather, conspiracies nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."  *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 689 (S.D.N.Y. 2013) (quotations omitted).

---

[23] *Federal Paper Board Co., Inc. v. Amata*, 693 F. Supp. 1376, 1384-85 (D. Conn. 1988), is inapposite because there the court held only that no restraint of trade is created by commercial bribery without more. *National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986), did not decide whether Visa's default interchange rule was a restraint; to the contrary, the court's analysis proceeded on the premise that the rule was a restraint.  *See id.* at 601-02.  While *NaBanco* upheld the restraint under the rule of reason after trial, Defendants have not moved to dismiss on that ground.

The Complaint exceeds the requirement to plead facts, assumed true for this motion, from which an inference of horizontal agreements among the Bank Defendants continuing after Visa's and MasterCard's respective IPOs "may be fairly drawn."  The Complaint pleads specific horizontal agreements among the Visa and MasterCard member banks that the Visa and MasterCard IPOs were conditioned by the competing banks that set Visa's and MasterCard's policies, *see United States v. Visa*, on the continuation of the Honor All Issuers and default interchange rules in post-IPO Visa and MasterCard.  Compl. ¶¶ 85-86, 127.  These allegations by themselves plead direct horizontal agreements to perpetuate the unlawful conduct post-IPO. Moreover, the Complaint pleads the execution of these horizontal agreements, i.e., the banks' continued adherence to the Honor All Issuers and default interchange rules, as acts in furtherance of these conspiracies.  *See id.* ¶¶ 130-32.  Defendants' arguments to the contrary are meritless because they disregard and mischaracterize these and other factual allegations.  Also, Defendants do not dispute that, after the IPOs, Visa and MasterCard each entered into written issuing and acquiring agreements with each of the Bank Defendants and other issuing and acquiring banks. These horizontal and vertical agreements among independent actors satisfy Sherman Act § 1's requirement of a "contract, combination . . . , or conspiracy."  Further, as explained below, the fact that Visa and MasterCard restructured their ownership via the IPOs neither amounts to withdrawal from the conspiracies nor shields Defendants from Sherman Act § 1.

### A.      The Complaint Pleads the Facts of Horizontal Agreements Among the Banks

Prior to their IPOs, Visa and MasterCard were member associations owned by, and comprised of, thousands of member banks.  Compl. ¶¶ 67-68, 72.  Each network was governed by its respective board of directors comprised of bank executives selected from the network's

32

member banks.  *Id.* ¶¶ 69, 73.  The Complaint details how Visa's and MasterCard's member banks

governed the networks and controlled every aspect of the networks' businesses, including

maintaining the Honor All Issuers and default interchange rules.  *See, e.g.*, *id.* ¶¶ 95-104, 128.

The banks decided to divest themselves of formal control of, and some of their ownership

interests in, the networks in 2006 (MasterCard) and 2008 (Visa).  The Complaint alleges that these

dramatic changes embraced by the banks occurred, not because they wanted to change the

substance of the way they had done business through Visa and MasterCard for over 40 years, but

in the hopes that a new corporate form would shield them from Section 1 liability in the wake of

*United States v. Visa*, while continuing their anticompetitive restraints unabated.  *Id.* ¶¶ 126-27.

Plaintiffs' Complaint alleges that the member banks agreed to the Visa and MasterCard

IPOs only on the condition that the networks' anticompetitive rules would remain in place post-

IPO.  Compl. ¶¶ 85-86.  Further, Visa's public SEC filings confirm that Visa's members readopted

Visa's pre-IPO rules for post-IPO Visa, including the Honor All Issuers and default interchange

rules.  *Id.* ¶ 130; Shinder Decl. Ex. 2, *Amended and Restated Global Restructuring Agreement*

(Aug. 24, 2007), Annex A at A-7 ("the Parties shall . . . cause the Board of Directors of Visa USA

to cause the By-Laws of Visa USA to be amended and restated in their entirety . . . .").  Plaintiffs

also allege how the European Commission found, after a full investigation, that the banks only

agreed to the IPO "after MasterCard's management assured them that the banks' interests will

continue to be preserved . . . ."  Compl. ¶ 134.[24]  Plaintiffs further allege that, as Defendants had

---

[24] Defendants argue that "'allegations of anticompetitive wrongdoing in Europe,' made 'without an adequate allegation of facts linking transactions in Europe to transactions and effects here' cannot state an antitrust claim."  Defs.' Mem. 30 n.9 (quoting *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007)).  *In re Elevator*, however, concerned allegations of misconduct taking place in Europe, but not in the United States.  502 F.3d at 51-52.  That is not the case here.  The European Commission's findings relate to conduct that occurred in the United States; namely, MasterCard's IPO.

agreed, the Honor All Issuers and default interchange rules have remained in place since the IPOs, and therefore Visa and MasterCard continue to set interchange rates and issuing banks continue not to compete for merchant acceptance.  Compl. ¶¶ 130-32.

