**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

7-ELEVEN, INC., ACADEMY, LTD. D/B/A ACADEMY
SPORTS + OUTDOORS, ALDO US INC. D/B/A ALDO AND
CALL IT SPRING, ALIMENTATION COUCHE-TARD INC.,
ALON USA, LP, AMAZON.COM, INC., AMERICAN
MULTI-CINEMA, INC., ASHLEY FURNITURE
INDUSTRIES INC., BARNES & NOBLE, INC., BARNES &
NOBLE COLLEGE BOOKSELLERS, LLC, BEALL'S, INC.,
BOSCOV'S, INC., BROOKSHIRE GROCERY COMPANY,
BUC-EE'S LTD., THE BUCKLE, INC., THE CHILDREN'S
PLACE RETAIL STORES, INC., COSTCO WHOLESALE
CORP., CRACKER BARREL OLD COUNTRY STORE,
INC., CUMBERLAND FARMS, INC., DICK'S SPORTING
GOODS, INC., DILLARD'S, INC., DRURY HOTELS
COMPANY, LLC, EUROMARKET DESIGNS, INC., D/B/A
CRATE & BARREL AND CB2, MEADOWBROOK, L.L.C.,
D/B/A THE LAND OF NOD, EXPRESS, LLC, FAMILY
DOLLAR STORES, INC., FAMILY EXPRESS
CORPORATION, FLEET WHOLESALE SUPPLY CO., INC.,
MILLS MOTOR, INC., MILLS AUTO ENTERPRISES,
INC., WILLMAR MOTORS, LLC, MILLS AUTO CENTER, INC.,
FLEET AND FARM OF ALEXANDRIA, INC., FLEET
WHOLESALE SUPPLY OF FERGUS FALLS, INC., FLEET
AND FARM OF GREEN BAY, INC., FLEET AND FARM OF
MENOMONIE, INC., MILLS FLEET FARM, INC., FLEET
AND FARM OF MANITOWOC, INC., FLEET AND FARM
OF PLYMOUTH, INC., FLEET AND FARM SUPPLY
COMPANY OF WEST BEND, INC., FLEET AND FARM OF
WAUPACA, INC., MILLS E-COMMERCE ENTERPRISES,
INC., BRAINERD LIVELY AUTO, LLC, FOOT LOCKER,
INC., THE GAP, INC., GENESCO INC., GNC HOLDINGS,
INC., IKEA NORTH AMERICA SERVICES, LLC, J. CREW
GROUP, INC., LOWE'S COMPANIES, INC., MICHAELS
STORES, INC., NEW YORK & COMPANY, INC., NIKE,
INC., P.C. RICHARD & SON, INC., PACIFIC SUNWEAR OF
CALIFORNIA, INC., PANDA RESTAURANT GROUP, INC.,
PANERA BREAD COMPANY, RALPH LAUREN
CORPORATION, RECREATIONAL EQUIPMENT, INC.,
REPUBLIC SERVICES, INC., RESTORATION
HARDWARE, INC., ROUNDY'S SUPERMARKETS, INC.,
STARBUCKS CORPORATION, STEIN MART, INC.,
SWAROVSKI U.S. HOLDING LIMITED, THE TALBOTS,
INC., THERMO FISHER SCIENTIFIC INC., THORNTONS

**FOURTH AMENDED**
**COMPLAINT AND JURY**
**DEMAND**

No. 13-cv-05746(MKB)(JO)

14-md-1720(MKB)(JO)

INC., THE WET SEAL, INC., WHOLE FOODS MARKET
GROUP, INC., WHOLE FOODS MARKET ROCKY
MOUNTAIN/SOUTHWEST, L.P., WHOLE FOODS
MARKET CALIFORNIA, INC., MRS. GOOCH'S NATURAL
FOOD MARKETS, INC., WHOLE FOOD COMPANY,
WHOLE FOODS MARKET PACIFIC NORTHWEST, INC.,
WFM-WO, INC., WFM NORTHERN NEVADA, INC., WFM
HAWAII, INC., WFM SOUTHERN NEVADA, INC., THE
WILLIAM CARTER COMPANY, COBORN'S,
INCORPORATED, D'AGOSTINO SUPERMARKETS, INC.,
JETRO CASH & CARRY ENTERPRISES, LLC, JETRO
HOLDINGS, LLC, NATIONAL ASSOCIATION OF
CONVENIENCE STORES, NATIONAL COMMUNITY
PHARMACISTS ASSOCIATION, NATIONAL GROCERS
ASSOCIATION, HMSHOST CORPORATION, SEARS
HOLDINGS CORPORATION, AND YUM! BRANDS, INC.,

*Plaintiffs,*

v.

VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL
SERVICE ASSOCIATION, MASTERCARD
INCORPORATED, MASTERCARD INTERNATIONAL
INCORPORATED, BANK OF AMERICA CORPORATION,
BANK OF AMERICA, N.A., FIA CARD SERVICES, N.A.,
JPMORGAN CHASE & CO., CHASE BANK USA, N.A.,
CHASE PAYMENTECH SOLUTIONS, LLC, JPMORGAN
CHASE BANK, N.A., CITIGROUP INC., CITIBANK, N.A.,
CITICORP PAYMENTS SERVICES, INC., WELLS FARGO
& COMPANY, AND WELLS FARGO BANK, N.A.,

*Defendants.*

Plaintiffs 7-Eleven, Inc., Academy, Ltd. d/b/a Academy Sports + Outdoors, Aldo US Inc.

d/b/a Aldo and Call It Spring, Alimentation Couche-Tard Inc., Alon USA, LP, Amazon.com,

Inc., American Multi-Cinema, Inc., Ashley Furniture Industries Inc., Barnes & Noble, Inc.,

Barnes & Noble College Booksellers, LLC, Beall's, Inc., Boscov's, Inc., Brookshire Grocery

Company, Buc-ee's Ltd., The Buckle, Inc., The Children's Place Retail Stores, Inc., Costco

Wholesale Corp., Cracker Barrel Old Country Store, Inc., Cumberland Farms, Inc., Dick's

Sporting Goods, Inc., Dillard's, Inc., Drury Hotels Company, LLC, Euromarket Designs, Inc.,

d/b/a Crate & Barrel and CB2, Meadowbrook, L.L.C., d/b/a The Land of Nod, Express, LLC,

Family Dollar Stores, Inc., Family Express Corporation, Fleet Wholesale Supply Co., Inc., Mills

Motor, Inc., Mills Auto Enterprises, Inc., Willmar Motors, LLC, Mills Auto Center, Inc., Fleet

and Farm of Alexandria, Inc., Fleet Wholesale Supply of Fergus Falls, Inc., Fleet and Farm of

Green Bay, Inc., Fleet and Farm of Menomonie, Inc., Mills Fleet Farm, Inc., Fleet and Farm of

Manitowoc, Inc., Fleet and Farm of Plymouth, Inc., Fleet and Farm Supply Company of West

Bend, Inc., Fleet and Farm of Waupaca, Inc., Mills E-Commerce Enterprises, Inc., Brainerd

Lively Auto, LLC, Foot Locker, Inc., The Gap, Inc., Genesco Inc., GNC Holdings, Inc., IKEA

North America Services, LLC, J. Crew Group, Inc., Lowe's Companies, Inc., Michaels Stores,

Inc., New York & Company, Inc., NIKE, Inc., P.C. Richard & Son, Inc., Pacific Sunwear of

California, Inc., Panda Restaurant Group, Inc., Panera Bread Company, Ralph Lauren

Corporation, Recreational Equipment, Inc., Republic Services, Inc., Restoration Hardware, Inc.,

Roundy's Supermarkets, Inc., Starbucks Corporation, Stein Mart, Inc., Swarovski U.S. Holding

Limited, The Talbots, Inc., Thermo Fisher Scientific Inc., Thorntons Inc., The Wet Seal, Inc.,

Whole Foods Market Group, Inc., Whole Foods Market Rocky Mountain/Southwest, L.P.,

Whole Foods Market California, Inc., Mrs. Gooch's Natural Food Markets, Inc., Whole Food

Company, Whole Foods Market Pacific Northwest, Inc., WFM-WO, Inc., WFM Northern

Nevada, Inc., WFM Hawaii, Inc., WFM Southern Nevada, Inc., The William Carter Company,

Coburn's, Incorporated, D'Agostino Supermarkets, Inc., Jetro Cash & Carry Enterprises, LLC,

Jetro Holdings, LLC, National Association of Convenience Stores, National Community

Pharmacists Association, National Grocers Association, HMSHost Corporation, Sears Holdings

Corporation, and Yum! Brands, Inc. by their undersigned attorneys Constantine Cannon LLP,

3

allege upon knowledge with respect to their own acts and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiffs are merchants from virtually every sector in the United States, including merchants in the following segments: home improvement, consumer electronics, supermarket, Internet, convenience store, fuel station, apparel and accessories, department store, jewelry and giftware, hardware, auto dealership and vehicle service center, hotel, hospitality, membership warehouse, books, sporting goods and outdoors, home office products, home appliances, health and wellness, arts and crafts, home furnishings, furniture and housewares, children's apparel and accessories, cosmetics and fragrances, footwear and headwear, movie theatre, scientific equipment, restaurant and café, and luxury goods.  Plaintiffs bring this action pursuant to federal and state antitrust laws in order to recover damages for anticompetitive conduct by the two electronic payment cartels in the United States: Visa and MasterCard.  These cartels' twin conspiracies and other anticompetitive conduct have already injured merchants and consumers on a magnitude of hundreds of billions of dollars during the Damages Period (January 1, 2004, through November 27, 2012), and they will cost merchants and consumers untold more billions.

2.      Given that the conduct in question is ongoing, Plaintiffs would be seeking monetary and equitable relief for the continuing harm caused by these restraints of trade if they were not barred from asserting such claims by the injunction in the *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720(MKB)(JO) (E.D.N.Y.) ("MDL 1720").  Because of the injunction, however, Plaintiffs' claims concerning Interchange Fees are limited to past damages, even though the conduct continues to harm competition and inflict damages on Plaintiffs and their customers.

4

3.      When the Damages Period began in 2004, Visa and MasterCard were the instrumentalities that effectuated the massive conspiracies among each association's owner/member banks that had agreed to unreasonably, and illegally, restrain competition.  Prior to their corporate restructurings in 2006 and 2008, respectively, MasterCard and Visa were each organized as a membership corporation, the owners and members of which were virtually all of the competing banks that issued General Purpose Payment Cards to consumers and/or that signed merchants to accept such cards.  Each membership corporation was governed by bank executives selected from Visa's and MasterCard's member banks, including the Bank Defendants.  As the Second Circuit held, Visa and MasterCard were "not single entities; they [were] consortiums of competitors," *i.e.*, banks such as the Bank Defendants that issue General Purpose Payment Cards. *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 242 (2d Cir. 2003).

4.      Throughout the Damages Period, Visa and MasterCard were the instrumentalities through which the competing banks that issued Visa and MasterCard General Purpose Payment Cards agreed not to compete with respect to merchant acceptance of those cards and fixed the Interchange Fees that merchants paid for acceptance of those cards.  These conspiracies began when Visa and MasterCard were structured as "consortiums of competitors" and they continued unabated after their corporate reorganizations.  In fact, Visa and MasterCard and the Bank Defendants designed the corporate restructurings of Visa and MasterCard to create veneers of separate independent entities that would mask the perpetuation of their anticompetitive cartels. The competing banks sitting on Visa's and MasterCard's boards ratified these transactions on the anticompetitive conditions that all banks continue to adhere to their agreements not to compete and that Visa and MasterCard maintain the default Interchange Fee rules that support the price-fixing conspiracies.  Based on this continuation of the underlying conspiracies, nothing has

5

changed since the IPOs and, if anything, Visa's and MasterCard's substantial market power has increased.

5.      The Visa Defendants engaged in a conspiracy in restraint of trade in the General Purpose Payment Card markets, and Visa has monopolized the General Purpose Debit Card market in the United States.  The Visa Defendants' principal unlawful anticompetitive conduct was an agreement to collusively fix the prices that merchants paid to accept Visa General Purpose Payment Cards at supracompetitive levels, an agreement which implemented the banks' scheme not to compete for merchant acceptance of their Visa General Purpose Payment Cards.  This unlawful agreement continues to this day.

6.      The MasterCard Defendants also engaged in a conspiracy in restraint of trade in the General Purpose Payment Card markets in the United States.  The MasterCard Defendants' principal unlawful anticompetitive conduct was an agreement to collusively fix the prices that merchants paid to accept MasterCard General Purpose Payment Cards at supracompetitive levels, an agreement which implemented the banks' scheme not to compete for merchant acceptance of their MasterCard General Purpose Payment Cards.  This unlawful agreement continues to this day.

7.      The Visa Defendants' and MasterCard Defendants' agreements to fix prices and not to compete ensured that the Bank Defendants enjoyed, and continue to enjoy, supracompetitive profits by maintaining the discipline of the Visa and MasterCard cartels.  The Bank Defendants have consistently declined to individually negotiate General Purpose Payment Card acceptance with merchants even when it would have been in their individual competitive interest to do so.  The supracompetitive profits created by the conspiracies also have lured additional banks into joining the conspiracies which has maintained and enhanced the cartels'

6

substantial market power.  These restraints have thus been both the glue binding Visa's and

MasterCard's twin cartels with their member/owner banks, and the means through which Visa

and MasterCard have expanded those cartels to achieve substantial market power in the General

Purpose Payment Card markets, power they wielded throughout the Damages Period and power

they continue to wield to this day.

8.     The Visa Defendants' and MasterCard Defendants' agreements not to compete

and price-fixing schemes are naked restraints of trade and *per se* violations of Section 1 of the

Sherman Act.

9.     Even if the Visa Defendants' and MasterCard Defendants' conduct is analyzed

under the rule of reason, the substantial harm caused by the cartels shows that their conduct

constituted unreasonable restraints of trade that violate Section 1 of the Sherman Act.  None of

Defendants' anticompetitive rules and practices are reasonably necessary for the functioning of

General Purpose Payment Card Networks.  Any benefits that Defendants claim are achieved by

these restraints of trade can be accomplished by means that are less destructive and harmful to

competition.  Even if these restraints have any competitive benefit, their anticompetitive

effects—massive overcharges to merchants and maintenance of substantial market power—

vastly outweigh any such benefit.

10.    The anticompetitive harm to merchants and consumers from Defendants' price

fixing and other anticompetitive conduct has been staggering.  During the Damages Period,

Defendants imposed Interchange Fees estimated at more than $350 billion on merchants and

consumers in the United States.  Moreover, Defendants' anticompetitive conduct has limited

competition in the General Purpose Payment Card markets, depriving participants in these

markets of lower prices as well as innovation, new payment options, and cost-saving approaches

(*e.g.*, to reduce fraud) that would have substantially benefited U.S. merchants and consumers.

## JURISDICTION AND VENUE

11.     This Fourth Amended Complaint is filed under Section 16 of the Clayton Act, 15

U.S.C. § 26, to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15

U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The

Court has jurisdiction over the federal antitrust law claims alleged herein under 28 U.S.C. §§

1331, 1337, 2201 and 2202.  The Court has jurisdiction over state antitrust and unfair

competition law claims alleged herein under 28 U.S.C. § 1367.

12.     Defendants transact business and are found in this District.  The interstate trade

and commerce involved and affected by the alleged violations of antitrust law occurred, in part,

within this District.  The acts complained of have had, and will have, substantial anticompetitive

effects in the District.  Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. §§

15, 22 and 26.

## DEFINITIONS

13.     The following terms are used in this Fourth Amended Complaint:

a.      "Acquirer" means a bank or other financial institution that has been
        authorized by a General Purpose Payment Card Network to enter into
        agreements with merchants that enable those merchants to accept General
        Purpose Payment Cards for the purchase of goods and services.  Acquirers
        authorized by the Visa and MasterCard General Purpose Payment Card
        Networks to acquire Visa- and/or MasterCard-branded General Purpose
        Payment Card transactions are members or agents of those networks.

b.      "Bank Defendants" refer to all Defendants in this action other than Visa and
        MasterCard.

c.      "Charge Card" (also referred to as a "Travel and Entertainment Card" or
        "T&E card") is a General Purpose Credit Card for which the cardholder is
        required, under most circumstances, to pay the card balance in full each
        month.  Diners Club cards and traditional American Express Green, Gold,
        Platinum and Centurion (Black) cards without preset spending limits are

8

examples of Charge Cards.

d.    "<u>Damages Period</u>" means the period from January 1, 2004 to November 27, 2012.

e.    "<u>General Purpose Credit Card</u>" during the Damages Period means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing a line of credit extended to the cardholder by the Issuer.  Examples of General Purpose Credit Cards are the Visa and MasterCard credit cards issued by the Bank Defendants, as well as certain Visa or MasterCard corporate cards, the Discover credit card issued by Discover Financial Services, and the Optima and Blue-type credit cards issued by American Express.  General Purpose Credit Cards also include Charge Cards such as the traditional American Express card that require payment at the end of a billing cycle.

f.    "<u>General Purpose Credit Card Network Services</u>" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Credit Cards are conducted, including authorization, clearance, and settlement.

g.    "<u>General Purpose Debit Card</u>" during the Damages Period means a plastic card or other physical form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for goods and services at a large number of diverse merchants by accessing an asset account, typically the cardholder's demand deposit account ("DDA"), at a bank or other financial institution. Visa's Signature Debit Card program (the "Visa Check Card") and MasterCard's Signature Debit Card program (sometimes referred to as "Debit MasterCard") are General Purpose Debit Cards, as are PIN Debit Cards authorized over Visa's Interlink and MasterCard's Maestro networks.  General Purpose Debit Cards also include prepaid cards, which access asset accounts other than the cardholder's DDA.  Examples include, but are not limited to, payroll cards and cards associated with a flexible spending account, health reimbursement arrangement, or health savings account.

h.    "<u>General Purpose Debit Card Network Services</u>" means the services and infrastructure that a network and its members provide to merchants through which payment transactions using General Purpose Debit Cards are conducted, including authorization, clearance, and settlement.

i.    "<u>General Purpose Payment Card</u>" means a General Purpose Credit Card or a General Purpose Debit Card.

j.    "<u>General Purpose Payment Card Network</u>" means an electronic payment system used to accept, transmit or process transactions made by General

Purpose Payment Cards for money, goods or services and to transfer information and funds among Issuers, Acquirers, merchants and users of General Purpose Payment Cards.  Both Visa and MasterCard operate General Purpose Payment Card Networks.

k.      "Honor All Issuers" rules are the "Honor All Cards" rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded General Purpose Credit Cards to accept all such General Purpose Credit Cards that carry the brand of that network, and the rules of Visa and MasterCard that require any merchant that accepts Visa- or MasterCard-branded General Purpose Debit Cards to accept all such General Purpose Debit Cards that carry the brand of the respective network.

l.      "Interchange Fees" are fees or rates fixed by Visa or MasterCard and their member banks that are paid to Issuers by merchants in conjunction with transactions in which Visa or MasterCard General Purpose Payment Cards are used as a means of payment for purchases of goods and services.  Interchange Fees are deducted by an Issuer from the funds owed to a merchant prior to the settlement of a Visa or MasterCard General Purpose Payment Card transaction.

m.      "Issuer" means a bank or other financial institution that issues General Purpose Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations.  Issuers authorized by the Visa and MasterCard General Purpose Payment Card Networks to issue Visa-and/or MasterCard-branded General Purpose Payment Cards are members of those networks.

n.      "MasterCard Defendants" refer to MasterCard Incorporated and MasterCard International Incorporated and all Bank Defendants that issued MasterCard-branded General Purpose Payment Cards during the Damages Period.

o.      "PIN Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account by swiping his or her card at the point-of-sale and entering a personal identification number ("PIN").  PIN Debit Card networks grew out of regional ATM networks and are processed differently than Signature Debit Card transactions. Examples of PIN Debit Card networks include Visa's Interlink network, MasterCard's Maestro network, FIS's NYCE network, and First Data Corporation's STAR network.

p.      "Premium Payment Card" means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards and is required by a network to provide a certain level of rewards or incentives to the cardholder.  The "Visa Signature Preferred Card" product and "World MasterCard Card" product are examples of Premium Payment Cards.