Defendants make much of the fact that plaintiffs "concede" that Visa and MasterCard changed their ownership structures through IPOs.  *See* Defs.' Mem. 27-28.  Visa's and MasterCard's IPOs, however, do not shield Defendants from scrutiny under the Sherman Act § 1.  Rather, the networks' recast legal status as stand-alone corporations is, by itself, irrelevant to the question of whether Defendants continued their illegal conspiracy after the IPOs.  The Supreme Court made that clear in *American Needle, Inc. v. NFL*:

> We have long held that concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities.  Instead, we have eschewed such formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate.

560 U.S. 183, 191 (2010).[25]  The Supreme Court applied this functional analysis to determine that the 32 NFL teams' decision to form NFL Properties, a legal entity to which each football team delegated its trademark licensing rights, did not shield the league from § 1.  The Court held:  "it is not dispositive that the teams have organized and own a legally separate entity that centralizes the management of their intellectual property.  An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label."  *Id.* at 197.

Post-IPO, each issuing bank, including each Bank Defendant, has delegated its decisions on pricing and other terms of merchants' acceptance to Visa and MasterCard, Compl. ¶ 129,

---

[25] In their *amicus* brief in *American Needle*, Visa and MasterCard agreed that "single-entity status depends on *substance* and not *form*."  *See* Br. of MasterCard Worldwide and Visa Inc. as Amici Curiae in Supp. of Respondents, No. 08-661, 2009 WL 4247980, at *20 (Nov. 24, 2009).  Visa and MasterCard urged the Supreme Court not to apply a "formalistic rule."  *Id.* at *1, *24 (internal quotations omitted).

similar to the NFL clubs' delegation of their trademark licensing authority to NFL Properties. Further, each bank has done so knowing and in furtherance of the banks' agreed-upon condition for the new corporate structures of Visa and MasterCard:  that the Honor All Issuers and default interchange rules continue post-IPO.  The banks' agreements to "centralize[] the management" of their individual pricing and other competitive decisions in Visa and MasterCard has created combinations in restraint of trade under the Sherman Act § 1.  Defendants suggest that "the opt-outs do not and cannot allege that each bank ever independently had the authority" to determine the price at which merchants must accept the banks' payment cards. Defs.' Mem. 34.  This suggestion is belied by the fact that, as Defendants acknowledge, banks have the authority to enter bilateral interchange agreements.  They do not do so because they have agreed not to compete.

## B.    Plaintiffs Allege Defendants Never Withdrew from Their Pre-IPO Conspiracy

Plaintiffs' allegations of the Bank Defendants' adherence to the Honor All Issuers and default interchange rules post-IPO reinforce the fact that the networks' IPOs were merely restructurings of corporate form, not substantive departures from Defendants' anticompetitive agreements which had been in place for decades.  The Second Circuit held in 2003 that Visa and MasterCard were consortiums of competing banks that "set the policies of Visa U.S.A. and MasterCard" and restrained trade.  *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003).  The policies set by the banks' horizontal conspiracies include the Honor All Issuers and default-interchange rules.  The pertinent question here is whether Defendants ever withdrew from those conspiracies.  This is a fact-intensive question on which Defendants bear the burden of proof and the resolution of which is improper on a motion to dismiss.  *See United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) ("[T]he burden of establishing withdrawal lies on the defendant.");

35

*United States v. Panebianco*, 543 F.2d 447, 454 n.5 (2d Cir. 1976); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 223 n.13 (3d Cir. 2008) ("Whether [defendant] withdrew from a conspiracy . . . is a jury question.").

Defendants have not met their burden of showing—as a matter of law at the pleading stage—that they withdrew from the anticompetitive conspiracies in which they had been engaged for decades.  To withdraw from a conspiracy, *inter alia*, a defendant must undertake "affirmative action . . . to disavow or defeat the purpose of the conspiracy."  *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988) (quotations omitted).  For example, a competitor withdrawing from a price-fixing conspiracy can "resum[e] . . . competitive behavior, such as intensified cutting or price wars."  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978).  "It is well-established that [m]ere cessation of activity is not enough."  *Berger*, 224 at 118.  The defendant must not "receive any additional benefits from the conspiracy" or take any subsequent act that promotes the purpose of the conspiracy.  *Id.*  "Unless a conspirator produces affirmative evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators."  *Panebianco*, 543 F.2d at 453.