10

q.     "Signature Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.  Signature Debit Card transactions are processed in the same way as General Purpose Credit Card transactions.  Examples of Signature Debit Cards include the Visa Check Card product and the Debit MasterCard product.

r.     "Visa Defendants" refer to Visa Inc., Visa U.S.A. Inc., and Visa International Service Association and all Bank Defendants that issued Visa-branded General Purpose Payment Cards during the Damages Period.

## PARTIES

### A.     Plaintiffs

14.     All of the Plaintiffs accepted Visa and MasterCard General Purpose Payment Cards during the Damages Period, and were injured in their business or property as a result of the unlawful conduct alleged in this Fourth Amended Complaint.

15.     Plaintiff 7-Eleven, Inc. ("7-Eleven") is a Texas corporation with its principal place of business in Dallas, Texas.  7-Eleven operates, franchises, or licenses more than 10,100 7-Eleven stores in North America.  Globally, 7-Eleven has more than 50,700 stores in 16 countries.  As of December 31, 2012, 7-Eleven operated approximately 2,250 7-Eleven stores in the United States with approximately another 5,870 7-Eleven stores operated by 7-Eleven franchisees.  7-Eleven's revenue for 2012 exceeded $23 billion.  7-Eleven has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover on behalf of its corporate and franchised 7-Eleven stores in the United States the damages incurred as a result of the conduct detailed in this Fourth Amended Complaint.

16.     Plaintiff Academy, Ltd. ("Academy") is a privately held company based in Katy, Texas doing business as Academy Sports + Outdoors.  Academy is one of the nation's largest

11

sporting goods and outdoor retailers, with a broad assortment of quality hunting, fishing, and camping equipment and gear, along with sports and leisure products, footwear, and apparel. Academy operates 161 stores in the United States, and sells goods over the Internet to U.S. customers.  Academy had over $3.5 billion in retail sales in 2012.  Academy has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

17.    Plaintiff Aldo US Inc. is a privately held Delaware corporation doing business as Aldo and Call It Spring.  Aldo US Inc. is a subsidiary of The Aldo Group, Inc. (together, with Aldo US Inc., "Aldo"), a privately held Canadian corporation.  Aldo, through its U.S. brands Aldo and Call it Spring, and through its additional international brands Little Burgundy, and Globo, is a worldwide retailer of shoes and accessories.  The company operates 418 Aldo stores and 30 Call it Spring stores in the United States, and sells goods over the Internet to U.S. consumers.  Aldo has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

18.    Plaintiff Alimentation Couche-Tard Inc. ("Couche-Tard") is a Canadian corporation organized under the laws of Quebec, with its principal place of business in Laval, Quebec, Canada.  In the United States, Couche-Tard is the largest independent convenience store operator in terms of number of company-operated stores.  As of April 28, 2013, Couche-Tard's network comprised 6,094 convenience stores throughout North America, including 4,546 stores with road transportation fuel dispensing.  Couche-Tard operates in the United States through its

U.S. subsidiaries Circle K Stores Inc. and Mac's Convenience Stores LLC, which operate under the Circle K and Mac's banners, respectively.  Couche-Tard has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

19.     Plaintiff Alon USA, LP ("Alon LP") is a limited partnership organized under the State of Texas, and is a majority owned subsidiary of Alon USA Energy, Inc. (hereinafter, collectively with its affiliates, referred to as "Alon").  Alon markets and distributes motor fuels to more than 600 independent and 300 company-owned retail locations.  Alon is also the largest licensee of 7-Eleven in the United States, operating stores in Central and West Texas and New Mexico.  Alon LP had over $900 million in retail sales in 2012.  Alon LP has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any franchisees, subsidiaries, and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

20.     Plaintiff Amazon.com, Inc. ("Amazon") is a Delaware corporation with its principal place of business in Seattle, Washington.  Amazon opened its virtual doors on the World Wide Web in July 1995 and it seeks to offer Earth's Biggest Selection.  Amazon seeks to be Earth's most customer-centric company for four primary customer sets: consumers, sellers, enterprises, and content creators.  In addition, Amazon provides services, such as advertising services and co-branded credit card agreements.  Amazon serves consumers through its retail websites, and focuses on selection, price, and convenience.  Amazon's subsidiary, Zappos.com, Inc. ("Zappos") is an online service company that sells shoes, clothing, handbags, accessories and more through two main websites: Zappos.com and 6pm.com.  Amazon and Zappos have

13

timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover the damages incurred, including by their subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

21.     Plaintiff American Multi-Cinema, Inc. ("AMC") is a Missouri corporation with its principal place of business in Leawood, Kansas.  AMC and its subsidiaries are principally involved in the theatrical exhibition business and own, operate or have interests in 342 movie theatres with 4,941 screens (as of March 30, 2013), primarily in the United States.  AMC had approximately $2.5 billion in retail sales in fiscal 2012.  AMC has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by all of its managed theaters and any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

22.     Plaintiff Barnes & Noble, Inc. ("Barnes & Noble") is a Delaware corporation with its principal place of business in New York, New York.  Barnes & Noble is one of the nation's largest booksellers and a leading content, commerce, and technology company providing customers easy and convenient access to books, magazines, newspapers, and other content across its multi-channel distribution platform.  Barnes & Noble operates 675 bookstores in all 50 states, and sells goods over the Internet to U.S. customers.  Barnes & Noble had approximately $5.025 billion in Barnes & Noble-branded store and Internet sales in 2012.  Barnes & Noble has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

23.     Plaintiff Barnes & Noble College Booksellers, LLC ("B&N College") is a Delaware limited liability company based in Basking Ridge, New Jersey.  B&N College is a

majority owned subsidiary of Barnes & Noble.  B&N College operates 686 college bookstores at colleges and universities across the United States.  Its operations include the sales of textbooks and course-related materials, emblematic apparel and gifts, trade books, school and dorm supplies, and convenience and café items on college and university campuses.  B&N College also offers a textbook rental option to its customers, as well as electronic textbooks and other course materials through a proprietary digital platform.  B&N College had approximately $1.8 billion in retail sales in 2012.  B&N College has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

24.     Plaintiff Beall's, Inc. ("Beall's") is a privately held Florida corporation with its principal place of business in Bradenton, Florida.  Beall's is engaged in the operation of two store formats through its wholly owned subsidiaries Beall's Department Stores, Inc. and Beall's Outlet Stores, Inc.  Beall's owns and operates over 500 stores in the United States, primarily in small- and medium-sized communities in Florida and other southern U.S. states, and sells goods over the Internet to U.S. customers.  Beall's had approximately $1.3 billion in retail sales in 2012.  Beall's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

25.     Plaintiff Boscov's, Inc. ("Boscov's") is a Pennsylvania corporation with its principal place of business in Reading, Pennsylvania.  Boscov's is a family owned department store founded by Solomon Boscov in 1911.  Boscov's operates through 42 stores reaching across five states in the Mid-Atlantic region.  Boscov's had net sales of approximately $1 billion in

2012.  Boscov's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

26.     Plaintiff Brookshire Grocery Company ("Brookshire") is a Texas corporation with its principal place of business in Tyler, Texas.  Brookshire is a Texas-based regional food chain that has been providing families with quality foods since 1928.  Brookshire operates more than 150 store locations under the banners of Brookshire's Food Stores, Super 1 Foods Stores, and FRESH by Brookshire's.  Brookshire has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

27.     Plaintiff The Buckle, Inc. ("The Buckle") is a Nebraska corporation with its principal place of business in Kearney, Nebraska.  The Buckle is a retailer of medium to better-priced casual apparel, footwear, and accessories for fashion-conscious young men and women. As of February 2, 2013, The Buckle operated 440 retail stores in 43 states throughout the continental United States under the names "Buckle" and "The Buckle," and it sells merchandise over the Internet to U.S. customers.  The Buckle had net sales of approximately $1.1 billion in 2012.  The Buckle has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

28.     Plaintiff The Children's Place Retail Stores, Inc. ("The Children's Place") is a Delaware corporation with its principal place of business in Secaucus, New Jersey.  The Children's Place is the largest pure-play children's specialty apparel retailer in North America. The Children's Place operates 1,111 stores and sells goods over the Internet to U.S. consumers.

16

The Children's Place (Barbados) Inc. is a subsidiary of The Children's Place and operates The Children's Place stores in Puerto Rico. The Children's Place had net sales of $1.558 billion in the United States and Puerto Rico for the fiscal year ended February 2, 2013. The Children's Place has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

29.     Plaintiff Costco Wholesale Corp. ("Costco") is a Washington corporation with its principal place of business in Issaquah, Washington. Founded in 1983 in Seattle, Washington, Costco owns and operates a chain of 622 membership warehouse stores in 41 states, the District of Columbia, and Puerto Rico, and sells goods over the Internet to U.S. customers. Costco had over $97 billion in retail sales in 2012. Costco has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

30.     Plaintiff Cracker Barrel Old Country Store, Inc. ("Cracker Barrel") is a Tennessee corporation with its principal place of business in Lebanon, Tennessee. Cracker Barrel, along with its subsidiaries CBOCS West, Inc., CBOCS Pennsylvania, LLC, CBOCS Properties, Inc. and CBOCS Texas, LLC, is engaged in the operation and development of its old country stores and restaurants, which provide a rustic, old country-store design offering a full-service restaurant menu featuring home-style country food, and a wide variety of decorative and functional items featuring rocking chairs, holiday and seasonal gifts and toys, apparel, cookware and foods. Cracker Barrel operates over 600 stores in the U.S., and sells goods over the Internet. Cracker Barrel had over $2.5 billion in sales in 2012. Cracker Barrel has timely opted out of the

proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

31.     Plaintiff Cumberland Farms, Inc. ("Cumberland Farms") is a Delaware corporation with its principal place of business in Framingham, Massachusetts.  Cumberland Farms operates approximately 600 retail stores, gas stations, and a support system including petroleum and grocery distribution in 11 states across the Northeast and Florida.  Cumberland Farms's subsidiary, Gulf Oil Limited Partnership ("Gulf"), is a distributor of quality motor fuels to thousands of outlets across its 27-state footprint.  Gulf also supplies heating oil, lubricants, and bio-fuels.  Gulf owns and operates a dozen petroleum terminals and supplies wholesale product through many third-party  terminals.  Cumberland Farms and Gulf have timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

32.     Plaintiff Dick's Sporting Goods, Inc. ("Dick's") is a Delaware corporation with its principal place of business in Coraopolis, Pennsylvania.  Dick's was founded in 1948 and is an authentic full-line sporting goods retailer offering a broad assortment of brand name sporting goods equipment, apparel, and footwear in a specialty store environment.  Dick's and its affiliates operate over 600 stores in 44 states, and sell goods over the Internet to U.S. customers. Dick's had approximately $5.8 billion in consolidated sales in 2012.  Dick's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

33.     Plaintiff Dillard's, Inc. ("Dillard's") is a Delaware corporation with its principal place of business in Little Rock, Arkansas.  Dillard's was founded in 1938 by William T. Dillard, and currently ranks among the nation's largest fashion apparel, cosmetics, and home furnishing retailers.  Dillard's operates 301 stores in the United States, and sells goods over the Internet to U.S. customers.  Dillard's had over $6.5 billion in retail sales in fiscal year 2012.  Dillard's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

34.     Plaintiff Drury Hotels Company, LLC ("Drury") is a privately owned Nevada limited liability company with its principal place of business in Cape Girardeau, Missouri.  Drury is a hotel management company that offers top-quality lodging at a reasonable price.  Drury operates more than 130 hotels in 20 states across the United States.  Drury had approximately $390 million in retail sales in 2012.  Drury has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

35.     Plaintiff Euromarket Designs, Inc., d/b/a Crate & Barrel and CB2 ("EDI"), is a privately held Illinois corporation, with its principal place of business in Northbrook, Illinois.  EDI is a prominent retailer of housewares, home furnishings and furniture.  The company operates 86 Crate & Barrel stores and 11 CB2 stores in the United States, and sells goods over the Internet to U.S. customers (and to other customers around the world).  Plaintiff Meadowbrook, L.L.C., d/b/a The Land of Nod ("Meadowbrook"), is a privately held Illinois limited liability company, with its principal place of business in Morton Grove, Illinois.  Meadowbrook is a prominent retailer of children's furniture and home furnishings, toys and

19

gifts, which operates 4 The Land of Nod stores in the United States, and sells goods over the Internet to U.S. customers (and to other customers around the world).  Crate & Barrel Holdings, Inc. is the sole owner of EDI and Meadowbrook, and the holder of various assets relating to the companies' businesses.  EDI and Meadowbrook had approximately $1.3 billion in retail sales for the fiscal year ended February 3, 2013.  EDI and Meadowbrook timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

36.     Plaintiff Express, LLC ("Express") is a Delaware corporation with its principal place of business in Columbus, Ohio.  Express, LLC is wholly owned by Express, Inc.  Express is a specialty apparel and accessory retailer offering both women's and men's merchandise. Express has over 30 years of experience offering a distinct combination of style and quality at an attractive value, targeting women and men between 20 and 30 years old.  Express offers its customers an assortment of fashionable apparel and accessories to address fashion needs across multiple aspects of their lifestyles, including work, casual, jeanswear, and going-out occasions. As of February 2, 2013, Express operated 625 stores across the United States, Canada, and Puerto Rico.  Express also sells goods over the Internet to U.S. customers.  Express had net sales of over $2 billion in 2012.  Express has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

37.     Plaintiff Family Dollar Stores, Inc. ("Family Dollar") is a Delaware corporation with its principal place of business in Matthews, North Carolina.  Family Dollar operates a chain

of more than 7,400 general merchandise retail discount stores in 45 states, providing value-conscious consumers with a selection of competitively priced merchandise in convenient neighborhood stores. Family Dollar had net sales of over $9.3 billion in fiscal year 2012. Family Dollar has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

38.     Plaintiffs Fleet Wholesale Supply Co., Inc., a Wisconsin corporation with its principal place of business in Brainerd, Minnesota; Mills Motor, Inc., a Minnesota corporation with its principal place of business in Brainerd, Minnesota; Mills Auto Enterprises, Inc., a Minnesota corporation with its principal place of business in Brainerd, Minnesota; Willmar Motors, LLC, a Minnesota limited liability company with its principal place of business in Brainerd, Minnesota; Mills Auto Center, Inc., a Minnesota corporation with its principal place of business in Brainerd, Minnesota; Fleet and Farm of Alexandria, Inc., a Minnesota corporation with its principal place of business in Brainerd, Minnesota; Fleet Wholesale Supply of Fergus Falls, Inc., a Minnesota corporation with its principal place of business in Brainerd, Minnesota; Fleet and Farm of Green Bay, Inc., a Wisconsin corporation with its principal place of business in Brainerd, Minnesota; Fleet and Farm of Menomonie, Inc., a Wisconsin corporation with its principal place of business in Brainerd, Minnesota; Mills Fleet Farm, Inc., a Minnesota corporation with its principal place of business in Brainerd, Minnesota; Fleet and Farm of Manitowoc, Inc., a Wisconsin corporation with its principal place of business in Brainerd, Minnesota; Fleet and Farm of Plymouth, Inc., a Wisconsin corporation with its principal place of business in Brainerd, Minnesota; Fleet and Farm Supply Company of West Bend, Inc., a Wisconsin corporation with its principal place of business in Brainerd, Minnesota; Fleet and

21

Farm of Waupaca, Inc., a Wisconsin corporation with its principal place of business in Brainerd, Minnesota; Mills E-Commerce Enterprises, Inc., a Minnesota corporation with its principal place of business in Brainerd, Minnesota; and Brainerd Lively Auto, LLC, a Minnesota limited liability company with its principal place of business in Brainerd, Minnesota (collectively, the "Mills Companies") individually own and operate dozens of stores and businesses in Minnesota, Wisconsin, Iowa, South Dakota, and North Dakota primarily under the "Mills," "Mills Fleet Farm," or "Mills Auto Group" brand names, including: retail stores, online stores, auto dealerships, vehicle service centers, and related operations. The Mills Companies have timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

39. Plaintiff Foot Locker, Inc. ("Foot Locker") is a New York corporation with its principal place of business in New York, New York. Foot Locker is a leading global retailer of athletically inspired shoes and apparel with eight brands: Foot Locker, Kids Foot Locker, Lady Foot Locker, Footaction, Champs Sports, Eastbay, CCS and SIX:02. Foot Locker owns and operates over 2,400 stores in the United States, and sells goods over the Internet to U.S. customers. Foot Locker had approximately $6.2 billion in retail sales in 2012. Foot Locker has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

40. Plaintiff The Gap, Inc. ("Gap") is a Delaware corporation with its principal place of business in San Francisco, California. Gap is a leading global specialty retailer with six brands: Gap, Banana Republic, Old Navy, Piperlime, Athleta, and Intermix. Gap offers clothing,

22

accessories, and personal care products for men, women, children, and babies in approximately

3,100 company operated stores in the United States and Canada, and sells goods over the Internet

to U.S. customers. Gap also has significant retail and Internet operations outside of the United

States. Gap had approximately $15.7 billion in retail sales in 2012. Gap has timely opted out of

the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred,

including by any subsidiaries and/or affiliates that operate in the United States, as a result of the

conduct detailed in this Fourth Amended Complaint.

41.     Plaintiff Genesco Inc. ("Genesco") is a Tennessee corporation with its principal

place of business in Nashville, Tennessee. Genesco is a specialty retailer that sells footwear,

headwear, sports apparel, and accessories in more than 2,400 retail stores throughout the U.S.

and internationally, principally under the names Journeys, Journeys Kidz, Shi by Journeys,

Underground by Journeys, Schuh, Lids, Lids Locker Room, and Johnston & Murphy. Genesco

also sells goods over the Internet to U.S. customers. Genesco had approximately $1.875

billion in U.S. retail sales in its fiscal year ended February 2, 2013. Genesco has timely opted

out of the proposed class settlement in MDL 1720 and is seeking to recover the damages

incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a

result of the conduct detailed in this Fourth Amended Complaint.