Contrary to Defendants' withdrawing from the alleged conspiracies, the Complaint pleads facts showing that Defendants continued to abide by the very same rules and engage in the very same anticompetitive practices after the IPOs.  Compl. ¶¶ 130-32.  There has been no "resumption of competitive behavior," *U.S. Gypsum*, 438 U.S. at 464.  The banks continue to adhere to the Honor All Issuers rules, and Visa and MasterCard continue to set interchange fees without competition among issuing banks.  Thus, Plaintiffs allege that Defendants did nothing to disavow or defeat the purpose of their pre-IPO conspiracies; Defendants continued to benefit from their

anticompetitive conduct.  It is Defendants' factual burden to prove otherwise, and therefore inappropriate for resolution on a Rule 12(b)(6) motion to dismiss.[26]

### C.   The Continuing Horizontal Conspiracy Can Be Inferred Even Absent Allegations of Direct Post-IPO Communications

Defendants argue that Plaintiffs have not alleged any continuing direct communications among the banks post-IPO that demonstrate an agreement.  *See* Defs.' Mem. 30-33.  But allegations of continuing direct communications among competitors are not required to show a horizontal agreement.  In *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939), the Supreme Court inferred a conspiracy among movie distributors where there was no evidence of direct communications among the distributors, explaining that it was sufficient "knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it" when doing so was contrary to each distributor's independent competitive interest to increase its sales by allowing lower prices.  *Accord Toys "R" Us, Inc. v. FTC*, 221 F.3d 928 (7th Cir. 2000) (applying *Interstate Circuit* to uphold finding of horizontal agreement among toy manufacturers to boycott sales to discounting warehouse stores without any evidence of direct communication among toy manufacturers, because each manufacturer:  entered into similar agreement with Toys "R" Us to deny sales to discounters; knew that its competitors were doing

---

[26] *National ATM Council, Inc. v. Visa Inc.*, 922 F. Supp. 2d 73 (D.D.C. 2013), and *National ATM Council, Inc. v. Visa Inc.*, -- F. Supp. 2d --, 2013 WL 6671660 (D.D.C. Dec. 19, 2013), are cited repeatedly by Defendants and are inapposite.  *National ATM Council* concerned Visa's and MasterCard's respective Plus and Cirrus rules imposed on ATM operators precluding them from imposing differential surcharges on ATM cardholders.  The court dismissed the complaints because they alleged no facts showing that the banks had conspired, as members of Plus and Cirrus, to impose the rules at issue after the IPOs, 922 F. Supp. 2d at 96, and then denied plaintiffs leave to replead because the proposed amended complaints simply "reassert[ed] many of the same facts as originally pled."  2013 WL 6671660, at *9.

the same; and such refusals to sell manufacturers' products into a growing sales channel were contrary to their independent competitive interests).

The allegations here are even stronger than the facts of *Interstate Circuit* and *Toys "R" Us*. First, Plaintiffs have pled specific, direct horizontal agreements among the banks to condition the IPOs on continuation of the Honor All Issuers and default interchange rules. These direct horizontal agreements satisfy the pleading requirement for concerted action. Second, Plaintiffs have pled a continuing agreement to abide by these rules after the IPOs. Under the rule of *Interstate Circuit*, it is unnecessary to prove, let alone allege, direct communications among the banks to continue to adhere to these rules after the IPOs. Each bank agreed through Visa and MasterCard to the maintain these restrictions on competition—which are against the banks' individual competitive interests—post-IPO, and each bank has done so knowing that its competitors were doing the same and that the IPOs were conditioned on these agreements.

Moreover, by requiring merchants to accept all issuers' cards, the Honor All Issuers rule, by its very nature, tells issuers that they are all agreeing to the same restriction. The banks' adherence to the Honor All Issuers and default interchange rules is against each bank's independent competitive interest because it is not in an individual bank's interest to agree to restraints on a merchant that prevent the merchant from favoring that bank's products over its competitor's because of that bank's more competitive pricing. Compl. ¶¶ 98-99. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010) (reversing Rule 12(b)(6) dismissal where plaintiffs "alleged behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals") (quotations omitted); *In re Flat Glass Antitrust Litig.,* 385 F.3d 350, 360-361 (3d Cir. 2004) ("In a competitive industry . . . , a firm would cut its

38

price with the hope of increasing its market share if its competitors were setting prices above

marginal costs."); *Laumann v. NHL*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012).[27]

### D. Defendants' Flawed Assertions That Their Conduct Had Pro-Competitive Effects Are Inappropriate for Resolution on a Motion to Dismiss

Defendants' assertion that the banks had an independent interest in agreeing to these rules

because of their supposed procompetitive effects and profitability for the banks, Defs.' Mem. 30,

32-33, raises more questions of fact inappropriate for resolution on a Rule 12(b)(6) motion.