42.     Plaintiff GNC Holdings, Inc. ("GNC") is a Delaware corporation with its

principal place of business in Pittsburgh, Pennsylvania. GNC is a specialty retailer that sells

health and wellness products, including vitamins, minerals, and herbal supplement products,

sports nutrition products, and diet products. GNC sells its products at over 8,100 locations

worldwide, and over the Internet to U.S. customers, including through its wholly owned

subsidiary LukcyVitamin.com. GNC had approximately $1.8 billion in retail sales in 2012.

GNC has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

43.     [This paragraph intentionally left blank].

44.     Plaintiff IKEA North America Services, LLC ("IKEA North America") is a Delaware limited liability company with its principal place of business in Conshohocken, Pennsylvania.  The IKEA Group is a global retailer whose stated vision and business idea is ". . . to create a better everyday life for the many people by offering a wide range of well-designed, functional home furnishing products at prices so low that as many people as possible will be able to afford them."  The retail operations of IKEA North America and its affiliates IKEA New York, LLC, IKEA U.S. East, LLC, and IKEA U.S. West, Inc. (collectively "IKEA US") are an extension of the global brand.  IKEA US currently operates 38 stores in the United States, and sells products over the Internet to U.S. customers.  IKEA US had approximately $4 billion in retail sales in 2012.  IKEA North America has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

45.     Plaintiff J. Crew Group, Inc. ("J. Crew") is a privately held Delaware corporation with its principal place of business in New York, New York.  J. Crew is a nationally recognized, multi-channel, multi-brand specialty retailer of women's, men's, and children's apparel, shoes and accessories.  As of March 20, 2013, J. Crew operated 296 retail stores in 47 states, and it sells merchandise over the Internet to U.S. customers.  J. Crew had $2.2 billion in revenues for the 2012 fiscal year, which ended on February 2, 2013.  J. Crew has timely opted out of the

24

proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

46.   Plaintiff Lowe's Companies, Inc. ("Lowe's") is a North Carolina corporation with its principal place of business in Mooresville, North Carolina.  Through its operating subsidiaries Lowe's Home Centers, Inc. and Lowe's HIW, Inc., Lowe's operates 1,752 home improvement retail stores across the United States, and sells goods over the Internet to U.S. customers, including through its wholly owned subsidiary Allied Trade Group, Inc.  Lowe's had approximately $50.5 billion in retail sales in 2012.  Lowe's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

47.   Plaintiff Michaels Stores, Inc. ("Michaels") is a Delaware corporation with its principal place of business in Irving, Texas.  Michaels, together with any subsidiaries, is the largest arts and crafts specialty retailer in North America, providing materials, project ideas, and education for creative activities.  Michaels owns and operates 1,115 Michaels stores in the United States and Canada, as well as 123 Aaron Brothers stores in the United States, and sells goods over the Internet to U.S. customers.  In fiscal 2012, Michaels had over $4.4 billion in retail sales.  Michaels has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

48.   Plaintiff New York & Company, Inc. ("New York & Company") is a Delaware

25

corporation with its principal place of business in New York, New York.  New York & Company is a leading specialty retailer of women's fashion apparel and accessories, and the modern wear-to-work destination for women, providing perfectly fitting pants and NY Style that is feminine, polished, on-trend and versatile.  As of February 2, 2013, New York & Company operated 519 stores in the United States, and it sells merchandise over the Internet to U.S. customers.  New York & Company had approximately $1 billion in net sales in 2012.  New York & Company has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

49.     Plaintiff NIKE, Inc. ("NIKE") is an Oregon corporation with its principal place of business in Beaverton, Oregon.  NIKE's principal business activity is the design, development and worldwide marketing of high quality footwear, apparel, equipment, accessories and services. NIKE is the largest seller of athletic footwear and athletic apparel in the world.  NIKE sells its products to retail accounts, through NIKE-owned retail stores and Internet sales, and through a mix of independent distributors and licensees, in approximately 190 countries around the world. NIKE had over $24 billion in revenue in Fiscal Year 2012.  NIKE has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

50.     Plaintiff P.C. Richard & Son, Inc. ("P.C. Richard") is a Delaware corporation. P.C. Richard, through its subsidiaries (including, but not limited to, P.C. Richard & Son Long Island Corporation), is a privately owned and operated company founded in 1909.  P.C. Richard is engaged principally in the retail sale of home appliances, televisions, consumer electronics,

and home office products principally in the New York metropolitan area and in New Jersey, Connecticut and Northeast Philadelphia. As of January 31, 2013, the company operated 65 showrooms, and it sells merchandise over the Internet to U.S. customers.  P.C. Richard has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

51.      Plaintiff Panda Restaurant Group, Inc. ("Panda RG") is a California corporation with its principal place of business in Rosemead, California.  Panda RG operates a chain of restaurants that offer Chinese food, gourmet Mandarin and Szechuan cuisine, and Japanese grill favorites, as well as appetizers, soups and salads, entrees, noodles and rice products, and sides. Panda RG operates over 1,500 restaurants in 42 states and Puerto Rico.  Panda RG had over $1.7 billion in revenue in 2012.  Panda RG has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

52.      Plaintiff Panera Bread Company ("Panera") is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Panera is a national bakery-café concept with over 1,700 company-owned and franchise-operated bakery-café locations in 44 states, the District of Columbia, and Ontario, Canada.  Panera serves nearly 8 million customers per week system-wide, and is currently one of the largest food service companies in the United States. Panera had approximately $1.9 billion in retail sales in 2012.  Panera has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred by all of its entities that operate in the United States including, but not limited to, its subsidiaries, franchisees, and agents, as a result of the conduct detailed in this Fourth Amended Complaint.

53.     Plaintiff Ralph Lauren Corporation ("Ralph Lauren") is a Delaware corporation with its principal place of business in New York, New York.  Ralph Lauren is a global leader in the design, marketing, and distribution of premium lifestyle products, including men's, women's, and children's apparel, accessories, fragrances, and home furnishings.  Ralph Lauren operates in three distinct but integrated segments: Wholesale, Retail, and Licensing.  As of March 30, 2012, Ralph Lauren's merchandise was sold through 379 directly operated stores and through multiple wholesale outlets.  In addition, as of March 30, 2012, the Company operated 474 concession shop locations worldwide, and its global licensing partners operated 59 Ralph Lauren stores and 27 dedicated concession shops as well as 58 Club Monaco stores.  Ralph Lauren also sells merchandise over the Internet to U.S. and certain other global customers.  Ralph Lauren had approximately $7 billion in sales in 2012.  Ralph Lauren has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

54.     Plaintiff Recreational Equipment, Inc. ("REI") is a member-owned consumer cooperative organized under the laws of the State of Washington with headquarters in Kent, Washington.  REI is a national outdoor retailer selling consumers the products they need to enjoy human-powered outdoor recreation.  REI offers its own line of quality award-winning gear and apparel, in addition to products from top brands for camping, climbing, cycling, fitness, hiking, paddling, snow sports, and travel.  REI is also the largest provider in the U.S. of education in outdoor recreation, through the REI Outdoor School and most of its stores.  REI operates 129 stores in the United States, and sells its products via the Internet and catalogue to U.S. customers.  REI had approximately $2 billion in retail sales in 2012.  REI has timely opted out of the

proposed class settlement in MDL 1720 and is seeking to recover the damages incurred as a result of the conduct detailed in this Fourth Amended Complaint.

55.     Plaintiff Republic Services, Inc. ("Republic") is a Delaware corporation with its principal place of business in Phoenix, Arizona.  Republic is the second largest provider of services in the domestic non-hazardous solid waste industry.  Republic provides non-hazardous solid waste collection services for commercial, industrial, municipal and residential customers through 334 collection operations in 39 states and Puerto Rico.  Republic had over $8 billion in revenue in 2012.  Republic has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

56.     Plaintiff Restoration Hardware, Inc. ("Restoration Hardware") is a Delaware corporation with its principal place of business in Corte Madera, California.  Restoration Hardware is a luxury home furnishings retailer that offers a growing number of categories including furniture, lighting, textiles, bathware, decorative accessories, outdoor and children's furnishings. These products are sold through the Company's stores, catalogs and websites. As of May 4, 2013, the Company operated approximately 70 retail stores and 14 outlet stores in 29 states, the District of Columbia and Canada, and had sourcing operations in Shanghai and Hong Kong.  Restoration Hardware had over $1 billion in net revenues in Fiscal 2012.  Restoration Hardware has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

57.     Plaintiff Roundy's Supermarkets, Inc. ("Roundy's") is a Wisconsin corporation

with its principal place of business in Milwaukee, Wisconsin.  Roundy's, through its retail banners Pick 'n Save, Rainbow, Copps, Metro Market, and Mariano's, is a leading Midwest supermarket chain that operates over 161 stores in the United States.  Roundy's had nearly $4.0 billion in retail sales in 2012.  Roundy's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

58.     Plaintiff Starbucks Corporation ("Starbucks") is a Washington corporation with its principal place of business in Seattle, Washington.  Starbucks is the premier roaster, marketer and retailer of specialty coffee in the world, operating in 62 countries.  Starbucks purchases and roasts high-quality coffees that it sells, along with handcrafted coffee, tea and other beverages and a variety of fresh food items, through company-operated stores. Starbucks also sells a variety of coffee and tea products and licenses its trademarks through other channels such as licensed stores, grocery and national foodservice accounts.  Starbucks had revenues of approximately $13.3 billion in Fiscal Year 2012.  Starbucks has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

59.     Plaintiff Stein Mart, Inc. ("Stein Mart") is a Florida corporation with its principal place of business in Jacksonville, Florida.  Stein Mart is a national retailer offering the fashion merchandise, service, and presentation of a better department or specialty store.  Stein Mart's focused assortment of merchandise features current-season, moderate to better fashion apparel for women and men, as well as accessories, shoes, and home fashions, all offered at prices competitive with off-price retail chains.  Stein Mart operates 263 stores in the United States.

30

Stein Mart had approximately $1.18 billion in retail sales in 2012.  Stein Mart has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

60.     Plaintiff Swarovski U.S. Holding Limited ("Swarovski") is a Rhode Island corporation with its principal place of business in Cranston, Rhode Island.  Swarovski, a subsidiary of Swarovski International Holding AG, manufactures and markets crystal giftware and jewelry.  Swarovski had approximately $485 million in retail sales in 2012.  Swarovski has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended Complaint.

61.     Plaintiff The Talbots, Inc. ("Talbots") is a Delaware corporation with its principal place of business in Hingham, Massachusetts.  Talbots is a specialty retailer and direct marketer of women's apparel, accessories and shoes sold almost exclusively under the *Talbots* brand.  Talbots operates over 500 stores in the United States and Canada, and sells merchandise over the Internet.  Talbots had over $1.1 billion in revenue in 2012.  Talbots has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

62.     Plaintiff Thermo Fisher Scientific Inc. ("TFS") is a Delaware corporation with its principal place of business in Waltham, Massachusetts.  It is the world leader in serving science, enabling its customers to make the world healthier, cleaner and safer by providing analytical instruments, equipment, reagents and consumables, software and services for research,

31

manufacturing, analysis, discovery and diagnostics.  TFS serves more than 350,000 customers,

including pharmaceutical and biotech companies, hospitals, clinical diagnostic labs, universities,

research institutions, and government agencies.  TFS had over $13 billion in revenue in 2012.

TFS has timely opted out of the proposed class settlement in MDL 1720 and is seeking to

recover the damages incurred by numerous TFS corporate entities that operate in the United

States as a result of the conduct detailed in this Fourth Amended Complaint.

63.     Plaintiff Thorntons Inc. ("Thorntons") is a Delaware corporation with its principal

place of business in Louisville, Kentucky.  As of this date, Thorntons operates 173 Retail Motor

Fuel and Convenience Stores in the states of Illinois, Indiana, Ohio, Kentucky, Tennessee and

Florida.  Thorntons had over $2.3 billion in retail sales in 2012.  Thorntons has timely opted out

of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred,

including by any subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth

Amended Complaint.

64.     Plaintiff The Wet Seal, Inc. ("Wet Seal") is a Delaware corporation with its

principal place of business in Foothill Ranch, California.  Wet Seal is a national multi-channel

specialty retailer selling fashion apparel and accessory items designed for female customers aged

13 to 39 years old.  As of February 2, 2013, Wet Seal operated 530 retail stores in 47 states and

Puerto Rico, and it sells merchandise over the Internet to U.S. customers.  Wet Seal had

approximately $580 million in sales in 2012.  Wet Seal has timely opted out of the proposed

class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any

subsidiaries and/or affiliates, as a result of the conduct detailed in this Fourth Amended

Complaint.

65.     Plaintiffs Whole Foods Market Group, Inc., a Delaware corporation with its

32

principal place of business in Austin, Texas; Whole Foods Market Rocky Mountain/Southwest, L.P., a Texas limited partnership with its principal place of business in Austin, Texas; Whole Foods Market California, Inc., a California corporation with its principal place of business in Emeryville, California; Mrs. Gooch's Natural Food Markets, Inc., a California corporation with its principal place of business in Glendale, California; Whole Food Company, a Louisiana corporation with its principal place of business in Austin, Texas; Whole Foods Market Pacific Northwest, Inc., a Delaware corporation with its principal place of business in Bellevue, Washington; WFM-WO, Inc., a Delaware corporation with its principal place of business in Austin, Texas; WFM Northern Nevada, Inc., a Delaware corporation with its principal place of business in Austin, Texas; WFM Hawaii, Inc., a Hawaii corporation with its principal place of business in Glendale, California; and WFM Southern Nevada, Inc., a Delaware corporation with its principal place of business in Glendale, CA, are collectively referred to herein as "Whole Foods."  Whole Foods is the world's leading retailer of natural and organic foods and America's first national "Certified Organic" grocer.  Whole Foods's company mission is to promote the vitality and well-being of all individuals by supplying the highest quality, most wholesome foods available.  Whole Foods is the largest retailer of natural and organic foods in the United States and the 11th largest food retailer overall.  It currently operates approximately 350 stores in the United States, Canada, and the United Kingdom.  Whole Foods had approximately $11.7 billion in sales in Fiscal 2012.  Whole Foods has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

      66.    Plaintiff The William Carter Company ("Carter's") is a Massachusetts

corporation with its principal place of business in Atlanta, Georgia.  Carter's is a leading

provider of apparel and related products exclusively for babies and young children, with history

dating back to 1865.  Carter's owns the *Carter's* and *OshKosh B'gosh* brands, two of the most

recognized brands in the U.S. children's apparel marketplace.  These brands are sold in leading

department stores, national chains, and specialty retailers domestically and internationally,

through more than 600 company-operated stores in the United States, Canada, and Japan, and to

U.S. customers over the Internet.  Carter's had over $1 billion in retail sales in 2012.  Carter's

has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the

damages incurred, including by any subsidiaries and/or affiliates that operate in the United

States, as a result of the conduct detailed in this Fourth Amended Complaint.

  66.a. Plaintiff Ashley Furniture Industries Inc. ("Ashley Furniture") is a Wisconsin

corporation with its principal place of business in Arcadia, Wisconsin.  Ashley Furniture is the

largest manufacturer of furniture in the world, and manufactures and distributes home

furnishings and accessories in the United States and internationally.  Ashley Furniture has timely

opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages

incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a

result of the conduct detailed in this Fourth Amended Complaint.

  66.b. Plaintiff Buc-ee's Ltd. ("Buc-ee's") is a Texas limited partnership with its

principal place of business in Lake Jackson, Texas.  Buc-ee's operates 29 retail stores in Texas.

Buc-ee's has timely opted out of the proposed class settlement in MDL 1720 and is seeking to

recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the

United States, as a result of the conduct detailed in this Fourth Amended Complaint.

  66.c. Plaintiff Family Express Corporation ("Family Express") is an Indiana

corporation with its principal place of business in Valparaiso, Indiana.  Family Express owns and

operates 60 convenience stores and fueling centers in Northwest and North Central Indiana.

Family Express has timely opted out of the proposed class settlement in MDL 1720 and is

seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that

operate in the United States, as a result of the conduct detailed in this Fourth Amended

Complaint.

      66.d.    Plaintiff Pacific Sunwear of Calfornia, Inc. ("PacSun") is a California corporation

with its principal place of business in Anaheim, California.  PacSun is a leading specialty retailer

rooted in the action sports, fashion and music influences of the California lifestyle.  PacSun

operates over 600 stores throughout the United States and Puerto Rico.  PacSun has timely opted

out of the proposed class settlement in MDL 1720 and is seeking to recover the damages

incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a

result of the conduct detailed in this Fourth Amended Complaint.

      66.e.  Plaintiff Coborn's, Incorporated ("Coborn's") is a Minnesota corporation with its

principal place of business in St. Cloud, Minnesota.  Founded in 1921, today Coborn's operates

over 120 retail locations, including 48 grocery stores, throughout the Midwest.  Coborn's has

timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the

damages incurred, including by any subsidiaries and/or affiliates that operate in the United

States, as a result of the conduct detailed in this Fourth Amended Complaint.

      66.f.  Plaintiff D'Agostino Supermarkets, Inc. ("D'Agostino") is a retail grocery chain

operating under the laws of New York with its principal place of business in Larchmont, New

York.  D'Agostino operates 14 grocery stores in the state of New York.  D'Agostino has timely

opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages

incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

66.g.  Plaintiff Jetro Cash & Carry Enterprises, LLC is a Delaware limited liability company, and a subsidiary of Jetro Holdings, LLC, a Delaware limited liability company with its principal place of business in College Point, New York (collectively, "Jetro").  Jetro is a wholesale cash and carry, serving grocery retailers and foodservice operators, and operates a total of 107 warehouses across 31 states under the names "Jetro Cash & Carry" and "Restaurant Depot."  Jetro has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

66.h.  Plaintiff National Association of Convenience Stores ("NACS") is a trade association organized under the laws of Virginia with its principal place of business in Alexandria, Virginia.  NACS is an international trade association representing more than 2,200 retail and 1,600 supplier company members. NACS member companies do business in nearly 50 countries worldwide, with the majority of members based in the United States.  NACS has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

66.i.  Plaintiff National Community Pharmacists Association ("NCPA") is a non-profit trade association organized under the laws of Virginia with its principal place of business in Alexandria, Virginia.  NCPA represents the pharmacist owners, managers, and employees of more than 23,000 independent community pharmacies across the United States.  NCPA has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the

damages incurred as a result of the conduct detailed in this Fourth Amended Complaint.