Moreover, the fact that actions might be in antitrust defendants' independent interests does not

save them from liability under the Sherman Act § 1 if they colluded to do what they otherwise

lawfully could have done independently. *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d

85, 103-04 (3d Cir. 2010) (reversing 12(b)(6) dismissal, citing *American Needle, Inc. v. NFL*, 560

U.S. 183, 190-91); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 648 (E.D. Mich.

2000) (denying motion to dismiss because "[d]efendants' . . . causation theories likewise ignore a

---

[27] Defendants' cases are inapposite.  In *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008) (Defs.' Mem. 31), plaintiffs alleged no facts to support their conclusory allegation of a conspiracy, which was based solely on the banks' alleged parallel conduct in paying fees to Visa and MasterCard and then recouping those fees from the plaintiffs.  *Id.* at 1048.  In the factually erroneous world of *Kendall*, it is correct that merely paying the same costs and recouping those costs from others does not plausibly suggest conspiracy.  In *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300, 311 (3d Cir. 2010) (Defs.' Mem. 31), plaintiffs alleged a "hub and spoke" conspiracy where insurance brokers acted as the "hub" and insurers the "spokes."  Plaintiffs alleged that the brokers were funneling unwitting clients to their co-conspirator insurers, who then paid brokers commissions that were surreptitiously priced into premiums. *Id.* at 308.  The court held plaintiffs had failed to allege a conspiracy under *Interstate Circuit* and *Toys "R" Us* because "[e]ach insurer's share of the market . . . depended on its ability to gain the broker's favor, not on the choices of its competitors," *id.* at 333, therefore there were no allegations of anything other than parallel conduct.  In *PSKS, Inc. v. Leegin Creative Leather Products, Inc.*, 615 F.3d 412 (5th Cir. 2010) (Defs.' Mem. 31), the court did not address whether the plaintiff alleged that the "spokes" of the alleged conspiracy had a common understanding that they would enter into similar agreements with the "hub."  It simply held that plaintiffs had failed to plead a conspiracy under *Toys "R" Us*.  *Id.* at 420.  In *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) (Defs.' Mem. 31-32), the court affirmed summary judgment because the plaintiff "failed to proffer sufficient evidence" that it was contrary to each competitor's self interest to engage in the conduct unless it knew that the other competitors would reciprocate.  *Id.* at 110-11. At the pleading stage, Plaintiffs are not required to "proffer sufficient evidence."

basic antitrust principle that, in antitrust cases such as this, the only difference between legal and illegal conduct is the existence of an agreement to do the same thing the parties could have done unilaterally and thus legally"), *aff'd,* 332 F.3d 896, 911-15 (6th Cir. 2003).

### E.     The Complaint Alleges Express Vertical Agreements

Defendants' argument that the Complaint fails to allege post-IPO vertical agreements subject to Sherman Act § 1, Defs.' Mem. 34-36, is baseless.  Plaintiffs alleged express vertical agreements between each of Visa and MasterCard and each of their issuing and acquiring banks. Compl. ¶¶ 137-38.  Defendants do not dispute the existence of these agreements.

Instead, Defendants cite *Howard Hess Dental Laboratories Inc. v. Dentsply International, Inc.*, 602 F.3d 237 (3d Cir. 2010), claiming that Plaintiffs are merely "reasserting a horizontal conspiracy claim as a vertical conspiracy claim."  Defs.' Mem. 36.  But horizontal and vertical agreements are not mutually exclusive.  For example, a "hub and spoke" conspiracy among horizontal entities (such as Bank Defendants) and an upstream or downstream entity (such as Visa and MasterCard) is "a hybrid of both vertical and horizontal conspiracies."  *Howard Hess*, 602 F.3d at 254; *see also Laumann*, 907 F. Supp. 2d at 486-87 ("It is well established . . . that a distributor's coordination of horizontal agreements in restraint of trade at the next distribution level by entering into a series of identical vertical agreements with multiple parties may subject all participants to antitrust liability.").[28]

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[28] *Howard Hess* held that the plaintiffs fell short of alleging a "hub-and-spoke" conspiracy by failing to "offer even a gossamer inference of any degree of coordination" among the dealers.  602 F.3d at 256.  By contrast, the Complaint pleads facts of agreements among Bank Defendants, Visa, and MasterCard.

DATED:  New York, New York
        May 5, 2014

                                        CONSTANTINE CANNON LLP


                                        By: _____/s_____
                                            Jeffrey I. Shinder
                                            Ankur Kapoor
                                            Gary J. Malone
                                             A. Owen Glist
                                            David A. Scupp
                                        335 Madison Avenue
                                        New York, New York 10017
                                        Telephone:  (212) 350-2700
                                        Facsimile:  (212) 350-2701
                                        Email: jshinder@constantinecannon.com

                                        *Attorneys for 7-Eleven Plaintiffs*

41