66.j.  Plaintiff National Grocers Association ("NGA") is a national trade association organized under the laws of the District of Columbia with its principal place of business in Arlington, Virginia.  NGA represents the retail and wholesale grocers that comprise the independent sector of the food distribution industry, as well as affiliated associations, manufacturers, and service suppliers.  NGA has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

66.k.   Plaintiff HMSHost Corporation ("HMSHost") is a Delaware corporation with its principal place of business in Bethesda, Maryland.  HMSHost is the world's largest provider of food, beverage and retail services for travelers.  HMSHost operates in more than 100 airports worldwide, including the top 20 busiest airports in North America, and at 99 Turnpike travel plaza stops in North America.  HMSHost has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

66.l.   Plaintiff Sears Holdings Corporation ("SHC") is a Delaware corporation with its principal place of business in Hoffman Estates, Illinois.  SHC is the parent company of Kmart Holding Corporation ("K-Mart") and Sears, Roebuck and Co. ("Sears").  SHC is a leading integrated retailer with approximately 1,733 Sears and K-Mart full-line and specialty retail stores in the United States.  Sears is the leading home appliance retailer as well as a leader in tools, lawn and garden, fitness equipment and automotive repair and maintenance.  SHC has timely

37

opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

66.m.   Plaintiff Yum! Brands, Inc. ("Yum!") is a North Carolina corporation with its principal place of business in Louisville, Kentucky.  Yum! is one of the world's largest restaurant companies with over 41,000 restaurants in more than 125 countries and territories. Yum!'s brands – KFC, Pizza Hut, and Taco Bell – are the global leaders of the chicken, pizza, and Mexican-style food categories.  Yum! has timely opted out of the proposed class settlement in MDL 1720 and is seeking to recover the damages incurred, including by any subsidiaries and/or affiliates that operate in the United States, as a result of the conduct detailed in this Fourth Amended Complaint.

### B.    Defendants

#### 1.    Visa and MasterCard

67.     Prior to the Visa IPO, Defendant Visa U.S.A. Inc. ("Visa U.S.A.") operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Its owner/members included approximately 14,000 banks.

68.     Prior to the Visa IPO, Defendant Visa International Service Association ("Visa International") operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Its owner/members included approximately 21,000 banks.

69.     Prior to the Visa IPO, Visa U.S.A. and Visa International were each governed by a board of directors (and Visa International had regional boards of directors for each of its geographical regions) comprised of bank executives selected from their member banks, including

some Bank Defendants.  Visa U.S.A. also was a regional group member of Visa International.

70.     Visa U.S.A. and Visa International, as well as other Visa entities not named as defendants in this Fourth Amended Complaint, conducted a number of corporate restructurings in 2007 and 2008 to combine several previously independent corporate entities into Defendant Visa Inc.  On March 19, 2008, Visa Inc. conducted an initial public offering through which it offered ownership shares to the general public and also issued ownership shares to its member banks.  As a result, Visa Inc. became and operates today as a publicly-traded Delaware corporation, with its principal place of business in Foster City, California.  Upon the restructuring, Visa U.S.A. and Visa International became wholly owned subsidiaries of Visa Inc. and they continue to operate as such today.  Visa Inc., Visa U.S.A., and Visa International are collectively referred to herein as "Visa."

71.     Visa operates General Purpose Payment Card Networks and did so throughout the Damages Period.

72.     Prior to the MasterCard IPO, Defendant MasterCard Incorporated was a private, SEC-registered share company, organized under the laws of Delaware with its principal place of business in Purchase, New York.  Defendant MasterCard International Incorporated, a wholly owned subsidiary of MasterCard Incorporated with its principal place of business also in Purchase, New York, was a Delaware membership corporation that, prior to the MasterCard IPO, consisted of more than 23,000 owner/member banks worldwide and was the principal operating subsidiary of MasterCard Incorporated.

73.     Prior to the MasterCard IPO, MasterCard Incorporated and MasterCard International Incorporated were governed by a global board of directors, as well as regional boards of directors for each of their geographical regions, that were comprised of bank

39

executives selected from their member banks, including some Bank Defendants.

74.     On May 25, 2006, MasterCard Incorporated and MasterCard International Incorporated conducted an initial public offering and entered into several related agreements to offer ownership shares to the general public and to issue ownership shares to MasterCard's member banks.  As a result, MasterCard Incorporated became and operates today as a publicly-traded Delaware corporation with its principal place of business in Purchase, New York.  Upon the restructuring and continuing to this day, MasterCard International Incorporated has remained MasterCard Incorporated's principal operating subsidiary with its principal place of business also in Purchase, New York, and doing business as MasterCard Worldwide.  MasterCard Incorporated and MasterCard International Incorporated (and MasterCard Worldwide) are collectively referred to herein as "MasterCard."

75.     MasterCard operates General Purpose Payment Card Networks and did so throughout the Damages Period.

### 2.     The Bank Defendants

76.     Defendant Bank of America, N.A. is a national banking association with a principal place of business in Charlotte, North Carolina.  Defendant Bank of America Corporation is a Delaware Corporation with its principal place of business in Charlotte, North Carolina, and is the ultimate parent of Bank of America, N.A.  Defendant FIA Card Services, N.A., is a wholly owned subsidiary of NB Holdings, Inc., itself a wholly owned subsidiary of Bank of America Corporation.  FIA Card Services, N.A., is a national banking association with its principal place of business in Wilmington, Delaware.  Bank of America, N.A., and FIA Card Services, N.A., are members of Visa and MasterCard that issue Visa- and MasterCard-branded General Purpose Payment Cards.  Bank of America, N.A., Bank of America Corporation, FIA

40

Card Services, N.A., and their predecessors and subsidiaries are collectively referred to herein as "Bank of America."

77.    Prior to the Visa IPO and at times during the Damages Period, Bank of America was represented on the Visa U.S.A. Board of Directors.  Prior to the MasterCard IPO and at times during the Damages Period, MBNA America Bank, N.A., which merged with and into Bank of America on January 1, 2006, was represented on the MasterCard U.S. and Global Boards of Directors.  Bank of America issues General Purpose Payment Cards to individuals and businesses throughout this judicial district.  It also provides card acceptance services to merchants throughout this judicial district through its substantial ownership in BA Merchant Services, LLC and Banc of America Merchant Services, LLC.  Bank of America has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Fourth Amended Complaint.

78.    Defendant JPMorgan Chase & Co. is a global financial firm that is incorporated in Delaware and has its principal place of business in New York, New York.  Defendant Chase Bank USA, N.A. is a wholly owned subsidiary of JPMorgan Chase & Co. and issues Visa- and MasterCard-branded General Purpose Payment Cards.  Chase Bank USA, N.A. is a national banking association and has its principal place of business in Newark, Delaware.  Defendant Chase Paymentech Solutions, LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Dallas, Texas.  Defendant JPMorgan Chase Bank, N.A., is a national bank organized under the laws of the United States with its principal place of business in Columbus, Ohio.  JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., and their predecessors and subsidiaries are collectively referred to herein as "Chase."

41

79.     Prior to the Visa IPO and at times during the Damages Period, Chase and various companies ultimately acquired by Chase (including Bank One Corporation and Bank One Delaware, N.A. (acquired by Chase in July 2004), Washington Mutual Bank (acquired by Chase in September 2008), and Providian National Bank (acquired by Washington Mutual in October 2005)) were represented on the Visa U.S.A. Board of Directors.  Prior to the MasterCard IPO and at times during the Damages Period, Chase was represented on the MasterCard Global Board of Directors and Washington Mutual was represented on the MasterCard U.S. Board of Directors.  Chase has also been represented on the Visa Inc. Board of Directors.  A longstanding Chase senior executive, Charles W. Scharf, has been installed as the CEO of Visa Inc., and another former Chase executive, Ryan McInerney, was recently hired as President of Visa Inc.  Chase issues General Purpose Payment Cards to individuals and businesses throughout this judicial district.  It also provides card acceptance services to merchants throughout this judicial district.  Chase has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Fourth Amended Complaint.

80.     Defendant Citigroup Inc. is a global bank that is incorporated in Delaware and has its principal place of business in New York, New York.  Defendant Citibank, N.A. is a national bank located in South Dakota for purposes of the National Bank Act, with its main office in New York, New York, and is an indirect subsidiary of Citigroup Inc.  Citibank, N.A. issues Visa- and MasterCard-branded General Purpose Payment Cards.  Defendant Citicorp Payment Services, Inc., a Delaware corporation with its principal place of business in Long Island City, New York, is a subsidiary of Citibank, N.A.  Citigroup Inc., Citibank, N.A., Citicorp Payment Services, Inc., and their predecessors and subsidiaries are collectively referred to herein as "Citigroup."

81.     Prior to the MasterCard IPO and at times during the Damages Period, Citigroup

42

was represented on the MasterCard U.S. and Global Boards of Directors.  It has also been represented on the post-IPO MasterCard Board of Directors.  Citigroup issues General Purpose Payment Cards to individuals and businesses throughout this judicial district.  It also provides card acceptance services to merchants throughout this judicial district.  Citibank has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Fourth Amended Complaint.

82.     Defendant Wells Fargo & Company is a financial holding company which is incorporated in Delaware with a principal place of business located in San Francisco, California. Defendant Wells Fargo Bank, N.A. is a national association and wholly owned subsidiary of Wells Fargo & Company with a main office located in Sioux Falls, South Dakota.  Wachovia Bank, N.A. merged into Wells Fargo Bank, N.A.  Wells Fargo Bank, N.A., issues, and Wachovia Bank, N.A., issued, Visa and MasterCard-branded General Purpose Payment Cards.  Wells Fargo & Company, Wells Fargo Bank, N.A., and their predecessors and subsidiaries are collectively referred to herein as "Wells Fargo."

83.     Prior to the Visa IPO and at times during the Damages Period, Wells Fargo and Wachovia were represented on the Visa U.S.A. Board of Directors.  Wells Fargo issues General Purpose Payment Cards to individuals and businesses throughout this judicial district.  Through its "Wells Fargo Merchant Services" division, it also provides card acceptance services to merchants throughout this judicial district.  Wells Fargo has had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Fourth Amended Complaint.

84.     Bank of America, Chase, Citigroup, and Wells Fargo are collectively referred to herein as the "Bank Defendants."  The Bank Defendants and/or entities they acquired were owner/member banks of the pre-IPO Visa and MasterCard networks.  The Bank Defendants are

43

actual or potential competitors for the issuance of General Purpose Payment Cards and the acquisition of merchants. The Bank Defendants are members of both Visa and MasterCard networks and have conspired with each other and with other Visa and MasterCard Issuers not to compete for merchants' acceptance of General Purpose Payment Cards, to require the payment of an Interchange Fee on every Visa and MasterCard transaction, and to fix the level of Interchange Fees that they charge to merchants.

85.     Certain banks, including some Bank Defendants, were board members of Visa from the beginning of the Damages Period through Visa's IPO in 2008 (and some banks, including Chase, were board members of post-IPO Visa). As Visa board members and/or as owner/members of Visa, the banks (including the Bank Defendants) collectively controlled every aspect of Visa's business. This collective control included the banks' agreements: (1) not to compete with one another for merchants' acceptance of Visa General Purpose Payment Cards; (2) to fix the Interchange Fees for Visa General Purpose Payment Card transactions in furtherance of their agreement not to compete; and (3) to set Visa's rules, including all the rules detailed in this Fourth Amended Complaint. Additionally, given the banks' control over pre-IPO Visa, they explicitly agreed to proceed with Visa's IPO on the condition that Visa's post-IPO structure would enable substantive continuation of the agreement not to compete and price fixing detailed in this Fourth Amended Complaint. All Visa member banks effectively delegated to Visa, in perpetuity, the ability to fix the banks' Interchange Fees to merchants. Each Bank Defendant (and all Visa member banks) knew that all other Visa members were also delegating their pricing decisions to Visa and MasterCard, which arrangement was further ratified by an agreement of Visa's member banks when they voted to approve Visa's restructuring, and each Bank Defendant (and all Visa member banks) knew that Visa would continue to enforce, *inter*

44

*alia,* its default Interchange Fee and Honor All Issuers rules.

86.     Certain banks, including some Bank Defendants, were board members of MasterCard from the beginning of the Damages Period through MasterCard's IPO in 2006 (and some banks, including Citigroup, were board members of post-IPO MasterCard).  As MasterCard board members and/or as owner/members of MasterCard, the banks (including the Bank Defendants) collectively controlled every aspect of MasterCard's business.  This collective control included the banks' agreements: (1) not to compete with one another for merchants' acceptance of MasterCard General Purpose Payment Cards; (2) to fix the Interchange Fees for MasterCard General Purpose Payment Card transactions in furtherance of their agreement not to compete; and (3) to set MasterCard's rules, including all the rules detailed in this Fourth Amended Complaint.  Additionally, given the banks' control over pre-IPO MasterCard, they explicitly agreed to proceed with MasterCard's IPO on the condition that MasterCard's post-IPO structure would enable substantive continuation of the agreement not to compete and price fixing detailed in this Fourth Amended Complaint.  All MasterCard member banks effectively delegated to MasterCard, in perpetuity, the ability to fix the banks' Interchange Fees to merchants.  Each Bank Defendant (and all MasterCard member banks) knew that all other MasterCard members were also delegating their pricing decisions to Visa and MasterCard, which arrangement was further ratified by an agreement of MasterCard's member banks when they voted to approve MasterCard's restructuring, and each Bank Defendant (and all MasterCard member banks) knew that MasterCard would continue to enforce, *inter alia,* its default Interchange Fee and Honor All Issuers rules.

## FACTUAL ALLEGATIONS

**A.     Defendants' Cartels**

87.     Defendants created and maintained two separate cartels that implemented their agreements to fix prices and not to compete.  One conspiracy was perpetrated by the Visa Defendants; the other was perpetrated by the MasterCard Defendants.  Both conspiracies are ongoing.

88.     The pillars of each of these conspiracies are Visa's and MasterCard's Honor All Issuers rules.  Pursuant to these rules, each network's member/owner banks have agreed that any merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network <u>must</u> accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network.  These "all or nothing" rules thereby constitute agreements among the banks not to compete for merchants' acceptance of their General Purpose Credit (or Debit) Cards.

89.     To reinforce their agreements not to compete for merchant acceptance, each network's Issuers have colluded to fix the Interchange Fees they charge merchants on every transaction through the default Interchange Fee rules.  This has prevented merchants from realizing the price-reducing benefits of Issuers competing on price, which would have occurred in a competitive market.  Instead, merchants accepting either Visa or MasterCard General Purpose Payment Cards pay the same Interchange Fee on a given transaction regardless of which Issuer is involved.  There is no competition.  Within each conspiracy, Issuers charge merchants exactly the same inflated prices that are the products of the banks' collusion.  These banks typically compete vigorously for cardholders, but they do not compete for merchant acceptance or for the Interchange Fees that merchants pay to accept their Visa and MasterCard cards.

46

90.     Visa and MasterCard are the enterprises by which competing banks implement and effectuate their agreements not to compete and agreements to fix prices.  These schemes rely on rules—such as the Honor All Issuers rules, default Interchange Fee rules, and other rules and policies that establish mechanisms for monitoring and enforcing these price-fixing schemes— that bind all Visa and MasterCard Issuers and Acquirers.

91.     In addition to inflicting direct anticompetitive harm on merchants with these price-fixing conspiracies, Defendants also have used them to acquire and maintain their substantial market power.  Specifically, Visa and MasterCard used these supracompetitive Interchange Fees as an incentive for Issuers (who receive the Interchange Fees paid by merchants) to issue Visa and MasterCard General Purpose Payment Cards.  Using price fixing to induce Issuers to join their cartels, Visa and MasterCard acquired sufficient market power in the General Purpose Payment Card markets such that most merchants were compelled to accept their cards for payment.  Moreover, once a merchant started accepting Visa's and MasterCard's General Purpose Payment Cards for payment, it was impossible to stop accepting them.  Once Visa and MasterCard acquired substantial market power over merchants, they maintained it by forcing merchants to pay ever higher Interchange Fees to continue to fund these price-fixing schemes and thereby perpetually maintain and enhance their cartels' market power through the present day.

92.     Although Visa and MasterCard initially focused their anticompetitive conduct on General Purpose Credit Cards, once they achieved substantial market power in the General Purpose Credit Card market they leveraged it to achieve substantial market power in the General Purpose Debit Card market by forcing merchants to accept Defendants' Signature Debit Card transactions as a condition of accepting Defendants' dominant General Purpose Credit Card

47

transactions and by engaging in a variety of other exclusionary conduct.

93.     As the natural and intended consequences of their anticompetitive conduct, Defendants were able to set both General Purpose Credit Card and Debit Card Interchange Fees at supracompetitive levels.  Defendants' anticompetitive conduct generated more than $350 billion in Interchange Fees for the colluding Issuers during the Damages Period—fees paid by merchants and their customers.  Merchants paid these anticompetitive fees directly throughout the Damages Period and they continue to pay them to this day.

94.     Defendants' anticompetitive conduct during the Damages Period was not reasonably necessary to operate their General Purpose Payment Card Networks.  Domestic and international examples have demonstrated that Interchange Fees are economically unnecessary to encourage Issuers to issue General Purpose Payment Cards or for these payment systems to function.  *A fortiori*, Issuers' collusively-fixed, supracompetitive Interchange Fees are unjustifiable.

### 1.     During the Damages Period, Visa and MasterCard facilitated horizontal conspiracies of their member banks

95.     As owners of Visa and MasterCard, and as board members and participants in key operating committees of pre-IPO Visa and MasterCard, the Bank Defendants, together with other co-conspiring Visa and MasterCard member banks, conspired to control every aspect of Visa's and MasterCard's business.  Such collective control was used to implement the member banks' agreements not to compete for merchant acceptance of General Purpose Payment Cards, and the associated agreements to fix the prices of Interchange Fees for Visa and MasterCard General Purpose Payment Card transactions.  During the Damages Period, the Bank Defendants, together with other co-conspiring Visa and MasterCard member banks, ratified the default Interchange

48

Fee schedules that were recommended by staff and consultants of Visa and MasterCard.  During

the Damages Period, the conspiracies broadened as more banks joined Visa and MasterCard and

agreed to abide by agreements not to compete and to fix prices.  The conspiracies also broadened

during that time period when the banks added new high-Interchange-Fee products—such as the

Visa Signature and Signature Preferred Cards and the World and World Elite MasterCard

Cards—to the universe of Visa and MasterCard products that were subject to the conspiracies.

96.     In a decision affirming the condemnation of other exclusionary rules of Visa and

MasterCard, the Second Circuit held in 2003 that Visa and MasterCard:

> are not single entities; they are consortiums of competitors.  They are owned and
> effectively operated by some 20,000 banks, which compete with one another in
> the issuance of payment cards and the acquiring of merchants' transactions.
> These 20,000 banks set the policies of Visa U.S.A. and MasterCard.  These
> competitors have agreed to abide by a restrictive exclusivity provision. . . . The
> restrictive provision is a horizontal restraint adopted by 20,000 competitors.

*United States v. Visa U.S.A. Inc.*, 344 F.3d at 242 (emphasis added).  Like those restrictive

provisions, to which the Bank Defendants agreed in their capacities, *inter alia*, as board members

and/or owners of Visa and MasterCard, the anticompetitive conduct by Visa and MasterCard

establishing the agreements not to compete and price-fixing schemes were the products of

conspiracies among competing Issuers—conspiracies that continue to this day.

### 2.     The Honor All Issuers rules constituted unjustifiable horizontal agreements not to compete on price

97.     In order to eliminate any incentive for Issuers to compete for merchant acceptance

based on the price of interchange, as they would have done in a competitive market, the Bank

Defendants  on Visa's and MasterCard's governing boards of directors approved the Honor All

Issuers rules.  *See, e.g.*, Visa Rule 5.2.B, *Visa U.S.A. Inc. Operating Regulations, Volume 1—

General Rules* (Nov. 15, 2008); MasterCard Rule 5.6.1, *MasterCard Rules* (Oct. 2008).  The

rules require a merchant to accept <u>all</u> of a network's Issuers' General Purpose Credit (or all

Debit) Cards bearing the network's brand if that merchant wants to accept any single Issuer's

General Purpose Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer.

These rules also prohibit merchants from steering consumers from using one Issuer's Visa or

MasterCard General Purpose Payment Cards to using General Purpose Payment Cards issued by

other Issuers or other cheaper forms of payment.

98.    These "all or nothing" rules support Defendants' cartels in the following manner.

By forcing a merchant to accept all General Purpose Credit (or Debit) Cards bearing the

network's brand, while barring merchants from steering by Issuer, Issuers need not worry about

losing business to a lower-cost competitor because all cards issued by every Issuer must be

accepted at the default Interchange Fee rates.  Thus, a merchant that must accept a Visa

Signature Preferred Card transaction, which bears an Interchange Fee ranging from 2.10% to

2.95% (plus $0.10), cannot attempt to steer consumers to cheaper forms of payment or even to

cheaper Visa (or MasterCard) standard General Purpose Credit Cards, for which the merchant

would pay substantially lower, but still supracompetitive, Interchange Fees.  Because of the

Honor All Issuers rules, Issuers have no incentive to enter into bilateral agreements outside the

conspiracy, *i.e.*, Issuers are incentivized not to "cheat" on the price-fixing scheme.  Thus, the

default Interchange Fees have become a price floor.

99.    If there had been no Honor All Issuers rules, it would have been in the economic

interest of an individual, profit-maximizing Issuer to lower the price it charged in order to

compete for merchants' business against other banks issuing similar General Purpose Payment

Cards.  These "all or nothing" rules, however, eliminated the incentives to engage in such

competition and to lower prices below the anticompetitive, cartel-determined levels set forth in

the default Interchange Fee schedule.  With the Honor All Issuers rules in place, it does not make economic sense for any Issuer to compete on price because merchants are forced to accept that Issuer's cards even though they are being charged inflated prices fixed by the cartels.  Because of these rules, Issuers have rebuffed overtures from merchants to enter into direct arrangements that would have benefited the Issuer.

100.     Visa and MasterCard have argued that the Honor All Issuers rules are necessary for their networks to function because, without them, universal acceptance of their General Purpose Payment Cards cannot be assured.  Visa's and MasterCard's conduct throughout the Damages Period reveals the pretextual nature of that justification.  Visa and MasterCard have permitted numerous products that function at only a subset of the locations that accept Visa and MasterCard General Purpose Credit (or Debit) Cards, and the introduction and proliferation of those products have not harmed the operation of their networks.  These include selective-acceptance (or selective-authorization) cards, which can be used only at certain merchant locations, even though they bear the Visa or MasterCard logos that supposedly connote universal acceptance of all the Visa or MasterCard brand's cards.  Examples include the increasingly-prominent flexible spending account cards and health reimbursement account cards, among others.  In addition, after the Damages Period, Visa and Chase entered an arrangement that purports to provide merchants the ability to prefer Chase-issued Visa General Purpose Payment Cards over other Visa General Purpose Payment Cards in certain limited circumstances.  These examples, among others, show that the Honor All Issuers rules are not necessary for a General Purpose Payment Card Network to function.  Moreover, even if the Honor All Issuers rules have some legitimate rationale, those objectives could be realized through less restrictive means.

### 3. The default Interchange Fee rules are unlawful horizontal agreements on price

101. The default Interchange Fee rules are the mechanisms that Defendants use to fix the prices of Interchange Fees.  Both Visa and MasterCard require that a default Interchange Fee apply to every transaction for which the Issuer and Acquirer has not entered into a separate, individually-negotiated agreement regarding fees (*i.e.*, bilateral agreement).  *See, e.g.*, Visa Rule 9.5, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); MasterCard Rule 9.4, *MasterCard Rules* (Oct. 2008).  These rules underpinned the Interchange Fee schedules, which applied to Visa and MasterCard transactions throughout the Damages Period.

102. While competition would have motivated rival Issuers to charge lower fees than the default Interchange Fees, they have never done so because the Honor All Issuers rules, working in tandem with the default Interchange Fee rules, eliminated any incentive for Issuers to charge fees below the anticompetitively high levels being fixed by the conspiracies.  As a result, there have been no bilateral agreements entered into by member banks of Visa or MasterCard.

103. In order to identify any cartel members "cheating" by secretly offering lower Interchange Fees, Visa and MasterCard monitored each transaction to ensure application of the appropriate Interchange Fee.  At the same time, Visa's and MasterCard's rules required all Issuers and Acquirers to adhere to all network rules.  *See, e.g.*, Visa Rule 1.2.A, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); MasterCard Rule 1.5.5, *MasterCard Rules* (Oct. 2008).  Member banks that violated any of these network rules were subject to fines and even expulsion from Visa and MasterCard and, by rule, the networks could not be held liable by these banks.  *See, e.g.*, Visa Rule 1.7, *Visa U.S.A. Inc. Operating*

52

*Regulations, Volume 1—General Rules* (Nov. 15, 2008); Visa Core Principles 1, 2.3, *Visa International Operating Regulations* (Oct. 15, 2010); MasterCard Rules 3.1, 3.1.2, 3.3, *MasterCard Rules* (Oct. 2008).  This enabled Visa and MasterCard to monitor compliance with, and enforce, the rules of their respective cartels.  These rules remain in place to this day.

104.    All Issuers used the same default Interchange Fee schedules for any given Visa and MasterCard payment transaction but, within each of those schedules, there was wide variability in the fees charged for various transactions.  For example, a schedule of default Interchange Fees set different fee levels for different card types (*e.g.*, standard General Purpose Credit Cards versus Premium Payment Cards).  This schedule of default Interchange Fees also imposed different fee levels by merchant category, with card-not-present merchants (merchants that sell goods and services to consumers without face-to-face interaction, *i.e.*, typically over the Internet or by telephone or mail-order) paying substantially higher rates and with supermarkets and warehouse clubs paying comparatively low rates.  This price discrimination evidenced Visa's and MasterCard's substantial market power.  While there were different fees within a given default Interchange Fee schedule, every Issuer applied the same fee schedule to a given transaction.  It is this collusion by every Issuer to set identical default Interchange Fee schedules that constitutes price fixing.

### 4.    Merchants pay Interchange Fees directly

105.    When a merchant accepts a Visa or MasterCard General Purpose Payment Card as payment for a transaction, that merchant is the direct purchaser of General Purpose Payment Card Network Services and directly pays the Interchange Fees associated with that transaction. The Issuer directly deducts the Interchange Fee from the net transaction amount passed through to the merchant.  Accordingly, Issuers account for Interchange Fees as revenue, and merchants

account for Interchange Fees as an expense.  In contrast, Acquirers do not account for

Interchange Fees as an expense.

106.     This prior deduction of Interchange Fees from the net transaction amount received

by the Acquirer stands in contrast to the payment of several network assessments imposed on

Acquirers.  Acquirers pay these network assessments directly.  The network assessments are

charged to the Acquirer, typically as part of a monthly invoice, and must be paid directly by

them like any other cost of doing business (*e.g.*, electricity bills).  Acquirers treat these network

assessments as expenses, unlike their treatment of Interchange Fees.

### 5.    Defendants have used their price-fixing schemes to establish, maintain, and enhance their long-held market power

107.     Using price fixing to induce Issuers to join their price-fixing cartels, Visa and

MasterCard acquired substantial market power in the General Purpose Payment Card markets, as

courts have repeatedly determined.  For example, in *United States v. Visa U.S.A. Inc.*, 163 F.

Supp. 2d 322, 340, 342 (S.D.N.Y. 2001), the court determined that "[b]ecause Visa and

MasterCard have large shares in a *highly* concentrated market with significant barriers to entry,

both defendants have market power in the general purpose card network services market,

whether measured jointly or separately; furthermore plaintiff has demonstrated that both Visa

and MasterCard have raised prices and restricted output without losing merchant customers."

There, the United States "prove[d] through the testimony of merchants that they cannot refuse to

accept Visa and MasterCard even in the face of significant price increases because the cards are

such preferred payment methods that customers would choose not to shop at merchants who do

not accept them." *Id.*  The Second Circuit affirmed this determination of market power, holding

that "Visa U.S.A. and MasterCard, jointly and separately, have power within the market for

network services." *United States v. Visa U.S.A. Inc.*, 344 F.3d at 239.

108.   Visa's and MasterCard's substantial market power has persisted throughout the Damages Period and remains intact today.  In a recent Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER, Dkt. #5 (E.D.N.Y. Oct. 4, 2010), at 6, the United States Department of Justice Antitrust Division ("Antitrust Division") alleged that Visa and MasterCard possessed market power in the "network services market" for General Purpose Cards (*i.e.*, general purpose credit and charge cards).  The non-discrimination restraints at issue in that case prevented merchants from "reducing [their] purchases of one network's services by encouraging [their] customers to choose a competing network's General Purpose Card." *Id.* at 7.  Although a merchant could theoretically resist high acceptance fees by no longer accepting Visa's or MasterCard's General Purpose Cards, the Antitrust Division recognized that the "all-or-nothing choice d[id] not effectively constrain Defendants' market power because merchants cannot refuse to accept these General Purpose Cards without alienating customers and losing significant sales." *Id*.

109.   These determinations that Visa and MasterCard possessed substantial market power are supported by direct evidence of that power.  That evidence includes: (1) Visa's and MasterCard's ability to raise Interchange Fees without the loss of merchant acceptance or transaction volume; (2) successful price discrimination such as the price discrimination described above; (3) setting Interchange Fees unrelated to costs; (4) the ability to enforce anticompetitive policies; and (5) forcing merchants and consumers to accept inferior products—including products that are susceptible to fraud.

a.    *Ability to raise Interchange Fees with impunity*

i.   *Visa*

110.    Starting in the 1970s, Visa has possessed and exercised substantial market power in the General Purpose Credit Card Network Services market, and that market power has increased significantly since then.  By the 1990s, Visa General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting Visa General Purpose Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

111.    In the General Purpose Credit Card Network Services market, Visa raised General Purpose Credit Card Interchange Fees without merchants ceasing to accept Visa's General Purpose Credit Cards.  In fact, Visa typically gained volume after these increases.  For example, during the Damages Period, Visa permitted Issuers to reclassify standard Visa General Purpose Credit Cards as Premium Payment Cards and, at the flip of a switch, the Interchange Fees that merchants paid for transactions made with such cards increased dramatically.  Notwithstanding the vigorous merchant opposition to these punitive price increases, no merchant dropped Visa as a result.

112.    Visa continued to possess by far the highest market shares and the highest number of General Purpose Credit Cards in circulation throughout the Damages Period.  Accordingly, most merchants must accept Visa General Purpose Credit Cards to remain viable.

113.    At the beginning of the Damages Period, Visa raised its Signature Debit Card Interchange Fees, and then throughout the Damages Period, Visa exercised its monopoly power to increase PIN Debit Card Interchange Fees as well.  Notwithstanding these price increases,

56

Visa's debit volumes have increased during the Damages Period.  As with General Purpose

Credit Cards, merchants could not drop Visa's Signature Debit or PIN Debit products despite

these significant price increases.  Visa's ability to increase Interchange Fees without losing

merchant acceptance or transaction volume directly evidences its monopoly power in the General

Purpose Debit Card market.

114.     Visa's monopoly power in the General Purpose Debit Card market and the

supracompetitive nature of General Purpose Debit Card Interchange Fees were confirmed by the

passage by Congress of Section 1075 of the Dodd-Frank Wall Street Reform and Consumer

Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-74 (July 21, 2010) (the "Durbin

Amendment"),[1] which required the Board of Governors of the Federal Reserve System (the

"Federal Reserve") to enact regulations to ensure that General Purpose Debit Card Interchange

Fees for covered Issuers (*i.e.*, banks with more than $10 billion in assets) are "reasonable and

proportional" to Issuer costs.  Section 920(a)(2) of the EFTA, 15 U.S.C. § 1693o-2(a)(2).  In

passing the Durbin Amendment, Congress made clear that the statute was designed to address

Visa's and MasterCard's ability to exercise substantial market power by raising Interchange Fees

well above cost.  Its principal author, Senator Richard J. Durbin, made numerous statements to

that effect on the floor of the Senate, including the following:

> For years, Visa and MasterCard, and their big bank backers, have unilaterally
> fixed prices on the fees small businesses pay every time they accept a debit card
> from a customer.  The two giant card networks control 80 percent of the debit
> card market—that is Visa and MasterCard.  And it is no surprise that debit
> interchange fees have risen, even as the price of processing the transaction has
> fallen. . . . Finally, Visa, MasterCard, and the Wall Street banks will face some
> check against their unbridled market power in the credit and debit industries.

---

[1] Section 1075 amended the Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.) ("EFTA") with a new Section
920, codified at 15 U.S.C. § 1693o-2.

156 Cong. Rec. S5,802–03 (daily ed. July 14, 2010).  Even though the Federal Reserve found that most Issuers' costs were slightly above "par" (*i.e.*, zero), to implement the Durbin Amendment it capped both Signature and PIN Debit Interchange Fees at $0.21 plus .05% plus an additional $0.01 fraud-prevention adjustment.  *See Regulation II, Debit Card Interchange Fees and Routing*, *Final Rule*, 76 Fed. Reg. 43,394 (July 20, 2011) (setting the cap); *Regulation II, Debit Card Interchange Fees and Routing*, *Final Rule*, 77 Fed. Reg. 46,258 (Aug. 3, 2012) (adding the fraud-prevention adjustment).  This cap, while significantly above cost for most Issuers, substantially reduced the debit Interchange Fees that prevailed for years due to Visa's dominance of this market.

### ii.  MasterCard

115.    MasterCard also has possessed and exercised substantial market power in the General Purpose Credit Card Network Services market since the 1970s, and MasterCard's market power also has increased significantly over the years.  By the 1990s, MasterCard General Purpose Credit Cards became the primary or only such cards for tens of millions of consumers in the United States.  Accepting MasterCard General Purpose Credit Cards became a competitive necessity for the vast majority of merchants, especially for card-not-present merchants that were heavily reliant on accepting such cards remotely.

116.    Like Visa, MasterCard has continually raised the Interchange Fees that merchants pay for accepting MasterCard General Purpose Credit Cards without losing merchant acceptance.  Like Visa, MasterCard permitted Issuers to reclassify standard MasterCard General Purpose Credit Cards as Premium Payment Cards and, at the flip of a switch, the Interchange Fees that merchants paid for transactions made with such cards increased dramatically.  Notwithstanding the vigorous merchant opposition to these punitive price increases, no merchant dropped

58

MasterCard as a result.  Once a merchant begins to accept MasterCard (and Visa) General Purpose Credit Cards, it is virtually impossible for it to stop, and no merchants have.

117.     MasterCard's substantial market power was further evidenced by its ability to successfully charge merchants higher Interchange Fees than Visa charged, even though MasterCard had lower market shares.  Throughout the Damages Period, MasterCard fixed Interchange Fees that were higher than Visa's.  MasterCard designed this strategy to compensate for its self-perceived inferiority to Visa in other dimensions that could make MasterCard less attractive to Issuers absent the higher Interchange Fees.  If it did not have substantial individual market power over merchants, MasterCard could not have consistently and profitably maintained higher Interchange Fees than Visa, a competing network.

### b.     Price discrimination

118.     As one court has held, Visa's and MasterCard's "ability to price discriminate also illustrates their market power.  Both Visa and MasterCard charge differing interchange fees based, in part, on the degree to which a given merchant category needs to accept general purpose cards. . . . Transactions with catalog and Internet merchants, for example, which rely almost completely on general purpose cards, have higher interchange fees than 'brick-and-mortar' merchants.  [Visa and MasterCard] rationalize this difference by pointing to increased fraud in these merchant categories, but this explanation is belied by the fact that the Internet merchant, not Visa/MasterCard or their member banks, bears virtually all the risk of loss from fraudulent transactions."  *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 340-41.  This price discrimination persisted throughout the Damages Period and continues to this day.

### c.     Setting supracompetitive prices unrelated to cost

119.     Visa and MasterCard did not set Interchange Fees based upon cost, as they would

59

have done in a competitive market.  For example, with respect to the General Purpose Debit Card market, as noted above, the Federal Reserve found in 2011 that Visa's and MasterCard's Signature Debit and PIN Debit Card rates were substantially above cost.  Visa's and MasterCard's ability to succeed in this conduct and profit from it is additional direct evidence of their substantial market power.

### d.   Enforcement of anticompetitive rules and policies

120.   Visa's and MasterCard's successful enforcement of anticompetitive rules and policies that harmed merchants without losing merchant acceptance or transaction volume further demonstrates the substantial market power that Visa and MasterCard had in the General Purpose Payment Card markets.  Despite the adverse economic impact of these rules and policies on merchants, given Visa's and MasterCard's substantial market power, merchants could not afford to stop accepting Visa or MasterCard transactions.

### e.   Forcing merchants and consumers to accept inferior products

121.   Visa's and MasterCard's success in forcing merchants and consumers to accept and use technologically-inferior products—including products that Visa and MasterCard knew would increase fraud—is further evidence of their substantial market power.  Visa and MasterCard could have dramatically reduced General Purpose Payment Card fraud in the United States during the Damages Period simply by adopting new card technology to replace the decades-old, fraud-prone magnetic stripe technology they forced merchants and consumers to use.  Instead, Visa and MasterCard succeeded in shifting most of the cost of fraud losses to merchants in this country through the implementation of various compliance programs and liability rules.  They did so because they and their member banks profit from fraud which creates a pretextual justification for high Interchange Fees.  Visa and MasterCard also profited from

60

fraud through punitive fines and fees for data breaches, another manifestation of their substantial market power.

122.    Visa and MasterCard have long recognized that the magnetic stripe technology that their General Purpose Credit Card and Signature Debit Card networks utilize is inherently insecure and fraud-prone.  Yet Visa and MasterCard have perpetuated the use of magnetic stripe technology by, among other things, delaying to take steps to implement more secure technologies.  As a result, the United States has experienced the highest fraud rates, with the gap growing.  For example, the United States was not among the top 10 countries with the most counterfeit fraud in 2004 but, by early 2010, it accounted for 85% of total counterfeit fraud among all top 10 countries combined.  *See* Counterfeit Fraud Migration, European Payments Council (June 29-30, 2010) at 5-7.

123.    This is a direct result of the conspiracies detailed in this Fourth Amended Complaint.  Despite the availability of technology to reduce fraud, Visa and MasterCard had no incentive to adopt it in the United States or compete on this basis because they could shift fraud-related costs to merchants and thereby profit from fraud while insulating the banks from its costs.  Visa's and MasterCard's ability to impose inferior quality card products and to permit preventable fraud during the Damages Period is further direct evidence of their substantial market power.  To the extent that Plaintiffs were forced to absorb the costs of such fraud through chargebacks or fees or fines, such costs are damages that flow from the conspiracies.

124.    Visa's and MasterCard's substantial market power continued, and even increased, during the Damages Period.  In fact, even though Plaintiffs include some of the largest merchants in the country, none of the Plaintiffs can drop Visa or MasterCard General Purpose Credit or Debit Cards without losing an unacceptable number of sales.

6.    **The MasterCard and Visa IPOs were changes in corporate form that maintained and enhanced the cartels**

125.    During the Damages Period, the Bank Defendants that sat on the Visa and MasterCard boards, and controlled them, approved MasterCard's and Visa's reorganizations into corporate entities that offered a portion of their shares to members of the public through IPOs. The Bank Defendants took advantage of their direct control over pre-IPO Visa and MasterCard to agree to post-IPO structures for Visa and MasterCard that were designed to perpetuate, and not to disturb, the anticompetitive conduct detailed in this Fourth Amended Complaint.

126.    These IPOs were a response to the growing antitrust challenges and adverse legal rulings regarding Visa's and MasterCard's organizational structures as associations of competing member banks. *See, e.g.*, MasterCard Incorporated Amendment No. 8 to Form S-1 Registration Statement (May 23, 2006) at 72-73 (noting that MasterCard had "faced heightened regulatory scrutiny and legal challenges in recent years").

127.    In response to these legal defeats and a host of additional antitrust challenges, Defendants decided to change the organizational structures of Visa and MasterCard in order to attempt to evade antitrust liability through superficial changes in corporate form.  But in doing so, the Bank Defendants and the other members of Visa and MasterCard agreed prior to the IPOs that post-IPO Visa and MasterCard would continue to support the agreements not to compete and to fix prices.

128.    They implemented this agreement by structuring the IPOs so that they cosmetically changed the corporate forms, while leaving the anticompetitive conduct intact.  Pre-IPO, the Bank Defendants (and other Visa and MasterCard owner/member banks) conspired through Visa's and MasterCard's governing boards and/or their ownership of Visa and

MasterCard to control every aspect of Visa's and MasterCard's businesses, including agreeing to fix the prices of Interchange Fees through ratification of the default Interchange Fee schedules and agreeing to set Visa's and MasterCard's rules, including maintaining the Honor All Issuers rules.

129.    Post-IPO, Visa and MasterCard act as the pricing and rules enforcement agents for their member banks.  Through the corporate reorganizations and subsequent IPOs, each Bank Defendant and all Visa and MasterCard member banks effectively delegated to Visa and MasterCard, in perpetuity, the ability to fix the bank's pricing to merchants.  Each Bank Defendant (and all Visa and MasterCard member banks) knew that all other Visa and MasterCard banks were also delegating their pricing decisions to Visa and MasterCard, which arrangement was ratified by a horizontal agreement of Visa's and MasterCard's member banks when they voted to approve Visa's and MasterCard's restructurings on these bases.

130.    Moreover, as part of the corporate reorganizations leading to their respective IPOs, the Bank Defendants and the other members of Visa and MasterCard reaffirmed and effectively readopted each network's rules, including the default Interchange Fee and Honor All Issuer rules.  Thus, the Bank Defendants' (and all Visa and MasterCard member banks') approval of this scheme was done knowing that all Visa and MasterCard member banks' Interchange Fees would be set by Visa and MasterCard.  This was a conscious commitment to an ongoing common scheme by horizontal competitors and, as such, is a continuing violation of Section 1 of the Sherman Act.  It maintains the pre-IPO status quo: Visa and MasterCard continue to set Interchange Fees for thousands of competing banks that, but for these conspiracies, would have independently competed for merchant acceptance.

131.    The IPOs increased the effectiveness of Defendants' price-fixing conspiracies as

well as Visa's and MasterCard's substantial market power by consolidating decision-making and coordinating communications among the conspirators.  Visa's and MasterCard's economists opined in 1993—well before these IPOs were being considered—that "[t]here would be far less competition in this industry if Visa and MasterCard had chosen to operate as single companies." David S. Evans and Richard L. Schmalensee, *The Economics of the Payment Card Industry* (1993), at 103.

132.    The anticompetitive effects of these ongoing conspiracies continue to harm merchants and consumers.  The banks continue to adhere to the rules at issue, without exception. And Visa and MasterCard continue to wield substantial market power over merchants as a result. In this regard, Visa and MasterCard and the Bank Defendants understood before the IPOs were consummated that, if Visa and MasterCard maintained the cartels' basic rules and structures, no bank would break rank and compete for merchant acceptance.  That is precisely what happened.

133.    The Defendants' post-IPO conduct confirms that the IPOs did not terminate their price-fixing cartels or reduce Visa's and MasterCard's substantial market power.  Visa's and MasterCard's anticompetitive rules, including the restraints at issue in this Fourth Amended Complaint, have remained the same.  Visa and MasterCard have exercised their substantial market power by imposing new network fees that merchants must pay.  Visa has engaged in a campaign to maintain its monopoly power in the General Purpose Debit Card market.  Perhaps most significantly, Visa's and MasterCard's Interchange Fees have remained at supracompetitive levels since the IPOs.  This continuity demonstrates that the IPOs perpetuated Defendants' anticompetitive schemes and their substantial market power.

134.    Government antitrust enforcers agree that these IPOs reflected changes merely in corporate form, not substantive conduct.  In 2007, the European Commission's Competition

64

Directorate issued a written determination that MasterCard's members had simply agreed to appoint MasterCard as their cartel manager to act in their collective best interest in setting the level of Interchange Fees.  In particular, the Competition Directorate's comprehensive decision found as follows:

> MasterCard's viewpoint that the IPO . . . had changed the organisation's governance so fundamentally that any decision of MasterCard Incorporated's Global Board no longer qualifies as [a] decision of an association [of its member banks] but rather as [a] "unilateral" act which each member bank bilaterally agrees to abide by, cannot be accepted. . . . MasterCard's member banks shaped and eventually approved the IPO in order to perpetuate the MIF [Multilateral Interchange Fee] as part of the business model in a form that they perceived to be less exposed to antitrust scrutiny.  Contrary to MasterCard's argument, the aim of avoiding exposure to antitrust risks due to the MasterCard MIF was a clear driving force behind the IPO.  Rather than modifying the business model to bring it in line with EU competition law, the banks chose to change the governance of their co-ordination specifically for antitrust sensitive decision making.  The member banks effectively "*outsourced*" this decision making to a new management body and made sure that their direct influence . . . would be limited to minority rights.  However, the banks also agreed to the IPO . . . after MasterCard's management assured them that the banks' interests will continue to be preserved under a new "enhanced customer approach" and via the local input of the banks in the decision making.  <u>It cannot be doubted that in approving the IPO and thereby delegating the decision making powers for the MIF to the new independent Global Board, the member banks legitimately expected and therefore agreed that this Board would henceforth set the MIF in a manner that is in their common interest</u>.

European Commission Decision, COMP/34.579, at ¶¶ 357, 378-379 (Dec. 19, 2007) (footnotes omitted, emphasis added).

135.    The fact that a majority of MasterCard's post-IPO directors were "independent" did not change the role of MasterCard as the "outsourced" pricing agent and manager of the members' Interchange Fee cartel:

> The circumstances that members of the Global Board are "independent" within the meaning of the NYSE criteria . . . is not a decisive question for there to be an association of undertakings.  As an organisation's members entrust decision making power to a common body with the expectations that the body's

65

> subsequent coordination of their competitive behaviour will occur in the common interest of the members, the independence of such body is no obstacle to qualifying its decisions as decision[s] of an association of undertakings.

*Id.* at ¶ 381.  Moreover, "[d]evelopments after the IPO also indicate that MasterCard's management takes into account concrete banks['] interests in setting the level of fallback interchange fees."  *Id.* at ¶ 389.

136.    In May 2012, the European General Court affirmed the Commission's conclusions:

> [T]he Commission was legitimately entitled to take the view, in essence, that despite the changes brought about by MasterCard's IPO, the MasterCard payment organisation had continued to be an institutionalised form of coordination of the conduct of the banks.  Consequently, the Commission was fully entitled to characterize as decisions by an association of undertakings the decisions taken by the bodies of the MasterCard payment organisation in determining the MIF.

*MasterCard, Inc. and Others v. European Commission*, Case T-111/08, at ¶ 259 (May 24, 2012). "[W]ith regard to merchants, what [MasterCard and it member banks] sought [post-IPO wa]s essentially the maximum threshold of their tolerance to the price of card transactions."  *Id.* at ¶ 257.

### 7.    Defendants' price-fixing schemes also are unlawful vertical price restraints

137.    The Interchange Fee price-fixing schemes adopted by Defendants also constituted anticompetitive and unreasonable vertical price restraints.  Visa and MasterCard entered into express vertical agreements with each of their member banks, binding all of their member banks to comply with the rules and regulations of their networks, including the rules at issue in this Fourth Amended Complaint.  In turn, Visa and MasterCard each acts as the enforcement agent and holds issuing and acquiring members responsible for compliance with the rules.  These two sets of vertical price restraints—one for Visa Defendants and the other for MasterCard

66

Defendants—continued in full effect during the Damages Period, including after Visa's and MasterCard's IPOs.

138.    For example, Rule 1.3 of the July 15, 2011 *MasterCard Rules* states: "[a]n applicant to be a Member must agree, and by execution and submission of an application to be a Member agrees, that it will comply with all applicable provisions of the Certificate of Incorporation and the Standards of this Corporation."  In turn, "Standards" is defined as: "[t]he Amended and Restated Certificate of Incorporation, Bylaws, Rules, and policies, and the operating regulations and procedures of the Corporation, including but not limited to any manuals, guides or bulletins, as may be amended from time to time."  *See* Definitions, *MasterCard Rules* (July 15, 2011).  Similarly, the "General Overview" of the April 10, 2011 *Visa International Operating Regulations* states: "[t]he *Visa International Operating Regulations* are set and modified by Visa to support the use and innovation of Visa products and services, and represent a binding contract between Visa and all Members."

**B.    Defendants' Interchange Fee Cartels Are Naked Restraints of Trade Without Justification**

139.    Defendants have argued over the years that Interchange Fees are cost-based and necessary mechanisms to reimburse Issuers to motivate them to issue General Purpose Payment Cards.  The facts show otherwise.

140.    General Purpose Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally.  Payment card networks can thrive without Interchange Fees.  Moreover, the Interchange Fees set by Defendants are not based on cost.  Interchange Fees offer no procompetitive justification to offset the anticompetitive harm caused by the conduct detailed in this Fourth Amended Complaint.

### 1. Banks would profit from issuing General Purpose Debit Cards even without collectively-set Interchange Fees

141.    General Purpose Debit Cards have long been positioned by Visa and MasterCard and the banks as a replacement for cash and checks, both of which have cleared "at par" (*i.e.*, zero interchange) for decades.  As such, Issuers have strong economic incentives to issue General Purpose Debit Cards even without income from Interchange Fees.  General Purpose Debit Cards provide numerous economic benefits to Issuers that justify their issuance even without Interchange Fees.  These benefits include: (1) savings relative to the costs of processing checks and cash; (2) motivating cardholders to maintain larger bank deposits, which Issuers can then lend; and (3) helping the Issuer to cross-sell other lucrative services, such as mortgages, home equity lines, and credit cards.  Moreover, issuance of General Purpose Debit Cards enhances the "stickiness" of the Issuer's valuable relationship with its customers.

142.    When banks first began to offer PIN Debit Cards in the United States, they did not charge Interchange Fees.  To the contrary, they <u>paid</u> merchants to provide debit services, a practice known as "reverse," "negative," or "Issuer-paid" interchange.  Other banks provided debit services at par.  The market for General Purpose Debit Card Network Services expanded substantially during the time of Issuer-paid and at-par interchange.  This model prevailed until the early 1990s, when it changed only because Visa and MasterCard extended their cartels into debit.

143.    Beginning in the early 1990s, Visa and MasterCard aggressively began to implement and enforce a strategy to leverage their substantial market power in the General Purpose Credit Card market and force merchants to pay supracompetitive General Purpose Debit Card Interchange Fees.  The linchpin of this strategy was the enforcement of "credit/debit tying rules" which, until January 1, 2004, forced merchants that accepted Visa's and MasterCard's

dominant General Purpose Credit Cards to also accept the networks' Signature Debit Card transactions. Visa and MasterCard set the same or similar Interchange Fees for General Purpose Credit Card and Debit Card transactions notwithstanding the different costs and demand characteristics of such transactions. Merchants had no choice but to accept Visa's and MasterCard's dominant, supracompetitively-priced General Purpose Credit Card products and were, therefore, forced to accept supracompetitive Signature Debit Card Interchange Fees.

144.   Visa and MasterCard then used the lucrative Interchange Fee stream created by this practice to induce additional Issuers to participate in the conspiracy and thereby entrench their dominance in the General Purpose Debit Card market. This strategy successfully destroyed the at-par interchange model that had prevailed for debit prior to the 1990s, as Visa and MasterCard had intended. Moreover, it distorted banks' incentives in debit, causing them to push the less secure, less efficient Signature Debit Card products of Visa and MasterCard and to suppress the safer, cheaper, and faster PIN Debit Card products that were being promoted by the competing PIN Debit Card networks, such as NYCE and STAR.

145.   The substantial non-interchange economic benefits of issuing General Purpose Debit Cards explain why Issuers did not anticipate any significant adverse impact as a result of the regulatory cap that the Federal Reserve placed on General Purpose Debit Card Interchange Fees in the United States pursuant to the Durbin Amendment discussed above. Addressing that impending regulatory cap, the CEO of Citigroup said: "We don't have much of an impact on debit card interchange or overdraft fees. Those are really small impacts on us." Citigroup Inc. Q4 2010 Earnings Call Transcript (Jan. 18, 2011). The Chairman and CEO of City National Corporation predicted: "The Durbin amendment on debit card interchange fees . . . its economic impact on City National is not going to be material." City National Corporation Q4 2010

Earnings Call Transcript (Jan. 20, 2011).  TCF Financial Corp.'s Chairman and CEO added that

"[w]e'll obviously still be profitable" even if there is a cap imposed on debit Interchange Fees.

Transcript to TCF Financial Corp.'s Conference Call, *TCF Discusses Lawsuit Challenging*

*Durbin Amendment* (Oct. 12, 2010).

146.     The facts that General Purpose Debit Card issuance continues to be profitable and

that debit volumes have increased since General Purpose Debit Card Interchange Fees for

regulated banks declined significantly beginning in late 2011 reinforce the conclusion that

General Purpose Debit Card Interchange Fees had been fixed at supracompetitive levels

throughout the Damages Period.

147.     The experience in other industrialized countries also highlights that the

development of debit in the United States, with cartel-determined supracompetitive Interchange

Fees, was a function of anticompetitive conduct in the General Purpose Debit Card industry in

this country.  Virtually all the countries with the highest debit usage—including Canada,

Denmark, Finland, Iceland, the Netherlands, New Zealand, and Norway—utilize an at-par

interchange pricing model.  For example, the Canadian debit system has always been based on

at-par pricing, and Canada has traditionally had higher per capita debit usage than the United

States, as well as higher debit penetration in merchant categories that do not accept PIN Debit

Cards in the United States.

148.     The vast and successful U.S. checking system also demonstrates that Interchange

Fees are not necessary for a General Purpose Debit Card Network to function.  Since 1916, by

rule of the Federal Reserve, trillions of dollars of checks drawn on the U.S. national banking

system have cleared at par.  Despite this prohibition on Interchange Fees, banks have continued

to offer checks to their customers and have continued to accept and cash checks issued by other

banks.

### 2. Banks would profit from issuing General Purpose Credit Cards even without collectively-set Interchange Fees

149. In the 1980s, the default Interchange Fee rules were rationalized as being necessary to give General Purpose Credit Card Issuers incentives to issue such cards. By 1990, it was apparent that General Purpose Credit Card Issuers were earning substantial profits from interest rates on revolving balances and annual fees, and therefore Interchange Fees were unnecessary to encourage General Purpose Credit Card issuance. Since then, the evidence has continued to show that General Purpose Credit Card Issuers can be profitable without collectively-set Interchange Fees.

150. International experience regarding Interchange Fees on General Purpose Credit Card transactions also indicates that Interchange Fees in the United States have been fixed at supracompetitive levels. In Australia, the Reserve Bank of Australia regulated Visa's and MasterCard's General Purpose Credit Card Interchange Fees during the past decade. Those regulations mandated a nearly 50% reduction (to an average of 50 basis points) of those Interchange Fees, rates that are much lower than those that prevailed in the United States during the Damages Period. Prior to enactment of these regulations, Visa and MasterCard argued that such a reduction in Interchange Fees would cause a "death spiral" that would lead to a collapse of their networks and upheaval in the industry. In reality, no such "death spiral" or collapse occurred. Visa's and MasterCard's General Purpose Credit Card volumes have <u>increased</u> in Australia since the regulations went into effect. Indeed, the European General Court recently reviewed the evidence from Australia and concluded: "[i]t is clear . . . that a substantial reduction in the MasterCard system's interchange fees that was imposed by the Reserve Bank of Australia had no notable impact on the system's viability . . . ." *MasterCard, Inc. and Others v. European*

71

*Commission*, Case T-111/08, at ¶ 111 (May 24, 2012).

151.    Similarly, the European Commission undertook a comprehensive study of General Purpose Credit Card Interchange Fees in Europe, and its Competition Directorate undertook antitrust investigations into Interchange Fees charged by MasterCard's and Visa's European affiliates.  In 2002, the Commission and Visa reached a settlement that lowered Interchange Fees first to 0.7%, and then to a cost-based standard if lower.  This commitment expired in 2007, and the Commission began a new investigation, which continues.  Following Visa's 2002 commitment to limit consumer General Purpose Credit Card Interchange Fees to 0.7%, Visa announced in May 2013 that it will limit Interchange Fees to 0.3%.  In 2007, the Commission found MasterCard's setting of Interchange Fees to be unlawful, and MasterCard agreed to cap its Interchange Fees for transactions crossing national borders at 0.3% during the pendency of its appeal of that decision.  For years, therefore, the resulting European Interchange Fees have been substantially below those that prevail in the United States that often exceed 2.00% due to the proliferation of Premium Payment Cards.  Again, there have been no adverse effects—Visa's and MasterCard's General Purpose Credit Card volumes in Europe have increased during this period.

152.    In neither Australia nor the European Union do Visa and MasterCard enjoy the economies of scale and scope associated with the much larger General Purpose Payment Card markets in the United States.  Visa's and MasterCard's General Purpose Credit Card Interchange Fees in the United States are <u>higher</u> than nearly every other General Purpose Credit Card Network outside the United States, including Visa's and MasterCard's own networks in other countries.

153.    The costs associated with issuing Visa and MasterCard General Purpose Credit

Cards have declined dramatically since 1990.  Issuer costs of funding a cardholder's grace period—known as float costs—have fallen significantly.  Visa and MasterCard General Purpose Credit Card Issuers have enjoyed additional savings from substantial decreases in hardware, processing, and telecommunications costs, as well as through economies of scale that have resulted from vastly-increased transaction volumes and concentration of card issuance through bank mergers and card portfolio acquisitions.

154.    Notwithstanding these declines in Issuer costs, however, Visa and MasterCard have substantially raised their Interchange Fees.  For example, Visa has raised the Interchange Fees and/or cost of acceptance that apply to Visa General Purpose Credit Card transactions throughout the Damages Period.  MasterCard has done the same.  This demonstrates that Interchange Fees are not based on costs, but rather are a cartel's anticompetitive exercise of market power.

155.    Visa and MasterCard have argued that default Interchange Fees are justified because, as a result of their Honor All Issuers rules, an individual Issuer could otherwise potentially "hold up" merchants that accept Visa's and MasterCard's General Purpose Payment Cards by charging as high an Interchange Fee as that Issuer wishes.

156.    This "hold-up" problem is the result of the banks' anticompetitive agreements not to compete for merchant acceptance, *i.e.*, the Honor All Issuers rules.  Attempting to justify Interchange Fee price fixing on the grounds that it addresses the problems of an agreement not to compete, as Defendants have sought to do, is perverse.  Price fixing in tandem with an agreement not to compete is not a justification for anticompetitive conduct.  It <u>is</u> anticompetitive conduct.

157.    Moreover, these schemes create a staggering amount of anticompetitive harm. Even if the elimination of this additional anticompetitive "hold-up" problem (an anticompetitive

problem created by the schemes themselves) was credited as a procompetitive benefit—which it should not be—any such "benefit" would be far exceeded by the remaining anticompetitive harm resulting from those schemes that is detailed throughout this Fourth Amended Complaint.

> **3.      Anti-steering rules hid the costs of Visa and MasterCard transactions from consumers, thereby inhibiting competition from other networks and reinforcing the Visa and MasterCard cartels**

158.      In a competitive world, some merchants could have used financial incentives and marketing to steer customers to other networks or forms of payment and, by increasing customers' price sensitivity to Interchange Fees, steering could have led to network competition. Visa and MasterCard prevented this from happening by enforcing anti-steering rules that prohibited merchants from making the cost of Visa and MasterCard transactions transparent to consumers and from making consumers who use the cards bear the associated costs.

159.      During the Damages Period, the anti-steering rules included Visa's and MasterCard's rules that prohibited merchants from offering discounts to consumers that used General Purpose Payment Cards that were less expensive than Visa or MasterCard General Purpose Payment Cards.  These rules remained in effect until Visa and MasterCard revised them to permit such discounting pursuant to a July 20, 2011 consent decree they entered into with the Antitrust Division.  Visa and MasterCard, however, still prohibit merchants from offering discounts that encourage consumers to use cheaper forms of payment, including one bank's Visa or MasterCard General Purpose Payment Cards instead of more expensive Visa or MasterCard General Purpose Payment Cards issued by other banks.  Such discounting by Visa or MasterCard Issuer would force Visa and MasterCard member banks to compete for merchant acceptance.

160.      The anti-steering restraints also include rules that prevented (and still prevent) banks from linking to multiple networks on General Purpose Credit Cards.  Because of the way

the General Purpose Debit Card industry developed, with most cards originating as ATM/PIN Debit Cards, General Purpose Debit Cards have long had multiple network linkages (or "bugs") on them, and that has facilitated the most effective form of steering for merchants—routing transactions to cheaper General Purpose Payment Card Networks.  There is no technical reason why multiple network functionality could not co-reside on General Purpose Credit Cards.  Visa and MasterCard rules, however, blocked that from happening throughout the Damages Period.

161.    The anti-steering restraints also include the rules that prevent merchants that accept Visa and MasterCard from testing differential acceptance or new ways to steer transactions to cheaper General Purpose Payment Card Networks at certain locations that operate under a single banner.  That is the way most merchants pilot new products, and such testing would have enabled merchants to introduce new ways to force the banks to compete for merchant acceptance.

162.    The anti-steering rules also included Visa's and MasterCard's prohibitions against surcharging their transactions.  Visa's previous no-surcharge rule (*see, e.g.*, Rule 5.2.F, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008)) provided that "[a] Merchant must not . . . [a]dd any surcharge to [t]ransactions."  MasterCard's previous no-surcharge rule (*see, e.g.*, Rule 5.9.2, *MasterCard Rules* (Oct. 2008)) similarly provided that "[a] Merchant must not directly or indirectly require any [MasterCard] Cardholder to pay a surcharge or any part of any Merchant discount . . . ."  While Visa and MasterCard modified these rules under the proposed settlement in MDL 1720 to permit surcharging of Visa and MasterCard General Purpose Credit Card transactions in limited circumstances effective January 27, 2013, the no-surcharging rules remain in place for Visa and MasterCard General Purpose Debit Card transactions.

163.    There were no procompetitive justifications for these anti-steering rules.  If merchants had not been restrained by these rules, some of them could have played Visa and MasterCard or the banks against one another by steering or threatening to steer customers away from using more expensive Visa and MasterCard General Purpose Payment Cards.  Were it not for the restraints, merchants could have used such tactics to try to negotiate more favorable terms from Visa or MasterCard or from individual Issuers.  As a result, the anti-steering rules, individually and collectively, exacerbated the anticompetitive effects of the conspiracies.

### C.    The Visa Defendants Engaged in Additional Anticompetitive Conduct That Monopolized, or Attempted to Monopolize, the General Purpose Debit Card Services Market

164.    The Visa Defendants' anticompetitive conduct has not been limited to the Interchange Fee price-fixing cartels detailed above.[2]  The Visa Defendants engaged in additional conduct to exclude competition with the purpose and effect of giving Visa a monopoly in the market for General Purpose Debit Card Network Services.  This included conduct occurring during the Damages Period, such as dedication agreements between Visa and Issuers of Visa General Purpose Debit Cards and the imposition of fixed network fees to blunt competition in the General Purpose Debit Card market.

165.    These exclusionary acts have continued to suppress competition in the market for General Purpose Debit Card Network Services, and thereby have enabled the Visa Defendants to charge higher Interchange Fees and Visa to charge higher network fees than they otherwise would have been able to charge merchants.

---

[2] The allegations in Paragraphs 164 through 175 are set forth on behalf of all Plaintiffs with the exception of 7-Eleven.

### 1.   Visa's strategy to maintain its monopoly power in the General Purpose Debit Card market

166.   When the Damages Period began, Visa possessed monopoly power in the General Purpose Debit Card market.  Its share of that market was approximately 60%, as it comprised 80% of the Signature Debit Card segment and was increasing its PIN Debit Card share through deals with the largest Issuers of Visa General Purpose Debit Cards.  By early 2004, Visa had entered into long-term dedication agreements with most of its large Issuers that "prevent[ed] Visa banks from switching to MasterCard" which, at the time, was the only other Signature Debit Card network.  *United States v. Visa U.S.A. Inc.*, No. 98-cv-7076(BSJ), 2007 WL 1741885, at *2 (S.D.N.Y. July 15, 2007).  Accordingly, Visa "essentially lock[ed] up 89% of the volume of its top 100 debit Issuers."  *Id.* at *1.  Those deals and the installed base of Visa- and Interlink-branded General Purpose Debit Cards enabled Visa to maintain its monopoly power even after it was forced to relinquish the tying rule by the antitrust settlements in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG) (E.D.N.Y.).

167.   By 2005, Visa's Interlink became the leading PIN Debit Card network with 36% of that segment of the General Purpose Debit Card market.  Visa maintained that position in PIN Debit, along with its dominant position in Signature Debit, throughout the Damages Period.  It did so through various deals with debit Issuers.  These deals, entered on exclusive or near-exclusive terms, made Visa's Interlink the exclusive or primary PIN Debit Card acceptance mark on well over 100 million debit cards.  These deals gave Visa the power to raise Interlink's Interchange Fees during the Damages Period because, even if a merchant tried to drop Interlink and its high rates, the merchant would pay more as transactions defaulted to the still-pricier Visa Signature Debit Card rates.  There were no other options on many Visa General Purpose Debit Cards.  This exclusivity on many such cards remained intact until April 2012, when Federal

Reserve regulations mandated that General Purpose Debit Card Issuers put a competing network's functionality on their debit cards.

168.     Visa used its monopoly power to suppress PIN Debit during the Damages Period. As Visa continued to drive up Interlink Interchange Fees, the competing PIN Debit Card networks raised their rates to maintain volume in a market that had long been dominated by Visa. The result was the convergence of PIN Debit Card and Signature Debit Card rates at high *ad valorem* prices, a trend that contributed significantly to the suppression of PIN Debit Card acceptance in the United States, a longstanding Visa objective.  With Signature Debit Card and PIN Debit Card Interchange Fees coming into alignment, merchant willingness to install PIN pads to accept PIN Debit Cards was materially reduced.  In PIN Debit alone, in large part because of Visa's conduct, merchants faced market-wide effective Interchange Fee increases of an estimated 234% between 1998 and 2006.

## 2.     Visa's strategy to maintain its monopoly power in the General Purpose Debit Card market post-Durbin

169.     By 2010, when Congress passed the Durbin Amendment, Visa's monopoly power in the General Purpose Debit Card market rested primarily on two anticompetitive prongs—the greater Interchange Fees associated with Signature Debit than PIN debit (which buttressed Visa's leading position in Signature Debit) and Visa's exclusive (Signature and/or PIN Debit) deals with many of the largest debit Issuers.  The Durbin Amendment threatened both for two reasons. First, the regulations that the Federal Reserve promulgated regarding General Purpose Debit Card Interchange Fees eliminated the distinction between Signature and PIN Debit for the large regulated Issuers that supported the dominance of Visa Check, Visa's Signature Debit product. Second, the Durbin Amendment repealed Visa's exclusive deals with Issuers by requiring that all General Purpose Debit Cards bear an unaffiliated network on each card.  That requirement

subjected Visa to potential competition to reduce Interchange Fees and network fees to win merchant routing decisions.  Many commentators observed that Visa could lose significant portions of its volume, and at least one concluded that up to 80 percent of its PIN Debit volume was at risk.

170.    Visa responded by implementing a fixed fee known as the Fixed Acquirer Network Fee ("FANF") effective April 2012.  The FANF is nothing more than a substantial price increase on merchants that Visa is using strategically as a lever to win General Purpose Debit Card deals with merchants.  If the merchant accepts any Visa General Purpose Payment Card transactions, credit or debit, the merchant must pay this fixed fee to "access" Visa's networks and, perversely, the more locations the merchant operates the greater the fee it has to pay.  This construct restores the tie between General Purpose Debit Card acceptance and General Purpose Credit Card acceptance that Visa previously utilized as the linchpin of its strategy to dominate the General Purpose Debit Card market.  It does so because the only way merchants can avoid the fee is to drop all Visa products, and the only way merchants can mitigate the fee is to route General Purpose Debit Card volume to Visa.  The FANF further penalizes a merchant for routing a transaction over a competing PIN Debit network because, if the merchant did that, then it would not be able to reduce its fixed fee by shifting volume to Visa.  In fact, because the merchant must pay Visa's fixed fee whether it routes the transaction to Visa or not, the merchant will, in effect, pay twice for the transaction.  The modest reduction that Visa belatedly offers for "selective acceptance" of Visa General Purpose Debit Cards or Visa General Purpose Credit Cards does nothing to alter the FANF's desired impact—to lock in Visa debit acceptance and force the merchant to route as many General Purpose Debit Card transactions as possible to Visa.

171.    The FANF maintained Visa's monopoly power by compromising the PIN Debit

networks' ability to compete and by neutralizing the competitive dynamic that should have been introduced by the Durbin Amendment.  While Visa leveraged its power in the General Purpose Credit Card market to distort competition in the General Purpose Debit Card market with the FANF, the competing PIN Debit networks cannot do that.  If they tried to implement such a fee, merchants would stop accepting their General Purpose Debit Cards.  As a result, Visa has gained a war chest that empowers it to win debit deals with merchants that cannot be matched by the competition.  Visa has achieved these volumes, which have maintained its monopoly power, not because it has better General Purpose Debit Card Networks but because it has the power to use a tying arrangement and an anticompetitive fixed fee to foreclose competition.

172.    At least one industry analyst recognized that Visa's conduct was likely to severely foreclose competition from PIN Debit Card networks and cement Visa's market power:

- "Tapping the entire Visa customer base to subsidize aggressive PIN-debit pricing should significantly boost Interlink's market share, possibly above today's exclusivity-driven levels.  This aggressive approach is clearly bad news for competing PIN-debit networks as they simply won't be able to match price with post-Durbin Visa."  *See* Chris Brendler *et al.*, "New Fee Structure; Near-Term Pain, Long-Run Gain," *Stifel Nicolaus* (Aug. 1, 2011).

- "In our view, the [FANF], once established, should actually increase Visa's long-run pricing power since merchants will have little ability to deter future price increases . . . [W]e think this fee gives Visa enormous long-run pricing power as there are few governors on future price increases . . . Over time, we think Visa near-term margin sacrifice will be easily offset by market share gains and additional pricing power."  *Id.*

173.    As a result of this conduct, Visa has maintained its monopoly power post-Durbin. Its share of the General Purpose Debit Card market remains at monopolistic levels and is poised to increase, and its ability to impose supracompetitive and economically unjustified fixed network access fees reflects its continuing monopoly power.

174.    Visa's monopoly power in the General Purpose Debit Card market is protected by high barriers to entry.  To be a viable payment network competitor, a potential entrant would

80

need both (1) widespread, if not ubiquitous, merchant acceptance and (2) large-scale distribution to consumers through Issuers.  While each poses a formidable barrier in its own right, the economic reality is that a new entrant must clear both barriers simultaneously.  Merchants are generally unwilling to accept a payment card brand that is carried by few cardholders, and cardholders are generally unwilling to carry a payment card brand that is not widely accepted by merchants.  Therefore, starting a new network, whether debit or credit, with sufficient scale to challenge Visa or MasterCard is extremely difficult.  These high barriers to entry, coupled with the entrenched dominance of Visa and MasterCard, explain in large part why no meaningful entry has occurred in the General Purpose Credit Card and Debit Card markets since Discover entered three decades ago in 1985.

175.     The Antitrust Division recently highlighted this structural barrier to entry in the context of the General Purpose Credit Card market in its Competitive Impact Statement relating to the Proposed Final Judgment as to Visa and MasterCard in *United States v. American Express Company*, No. 10-cv-4496-NGG-RER, Dkt. #5, at 7 (E.D.N.Y. Oct. 4, 2010):

> Significant barriers to entry and expansion protect Defendants' market power, and have contributed to Defendants' ability to maintain high prices for years without threat of price competition by new entry or expansion in the market.  Barriers to entry and expansion include the prohibitive cost of establishing a physical network over which General Purpose Card transactions can run, developing a widely recognized brand, and establishing a base of merchants and a base of cardholders.  Defendants, which achieved these necessities early in the history of the industry, hold substantial early-mover advantages over prospective subsequent entrants.  Successful entry today would be difficult, time consuming, and expensive.

## ANTITRUST INJURY

176.     Defendants' price-fixing cartels and Visa's monopolistic conduct have caused substantial and ongoing anticompetitive harm to merchants as direct purchasers of General Purpose Payment Card Network Services in the form of inflated Interchange Fees paid directly

81

by those merchants, foreclosure of network competitors, and reduced output.  Merchants and

their customers have borne—and continue to bear—the brunt of hundreds of billions of dollars of

supracompetitive fees and severely decreased consumer welfare.

177.    Each Plaintiff has suffered direct antitrust injury from Defendants' conduct in

violation of the antitrust laws set out above.  During the Damages Period, each Plaintiff had a

contract with an Acquirer under which each Plaintiff directly paid the applicable Interchange Fee

to the relevant Issuer with respect to transactions in which a Plaintiff accepted a Visa General

Purpose Payment Card as a method of payment.  As a result, each Plaintiff paid (and continues to

pay) substantial, unlawful overcharges as a direct result of the price fixing and monopolization

set out in this Fourth Amended Complaint.  Each Plaintiff also was (and continues to be)

deprived of the benefits of competition limited by this conduct in the relevant markets.

178.    Because the supracompetitive Interchange Fees that Plaintiffs had to pay were a

substantial cost of doing business, Plaintiffs were forced to raise retail prices paid by their

customers and/or to reduce retail services provided to their customers as a means of offsetting

these Interchange Fees.  As a result, retail sales were below what they would have been and

thereby harmed the economy.  Moreover, as evidenced by the impact on merchant acceptance of

the mandated Interchange Fee reductions in Australia, inflated Interchange Fees also artificially

reduce merchant acceptance of General Purpose Payment Cards.  These reductions in retail sales

and merchant acceptance, coupled with the limitations on competition from other networks

resulting from Defendants' anticompetitive conduct, significantly reduced output below what it

would have been.  By imposing a massive and hidden tax on both merchants and consumers,

Defendants' conduct decreased consumer welfare and imposed substantial anticompetitive harm.

179.    Moreover, because of the conduct detailed in this Fourth Amended Complaint,

Plaintiffs could not limit these higher retail prices to customers using the General Purpose Payment Cards that generated the underlying Interchange Fees.  All customers, including less affluent ones who are more likely to pay with cash, had to bear the cost of these inflated Interchange Fees in the form of higher retail prices.

180.    Further, the imposition of supracompetitive Interchange Fees distorted Issuer incentives in both markets, perpetuating the fraud-prone magnetic stripe system in the United States.  This diminution of innovation is a further harm to competition.

## RELEVANT MARKETS

181.    Merchants' demand for General Purpose Payment Card Network Services (authorization, clearance, and settlement of transactions for which a merchant accepts a General Purpose Payment Card) stems from consumer demand for using General Purpose Payment Cards to pay for goods and services.  Accordingly, because consumer demand establishes both a distinct General Purpose Credit Card market as well as a General Purpose Debit Card market, there are corresponding markets, based upon derived merchant demand, for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

**A.    There Are Distinct Markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services**

**1.    General Purpose Credit Card Network Services**

182.    There were relevant product markets for General Purpose Credit Cards and General Purpose Credit Card Network Services throughout the Damages Period.  The existence of these markets have been confirmed by economic analysis of cross-elasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Fourth Amended Complaint.  These markets continue to be relevant product markets to this day.

183.    General Purpose Credit Cards allow a consumer to purchase goods and services by accessing a line of credit extended to the cardholder by the Issuer that issued the card.  These cards provided (and still provide) consumers deferred payment and, typically, the opportunity to revolve balances over time.  Charge Cards are a subset of General Purpose Credit Cards that require the consumer to pay off the balance owed upon receipt of their statement, usually monthly.

184.    From the consumer perspective, there are no close substitutes for General Purpose Credit Cards because other forms of payment do not offer comparable credit facilities. Therefore, General Purpose Credit Cards are better suited for large purchases that a consumer needs to finance over time than are payment methods such as cash, checks, and General Purpose Debit Cards that do not allow deferred payment.  This feature is reflected in studies of consumer payment patterns, which show that the average transaction size for General Purpose Credit Card transactions consistently has significantly exceeded the average ticket for General Purpose Debit Card transactions since the mid-1990s.

185.    In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336, the court held that "consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards." The court also found that Issuers "do not view cash or checks as 'competitive' with general purpose [credit] cards."  *Id.*  Most consumers do not want to carry large sums of cash to make large purchases, and checks do not match the acceptance of General Purpose Credit Cards.

186.    Thus, the evidence demonstrates that General Purpose Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions, and for which other payment methods are not close substitutes.  A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to

84

Issuers; demand is sufficiently inelastic to establish a market for General Purpose Credit Cards. This was the case throughout the Damages Period.

187.     As the court held in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 336, "it is highly unlikely that there would be enough cardholder switching away from credit and charge cards to make any such [hypothetical] price increase unprofitable for a hypothetical monopolist of general purpose [credit] card products."

188.     Limited purpose proprietary credit cards, such as the Sears' card, generally were (and are) accepted only by a single merchant.  Consumers, as a result, did not (and do not) consider proprietary credit cards to be reasonably interchangeable with General Purpose Credit Cards that can be used at numerous merchant locations, as recognized by the court in *United States v. Visa U.S.A. Inc.*  That court held that "[b]ecause proprietary cards, such as a Sear[s'] or Macy's card, are accepted only at a single merchant[,] consumers do not believe that proprietary cards are substitutes for general purpose [credit and T&E] cards and therefore they should not be included in the relevant market."  163 F. Supp. 2d. at 336.  Because of their limited utility, proprietary cards did not (and do not) constrain the prices to merchants for accepting General Purpose Credit Cards.

189.     The events in 2003 following the settlement of the *Visa Check* class action challenging the credit/debit tying rules also support the conclusion that General Purpose Credit Cards and Debit Cards are in separate markets.  The settlements required Visa and MasterCard to untie General Purpose Credit Card and Debit Card acceptance and give merchants the right to choose to accept one product without the other.  Once the settlements went into effect and the tie between credit and debit acceptance was broken, Visa and MasterCard increased General Purpose Credit Card Interchange Fees and reduced Signature Debit Card Interchange Fees.  This

outcome demonstrates that General Purpose Credit Cards and Debit Cards are in separate markets.

190.    Interchange Fees for both PIN Debit Cards and Signature Debit Cards have decreased since the Federal Reserve promulgated regulations pursuant to the Durbin Amendment, but General Purpose Credit Card Interchange Fees have not decreased in response to reduced General Purpose Debit Card fees to merchants.  The absence of sensitivity of General Purpose Credit Card Interchange Fees to Interchange Fees for General Purpose Debit Cards is strong economic evidence that General Purpose Credit Cards and Debit Cards are not in the same relevant market.

191.    During the Damages Period, Visa and MasterCard have continued to raise General Purpose Credit Card Interchange Fees, including significant rate increases for Premium Payment Card transactions, and no merchants have stopped accepting Visa and MasterCard General Purpose Credit Card transactions.  This shows that merchants continue to believe that a sufficient number of consumers view General Purpose Credit Cards as unique and that merchants must accept them.  General Purpose Credit Card Network Services is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

### 2.    General Purpose Debit Card Network Services

192.    There were relevant product markets for General Purpose Debit Cards and General Purpose Debit Card Network Services throughout the Damages Period.  These markets consisted of both Signature Debit Cards and PIN Debit Cards.  The existence of these markets has been confirmed by economic analysis of cross-elasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Fourth

86

Amended Complaint.  These markets continue to be relevant product markets to this day.

193.    General Purpose Debit Cards permit consumers to purchase goods and services by directly accessing the consumer's asset account, usually a DDA or checking account.  General Purpose Debit Cards include stored-value cards, such as payroll cards and flexible spending account cards, where funds are pre-loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card.  Depending on the type of debit transaction, payment is withdrawn from the cardholder's account and transferred to the merchant within one to several days later.

194.    Both PIN Debit Cards and Signature Debit Cards offer basically the same functionality to consumers—a means of payment that is widely accepted and provides for a quick and automatic transfer of funds from the cardholder's asset account (usually a checking account) to the merchant's account.  While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes.  Merchants' ability to steer cardholders from Signature Debit Cards to PIN Debit Cards confirms this.

195.    General Purpose Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions.  Because payments are deducted in a matter of hours (or a few days at most) from a consumer's DDA, General Purpose Debit Cards are strongly differentiated from General Purpose Credit Cards.  Consumers do not consider General Purpose Credit Cards to be an adequate substitute for General Purpose Debit Cards. Consumers tend to use General Purpose Debit Cards for everyday purchases, such as groceries, small household items, and other small value purchases, especially of non-durable goods.  Many consumers segment their purchases and prefer to put these everyday purchases on their General Purpose Debit Cards and use their General Purpose Credit Cards for larger-ticket items that are

not consumed on a monthly basis.

196.    In *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d at 337, the court held that:

> Consumers . . . do not consider debit cards to be substitutes for general purpose [credit] cards.   Due to their relative lack of merchant acceptance, their largely regional scope, and their lack of a credit function, on-line debit cards, which require a PIN number, are not adequate [substitutes for general purpose credit cards].   Similarly Visa and MasterCard research demonstrates that consumers do not consider off-line debit cards to be an adequate substitute for general purpose [credit] cards. . . .   Knowledgeable industry executives agree with these conclusions.

197.    General Purpose Debit Cards are safer than carrying cash and do not require that a consumer plan ahead (*e.g.*, by withdrawing cash from a bank account in order to make purchases).   As Visa and MasterCard have acknowledged, General Purpose Debit Cards also are more widely accepted than checks, making them suitable for transactions at many merchants where checks are not an option.   Consumers view General Purpose Debit Cards as superior to cash and checks and, thus, they likely would not switch to cash and checks in response to a small but significant, non-transitory price increase.   Cash and checks also are not reasonably interchangeable with General Purpose Debit Card Network Services for merchants.   As the price of PIN Debit Card acceptance increased from a negative price (*i.e.*, merchants were paid to accept debit because it saved banks' check and cash processing costs) to zero (at-par) to the supracompetitive levels of today, merchants did not substitute away from debit.

198.    Merchant demand exists separately for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.   As noted by the court in the *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG), 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003), "[o]verwhelming evidence establishes that merchant demand for credit card [network] services is distinct from merchant demand for debit card network services."

"[D]ebit card [network] services is a well-defined submarket characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole." *Visa Check*, 2003 WL 1712568, at *7.

### B. The Geographic Market for All Relevant Product Markets Is the United States

199. The geographic market for all relevant product markets was the United States throughout the Damages Period, and that continues to be the case to this day. Many of Visa's and MasterCard's rules regarding General Purpose Credit Card and General Purpose Debit Card transactions applied only to the U.S. market. Visa and MasterCard also set policies and pricing—including Interchange Fees—separately for the United States from other regions. Additionally, U.S. consumers would not find General Purpose Credit Cards or General Purpose Debit Cards issued in other countries—and therefore other currencies—to be adequate substitutes for General Purpose Credit Cards or General Purpose Debit Cards issued by U.S. banks. Defendants also have demonstrated that small but significant, non-transitory increases in prices limited to these product markets in the United States have been profitable and have not caused merchants to turn to other services sufficiently to make these price increases unprofitable.

### FIRST CLAIM FOR RELIEF

**Against the Visa Defendants for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Credit Card Network Services**

200. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

201. The Visa Defendants' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

202. The Visa Defendants maintained the conspiracy for Visa General Purpose Credit

Card transactions throughout the Damages Period.

203.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

204.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

205.    Plaintiffs suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

206.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

## SECOND CLAIM FOR RELIEF

### Against the Visa Defendants for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Debit Card Network Services

207.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

208.    The Visa Defendants' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

90

209.    The Visa Defendants maintained the conspiracy for Visa General Purpose Debit Card transactions throughout the Damages Period.

210.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

211.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

212.    Plaintiffs suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

213.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

### THIRD CLAIM FOR RELIEF

**Against the MasterCard Defendants for Horizontal Price Fixing and
Horizontal Agreements Not to Compete in the Market for
General Purpose Credit Card Network Services**

214.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

215.    The MasterCard Defendants' agreement not to compete and price-fixing schemes

91

constituted anticompetitive horizontal restraints.

216.    The MasterCard Defendants maintained the conspiracy for MasterCard General Purpose Credit Card transactions throughout the Damages Period.

217.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for MasterCard General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among MasterCard and its owner/member banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

218.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

219.    Plaintiffs suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

220.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

## FOURTH CLAIM FOR RELIEF

### Against the MasterCard Defendants for Horizontal Price Fixing and Horizontal Agreements Not to Compete in the Market for General Purpose Debit Card Network Services

221.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

92

222.    The MasterCard Defendants' agreement not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

223.    The MasterCard Defendants maintained the conspiracy for MasterCard General Purpose Debit Card transactions throughout the Damages Period.

224.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees that merchants paid to Issuers for MasterCard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These price increases were the products of the agreement among MasterCard and its owner/member banks that the banks will not compete for merchants' acceptance of MasterCard transactions.

225.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended.  Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

226.    Plaintiffs suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

227.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

## FIFTH CLAIM FOR RELIEF

### Against the Visa Defendants for Vertical Price Restraints in the Market for General Purpose Credit Card Network Services

228.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 199 with the same force and effect as if set forth here in full.

229.    The Visa Defendants' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

230.    Visa entered into an express vertical agreement with each of the Bank Defendants and with each of Visa's member/owner banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules. In turn, Visa acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages Period.

231.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

232.    Plaintiffs suffered antitrust injury from these unreasonable restraints of trade.

233.    As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

### SIXTH CLAIM FOR RELIEF

**Against the Visa Defendants for Vertical Price Restraints in the
Market for General Purpose Debit Card Network Services**

234.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 199 with the same force and effect as if set forth here in full.

235.    The Visa Defendants' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

236.    Visa entered into an express vertical agreement with each of the Bank Defendants and with each of Visa's member/owner banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules. In turn, Visa acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages Period.

237.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

238.    Plaintiffs suffered antitrust injury from these unreasonable restraints of trade.

239.    As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

### SEVENTH CLAIM FOR RELIEF

**Against the MasterCard Defendants for Vertical Price Restraints in
the Market for General Purpose Credit Card Network Services**

240.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

95

through 199 with the same force and effect as if set forth here in full.

241.    The MasterCard Defendants' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

242.    MasterCard entered into an express vertical agreement with each of the Bank Defendants and with each of MasterCard's member banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee and Honor All Issuers rules.  In turn, MasterCard acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages Period.

243.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for MasterCard General Purpose Credit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

244.    Plaintiffs suffered antitrust injury from these unreasonable restraints of trade.

245.    As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

## EIGHTH CLAIM FOR RELIEF

### Against the MasterCard Defendants for Vertical Price Restraints in the Market for General Purpose Debit Card Network Services

246.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

through 199 with the same force and effect as if set forth here in full.

247.    The MasterCard Defendants' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

248.    MasterCard entered into an express vertical agreement with each of the Bank Defendants and with each of MasterCard's member banks, binding all of them to comply with the rules and regulations adopted by MasterCard, including the default Interchange Fee and Honor All Issuers rules.  In turn, MasterCard acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations.  These agreements continued in full effect throughout the Damages period.

249.    These vertical price restraints imposed supracompetitive Interchange Fees on merchants for MasterCard General Purpose Debit Card transactions, and it imposed additional damages in the form of network fees, fines, and fraud losses.  These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act.  This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

250.    Plaintiffs suffered antitrust injury from these unreasonable restraints of trade.

251.    As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Plaintiffs were injured in their business and property in an amount not presently known with precision.

## NINTH CLAIM FOR RELIEF

### Against Visa for Monopolization of the Market for General Purpose Debit Card Network Services

252.    Plaintiffs (with the exception of 7-Eleven) repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth

here in full.

253.     Through the anticompetitive acts set forth above, Visa has unlawfully acquired

monopoly power in the market for General Purpose Debit Card Network Services.  Visa has

taken acts that have the effect of giving it power over price and the power to exclude competition

in the market for General Purpose Debit Card Network Services.

254.     Through the FANF, Visa has further unlawfully maintained its monopoly power

through anticompetitive conduct that had the purpose and effect of excluding competition from,

and raising the costs of, other providers of General Purpose Debit Card Network Services.

255.     As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees

and network fees for General Purpose Debit Card Network Services were set at artificial,

supracompetitive levels and Plaintiffs suffered injury to their business and property by paying

such artificially-inflated, supracompetitive Interchange Fees and network fees.  Plaintiffs

suffered antitrust injury from these acts of monopolization.

256.     Visa's unlawful acquisition of monopoly power constituted a violation of Section

2 of the Sherman Act.  Visa's unlawful maintenance of monopoly constitutes a violation of

Section 2 of the Sherman Act, which is ongoing.

## TENTH CLAIM FOR RELIEF

### Against Visa for Attempted Monopolization of the Market
### for General Purpose Debit Card Network Services

257.     Plaintiffs (with the exception of 7-Eleven) repeat and reallege each and every

allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth

here in full.

258.     Visa has taken acts that have the effect of giving Visa power over price and the

power to exclude competition in the market for General Purpose Debit Card Network Services.

259.    Visa specifically intended to monopolize the market for General Purpose Debit Card Network Services, as evidenced by its specific intent to obtain power over Interchange Fee and network fee pricing for General Purpose Debit Card Network Services, its specific intent to exclude competition in the market for General Purpose Debit Card Network Services, and by its specific intent to take acts with the effects of giving Visa power over price and excluding competition.

260.    To the extent it does not already possess monopoly power, there is a dangerous probability that Visa will obtain monopoly power in the market for General Purpose Debit Card Network Services through the FANF.

261.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and network fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Plaintiffs suffered injury to their business and property by paying such artificially-inflated, supracompetitive Interchange Fees.  Plaintiffs suffered antitrust injury from these attempted acts of monopolization.

262.    Visa's attempted monopolization constituted and, through the FANF, continues to constitute a violation of Section 2 of the Sherman Act.

**ELEVENTH CLAIM FOR RELIEF**

**Against Visa and the Bank Defendants for Conspiracy to Monopolize
the Market for General Purpose Debit Card Network Services**

263.    Plaintiffs (with the exception of 7-Eleven) repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

264. Visa and the Bank Defendants combined and conspired among themselves with the specific intent to monopolize the market for General Purpose Debit Card Network Services.

265. This conspiracy was successful, as Visa, through the overt acts described above, acquired, enhanced, and maintained monopoly power in the market for General Purpose Debit Card Network Services during the Damages Period.

266. As a direct and proximate result of Visa and the Bank Defendants' conspiracy to monopolize, Interchange Fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Plaintiffs suffered antitrust injury to their business and property by paying such artificially-inflated, supracompetitive Interchange Fees.

267. Visa and the Bank Defendants' conspiracy to monopolize constituted and, through the FANF, continues to constitute a violation of Section 2 of the Sherman Act.

## TWELFTH CLAIM FOR RELIEF

### Against All Defendants for Violation of State
### Antitrust and Unfair Competition Laws

268. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 199 with the same force and effect as if set forth here in full.

269. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Alabama Code § 8-10-1 et seq.

270. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 et seq.

271. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of California Bus. & Prof. Code § 16700 et seq. and Cal. Bus. & Prof. Code § 17200 et seq.

100

272.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of District of Columbia Code § 4501 et seq.

273.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Florida Stat. Ann. § 501.201 et seq.

274.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Hawaii Rev. Stat. § 480-1 et seq.

275.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 et seq.

276.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Iowa Code Ann. § 553.1 et seq.

277.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 et seq.

278.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maine Rev. Stat. Ann. 10, § 1101 et seq.

279.     By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 et seq.

280.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Minnesota Stat. Ann. § 325D.49 et seq.

281.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Mississippi Code Ann. § 75-21-1 et seq.

282.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 et seq.

283.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nevada Rev. Stat. Ann. § 598A.010 et seq.

284.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 et seq.

285.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New York General Business Law § 340 et seq. and § 369-A.

286.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 et seq.

287.    By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Dakota Cent. Code § 51-

08.1-01 et seq.

288. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Oregon Rev. Stat. Ann. § 646.705 et seq.

289. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Rhode Island Gen. Laws Ann. § 6-36-1 et seq.

290. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1 et seq.

291. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 et seq.

292. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Vermont Stat. Ann. 9 § 2451 et seq.

293. By reason of the foregoing, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Wisconsin Stat. Ann. § 133.01 et seq.

294. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs suffered injury to their business and property in each of these states by paying such artificially-inflated, supracompetitive Interchange Fees for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

103

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully demand:

A.      that the Court declare, adjudge, and decree that Defendants have committed the violations of law alleged herein;

B.      that the Court award damages sustained by Plaintiffs because of Defendants' misconduct (to the extent that such damages claims are not barred by the release in MDL 1720), in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees, and costs of suit;

C.      that the Court enjoin Visa's FANF; and

D.      that the Court grant such other and further relief as it may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury of all issues properly triable thereby.

DATED:  New York, New York
             February 17, 2015

**CONSTANTINE CANNON LLP**


By:_____/s/ Jeffrey I. Shinder_____
    Jeffrey I. Shinder
    Gary J. Malone
    A. Owen Glist
    Ankur Kapoor
    David A. Scupp
    335 Madison Avenue, 9th Floor
    New York, New York 10017
    Telephone:  (212) 350-2700
    Facsimile:  (212) 350-2701
    jshinder@constantinecannon.com

    W. Stephen Cannon
    Richard O. Levine
    One Franklin Square
    1301 K Street, N.W., Suite 1050 East
    Washington, DC 20005
    Telephone: (202) 204-3500
    Facsimile: (212) 204-3501

    *Counsel for Plaintiffs*

105