UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

IN RE PAYMENT CARD INTERCHANGE FEE
AND MERCHANT DISCOUNT ANTITRUST
LITIGATION

**MEMORANDUM & ORDER**
05-MD-1720 (MKB) (JO)

This document refers to: ALL ACTIONS

-------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

A putative Rule 23(b)(3) class of over twelve million nationwide merchants brought an antitrust action under the Sherman Act, 15 U.S.C. §§ 1 and 2, and state antitrust laws, against Defendants Visa and Mastercard networks, as well as various issuing and acquiring banks.[1] *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 213, 223 (E.D.N.Y. 2013) ("*Interchange Fees I*"), *rev'd and vacated*, 827 F.3d 223 (2d Cir. 2016) ("*Interchange Fees II*"); (First Consolidated Am. Class Action Compl., Docket Entry No. 317.) Plaintiffs are merchants that accept or accepted Visa- and Mastercard-branded cards, and have alleged that Defendants harmed competition and charged the merchants supracompetitive fees by

---

[1]  The putative Rule 23(b)(3) class sought relief in the form of monetary damages, and brought the action along with a separate class that sought equitable relief.  (*See* First Consolidated Am. Class Action Compl. 1, Docket Entry No. 317.)  At the earliest stages of this litigation, multiple class actions, as well as individual lawsuits by large retailers, were filed against Defendants.  All actions were consolidated together into a multi-district litigation in 2005 (the "MDL").  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 220 n.12 (E.D.N.Y. 2013) ("*Interchange Fees I*").  Since the initial consolidation, a number of matters have been continuously added to the MDL, which now involves over seventy associated cases.

creating unlawful contracts and rules and by engaging in various antitrust conspiracies.[2]

*Interchange Fees I*, F. Supp. 2d at 213; *Interchange Fees II*, 827 F.3d at 228–29.

Currently before the Court is Rule 23(b)(3) Class Plaintiffs' motion for final approval of a class settlement agreement (the "Superseding Settlement Agreement") pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure.  (Rule 23(b)(3) Class Plaintiffs' Notice of Mot. for Final Approval ("Pls. Mot."), Docket Entry No. 7469; Mem. of Law in Supp. of Pls. Mot. ("Pls. Mem."), Docket Entry No. 7469-1.)  The Court preliminarily approved the class settlement on January 24, 2019 (the "January 24, 2019 Order").  (Jan. 24, 2019 Order, Docket Entry No. 7361.)  In support of the motion, Class Counsel for the Rule 23(b)(3) class ("Rule 23(b)(3) Class Counsel" or "Class Counsel") submitted past and present declarations of Class Counsel attorney

---

[2]  In general, in a credit card transaction, a "merchant receives the purchase price minus two fees: the 'interchange fee' that the issuing bank charge[s] the acquiring bank and the 'merchant discount fee' that the acquiring bank charge[s] the merchant."  *Interchange Fees II*, 827 F.3d at 228.  As previously summarized by the Second Circuit, Plaintiffs challenged several credit card network rules as anticompetitive:

> The "default interchange" fee applies to every transaction on the network (unless the merchant and issuing bank have entered into a separate agreement).  The "honor-all-cards" rule requires merchants to accept all Visa or MasterCard credit cards if they accept any of them, regardless of the differences in interchange fees.  Multiple rules prohibit merchants from influencing customers to use one type of payment over another, such as cash rather than credit, or a credit card with a lower interchange fee.  These "anti-steering" rules include the "no-surcharge" and "no-discount" rules, which prohibit merchants from charging different prices at the point of sale depending on the means of payment.

*Id.* at 228–29.  "Plaintiffs allege[d] that these [anticompetitive] rules were adopted pursuant to unlawful agreements among the banks and Visa [and MasterCard]," and "that the banks owned and effectively operated Visa and MasterCard, such that Visa and MasterCard were unlawful 'structural conspiracies' or 'walking conspiracies' with respect to their network rules and practices."  *Interchange Fees I*, 986 F. Supp. 2d at 220–21.  For a further explanation of credit card transactions and interchange fees, *see id.* at 214–15.  As discussed *infra*, some of these challenged rules have been altered as a result of changes in the credit card industry, and some have been altered as a result of a prior settlement in this action.

K. Craig Wildfang, a declaration assessing litigation risks by the Honorable H. Lee Sarokin (ret.), an expert report from economist Michael Williams, Ph.D., and declarations from the Class Administrator on the implementation of the notice plan.[3]

In deciding the motion, the Court also considers, *inter alia*, objections from putative class members, Class Plaintiffs' reply in support of their motion for final approval, and the Class Administrator report, which includes the list of class members that opted out of the Superseding Settlement Agreement.[4]

For the reasons discussed below, on December 13, 2019, the Court granted final approval of the Superseding Settlement Agreement (the "Final Approval Order"). (Final Approval Order, Docket Entry No. 7818.)

## I.   Background

The Court assumes familiarity with the facts and extensive procedural history as set forth in *Interchange Fees I*, 986 F. Supp. 2d 207; *Interchange Fees II*, 827 F.3d 223; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11 (E.D.N.Y. 2019)

---

[3] (Decl. of K. Craig Wildfang in Supp. of Pls. Mot. ("Wildfang 2019 Decl."), Docket Entry No. 7469-3; Decl. of K. Craig Wildfang in Supp. of Rule 23(b)(3) Class Pls. Mot. for Prelim. Approval of Settlement ("Wildfang 2018 Decl."), annexed to Wildfang 2019 Decl. as Ex. 1, Docket Entry No. 7469-3; Decl. of K. Craig Wildfang in Supp. of Class Pls. 2013 Mot. for Final Approval of Settlement ("Wildfang 2013 Decl."), annexed to Wildfang 2019 Decl. as Ex. 3, Docket Entry No. 7469-3; Decl. of the Honorable H. Lee Sarokin ("Judge Sarokin Decl."), Docket Entry No. 7469-4; Expert Report of Michael A. Williams, Ph.D. ("Williams Report"), Docket Entry No. 7469-5; Decl. of Cameron R. Azari ("Azari Decl."), Docket Entry No. 7469-6; Decl. of Nicole Hamann ("Hamann Decl."), Docket Entry No. 7469-7.)

[4] (*See* Reply in Supp. re Pls. Mot., Docket Entry No. 7667; 2019 Report of the Class Administrator ("Class Administrator Report"), Docket Entry No. 7641-1; Suppl. Decl. of Cameron R. Azari ("Azari Suppl. Decl."), Docket Entry No. 7641-2.)

("*Interchange Fees III*").  The Court therefore provides only a summary of the relevant facts and procedural history.

### a.    Third Consolidated Amended Class Action Complaint

In commencing this action, Plaintiffs sought both injunctive and monetary relief, and after years of litigation, former District Judge John Gleeson approved a settlement (the "2013 Settlement Agreement") for an injunctive relief class and a monetary damages relief class, *see Interchange Fees I*, 986 F. Supp. 2d at 216 n.7, 240, which was vacated by the Second Circuit on June 30, 2016 and remanded to this Court, *Interchange Fees II*, 827 F.3d at 227, 229.[5]  On October 30, 2017, Rule 23(b)(3) Class Counsel filed a Third Consolidated Amended Class Action Complaint (the "TAC") on behalf of named Rule 23(b)(3) representative class plaintiffs ("Rule 23(b)(3) Class Plaintiffs" or "Class Plaintiffs"), and a putative Rule 23(b)(3) class.[6] (TAC, Docket Entry No. 7123.)  According to the TAC, the Rule 23(b)(3) Class Plaintiffs include: Photos Etc. Corporation; Traditions, Ltd.; Capital Audio Electronics, Inc.; CHS, Inc.;

---

[5]  Following remand, the two putative classes — the Rule 23(b)(2) injunctive class, and the Rule 23(b)(3) damages class — have been proceeding separately, and are each represented by separate counsel.  (*See* Mem. and Order dated Nov. 30, 2016 ("Interim Class Counsel Order"), Docket Entry No. 6754.)

[6]  In 2017, Class Plaintiffs moved to amend their Complaint.  (*See* Class Pls. Mot. for Leave to Amend Compl., Docket Entry No. 6880.)  On August 30, 2018, after finding that under Rule 15(c) the amended pleadings related back to earlier complaints, the Court affirmed Plaintiffs' ability "to amend the Complaints to assert an alternative, two-sided market theory following the Second Circuit's decision in *United States v. Am. Express Co.*, 838 F.3d 179 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. ---, 138 S. Ct. 2274, 2285 (2018)." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720, 2018 WL 4158290, at *3 (E.D.N.Y. Aug. 30, 2018).  In *United States v. American Express Company*, the Second Circuit held that "[t]he District Court erred in excluding the market for cardholders from its relevant market definition."  838 F.3d at 197.

Crystal Rock, LLC;[7] Discount Optics, Inc.; Leon's Transmission Service, Inc.; Parkway Corp.; and Payless, Inc.  (*See id.* ¶ 2.)

After additional extensive discovery and renegotiations, the Rule 23(b)(3) Class Plaintiffs and Defendants reached a new and separate settlement agreement, the Superseding Settlement Agreement, which the Court granted preliminary approval of on January 24, 2019.  (Jan. 24, 2019 Order; Superseding Settlement Agreement, Docket Entry No. 7257-2); *see also Interchange Fees III*, 330 F.R.D. 11.

### b.  Superseding Settlement Agreement

The Superseding Settlement Agreement defines the proposed Rule 23(b)(3) putative class to include:

> [a]ll persons, businesses, and other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in the United States at any time from January 1, 2004 to the Settlement Preliminary Approval Date, except that the Rule 23(b)(3) Settlement Class shall not include (a) the Dismissed Plaintiffs, (b) the United States government, (c) the named Defendants in this Action or their directors, officers, or members of their families, or (d) financial institutions that have issued Visa-Branded Cards or Mastercard-Branded Cards or acquired Visa-Branded Card transactions or Mastercard-Branded Card transactions at any time from January 1, 2004 to the Settlement Preliminary Approval Date.

(Superseding Settlement Agreement ¶ 4.)  All class members had the right to "opt out" — or exclude themselves — from participation in the class and from being bound by the terms of the Superseding Settlement Agreement.  (*See id.* ¶ 39(f); Mem. in Supp. of Rule 23(b)(3) Class Pls.

---

[7]  On April 27, 2018, the Court dismissed the claims and actions of Crystal Rock, LLC without prejudice.  (*But see* Stipulation and Order of Dismissal dated Apr. 27, 2018, Docket Entry No. 7197 (stating that "[a]ll discovery taken of Crystal Rock, LLC . . . will remain in the factual record").)  As a result, Crystal Rock, LLC is not listed as a Class Plaintiff in the Superseding Settlement Agreement, and the Court does not consider the facts as to Crystal Rock, LLC in this Memorandum and Order.  (*See* Superseding Settlement Agreement ¶ 3(ii); TAC ¶ 14.)

Mot. for Class Settlement Prelim. Approval ("Mem. in Supp. of Prelim. Approval") 2, Docket

Entry No. 7257-1.)

The Superseding Settlement Agreement provides for an award of over $6.3 billion in

relief before opt-out reductions and expense takedowns[8] — a figure that Class Counsel believes

is the largest cash settlement in antitrust class action history. (Pls. Mem. 3; Wildfang 2018 Decl.

¶ 3.) Putative class members that did not opt out of the settlement are entitled to "receive the

same benefit — a *pro rata* share of the monetary fund based on the interchange fees attributable

to their transactions during the class period." (Mem. in Supp. of Prelim. Approval 2; Plan of

Administration and Distribution I-2, 3, annexed to Superseding Settlement Agreement as App. I.)

In return for a *pro rata* share of the fund, the class members will release the claims raised

in the TAC — "claims arising out of or relating to conduct or acts that were alleged or raised or

that could have been alleged or raised relating to the subject matter of this litigation," (Mem. in

Supp. of Prelim. Approval 2), that have accrued through the date of the Court's preliminary

approval of the settlement, i.e., January 24, 2019, and that "accrue no later than five years after

the Settlement Final Date," (Superseding Settlement Agreement ¶ 31(a)).[9] The released claims

_____

[8] Under the Superseding Settlement Agreement, Defendants made additional cash payments of $900 million to the existing settlement funds, which had been reduced to account for opt-out class members. (Pls. Mem. 3.) As of June 6, 2019, the settlement fund held a value of $6,322,607,198.34. (*Id.* at 3 n.3.) The Superseding Settlement Agreement allows for a maximum of $700 million in reductions for opt-out class members, (*see* Superseding Settlement Agreement ¶ 22); as of October 25, 2019, the value of the settlement fund had been reduced by $700 million, and had a value of $5,620,511,120, (Notice re Pls. Mot. 2, Docket Entry No. 7752 ("Based on the transaction volume that opted-out of the settlement, the takedown is $700 million.")).

[9] "Settlement Final Date" is defined as the business day after the affirmation by any appeals court of this Court's final approval of the proposed settlement. (*See* Superseding Settlement Agreement ¶ (3)(ss).) According to Class Counsel, this effectively means that "[t]he release will bar claims that have accrued within five years following . . . the exhaustion of all appeals." (Mem. in Supp. of Prelim. Approval 23.)

also encompass claims that were or could have been alleged in this action relating to, among other things, interchange fees, anti-steering rules, and honor-all-card rules.  (*See id.* ¶ 31(b)(i)–(vi).)

The Superseding Settlement Agreement does not release the right of any Rule 23(b)(3) class member to participate in the Rule 23(b)(2) action "solely as to injunctive relief claims."[10] (*See id.* ¶ 34(a); *see also* Mem. in Supp. of Prelim. Approval 23 ("[T]he release does not bar the injunctive relief claims asserted in the pending proposed Rule 23(b)(2) class action . . . . Nothing in the release affects in any way the scope of injunctive relief which the [Rule 23(b)(2)] Plaintiffs and proposed class can seek.").)

### c.   Preliminary approval of the Superseding Settlement Agreement

On January 24, 2019, the Court preliminarily approved the Superseding Settlement Agreement and preliminarily granted class certification for the purposes of settlement, appointed Class Counsel and the Class Administrator, and approved the proposed Notice Plan, Class Notices, and Plan of Administration and Distribution.  *See Interchange Fees III*, 330 F.R.D. at 27.  On January 28, 2019, the Court issued a Memorandum and Order (the "Preliminary Approval Order") setting forth its reasons for granting preliminary approval.  *Interchange Fees III*, 330 F.R.D. 11.

---

[10]   The Court notes that documents and filings refer to the Rule 23(b)(2) action in a variety of ways.  The Rule 23(b)(2) action is proceeding in this MDL as *Barry's Cut Rate Stores Inc. et al. v. Visa, Inc., et al.*, No. 05-MD-01720.  The action is sometimes referred to as "*Barry's*" and the class is sometimes referred to as the "equitable relief class."  For the purposes of consistency across opinions, the Court uses the terms "Rule 23(b)(2)" and "injunctive relief" to refer to the action, as opposed to "*Barry's*" and "equitable relief."

### d.    Notice

#### i.    Mailing and publication

The Court approved a direct-mail and media Notice Plan, and a Publication Notice and Long Form Notice in the Preliminary Approval Order as sufficient to adequately notify class members of the proposed settlement.  *Id.* at 59.  To facilitate notice, the Class Administrator gathered over 221 million merchant records from Mastercard, Visa, and large U.S. payment processors, which resulted in a database of over 16 million merchants.  (Azari Decl. ¶ 11; *see also* Hamann Decl. ¶¶ 10–16.)  Between March 25, 2019 and April 24, 2019, 16,330,223 notices were sent to "likely" class members by first class mail.  (Azari Decl. ¶ 14; Hamann Decl. ¶ 22.)  In addition, the Class Administrator also undertook a publication campaign, including "354 separate print publication units with a combined circulation of more than 39.9 million and more than 689 million . . . internet banner impressions."  (Azari Decl. ¶ 16.)  The Publication Notice appeared in major publications, including the *Financial Times*, the *Wall Street Journal*, the *New York Times*, *Forbes*, *People*, *Sports Illustrated*, and *National Geographic*, as well as newspapers in U.S. territories, language-targeted publications, and trade, business, and specialty publications. (*Id.* ¶¶ 30, 32, 34, 36–37.)  Banner advertisements appeared on, *inter alia*, Google and Facebook. (*Id.* ¶ 39.)  This "combined measurable paid print and internet effort . . . reached 80.4% of all U.S. Adults aged 18+ with an average frequency of 2.8 times, 84.2% of all U.S. Business Owners with an average frequency of 3.2 times, and 84.4% of all U.S. Adults in Business and Finance Occupations with an average frequency of 3.4 times."  (*Id.* ¶ 14.)  The Long Form Notice was also sent to 68,822 available e-mail addresses, and was available for download on the case website, www.paymentcardsettlement.com, maintained in eight different languages.  (*Id.* ¶¶ 26–27.)

ii.    **Notice of exclusion to Dismissed Plaintiffs**

During the preliminary approval phase, the Court received objections to preliminary approval by a group of entities that own and/or operate gas stations and convenience stores that sell petroleum products that are produced and branded by major oil refiners such as Shell and ConocoPhillips (collectively, the "Branded Operators"). *See Interchange Fees III*, 330 F.R.D. at 25–26. The Branded Operators' expressed concern that some portion of them had been labeled as "Dismissed Plaintiffs" and excluded from the Superseding Settlement Agreement due to separately negotiated settlement agreements entered into by major oil suppliers and brands, and that there would "be a 'failure to notify' hundreds of class members as a result of these exclusion lists."  (Mem. in Opp'n to Prelim. Approval of Class Settlement ("Mem. in Opp'n to Prelim. Approval") 5, Docket Entry No. 7300; *id.* at 19 ("Defendants have been allowing the Oil Brands to negotiate opt-out settlement agreements on behalf of all of their [B]randed [O]perators without the consent of the operators.").)

In order to address these concerns, the Court directed Class Counsel to send a Notice of Exclusion to Dismissed Plaintiffs — i.e., entities and their affiliates that have previously dismissed their lawsuits against Defendants — in order to notify the Dismissed Plaintiffs that they will be ineligible to receive settlement funds.  (*See* Notice of Exclusion from Class Action Settlement ("Notice of Exclusion"), annexed to Proposed Prelim. Approval Order as Ex. 2, Docket Entry No. 7354-1.)  Between March 25, 2019 and April 24, 2019, the Class Administrator mailed 6100 Dismissed Plaintiff notices of exclusion.  (Hamann Decl. ¶ 28.)  On June 5, 2019, the Class Administrator mailed another 518 notices of exclusion.  (*Id.*)  In response to several Branded Operators indicating to the Court that they had not received notice, Magistrate Judge James Orenstein discussed the issues with the parties at a July 9, 2019 status

conference, and ordered Notice to be sent to those Branded Operators.  (*See* Min. Entry dated July 9, 2019 ("The parties will take appropriate step[s] to provide notices to all non-party Branded [Operator] objectors to the pending proposed settlement who report that they have not received a copy of the notice.").)  By August 6, 2019, the Class Administrator had mailed sixty-seven such notices.  (*See* Class Administrator Report ¶ 6 ("[I]n response to certain objectors' claims that they had not received a copy of the notice, . . . copies of the long form notice [were mailed to] the objector to the address provided in their objection.").)

### iii.   Additional notice

On July 22, 2013, one day before the opt-out and objection deadline, Class Counsel notified the Court "that communications had been made by certain hotel brands to their respective hotel-franchisees stating that the hotel brands planned to opt out from the Class the franchisees, unless the franchise owner affirmatively indicated to the brand that it did not want to be included in the brand's planned opt-out litigation."  (Letter dated July 22, 2019 1, Docket Entry No. 7552.)  Class Counsel stated that they were "aware that issues related to the franchisee/franchisor relationship may arise during any claims process and such issues — a matter of contract — will likely be resolved through a process such as that employed in the Wal-Mart litigation where a special master made determinations regarding similar matters."  (*Id.*)  However, they were concerned "that certain information was not provided to franchise owners," and thus proposed sending a written communication and allowing any franchisee that had been opted out "to effectively nullify that opt out within a period of 45 days after receiving this supplemental communication approved by Class Counsel."  (*Id.* at 2.)

On August 28, 2019, Class Counsel notified the Court that "[t]he Class Administrator has received requests for exclusion from the Settlement Class that purport to request exclusion on

10

behalf of a variety of entities in addition to the entity that actually submitted the request," i.e., that "[c]ertain entities have submitted requests for exclusion . . . on behalf of subsidiaries, franchisees, licensees, affiliated entities," and more.  (Status Report dated Aug. 28, 2019 2–3, Docket Entry No. 7660.)  Class Counsel informed the Court that they were reviewing the exclusion requests and that "[t]o the extent any issues [could not] be resolved, Rule 23(b)(3) Class Counsel will . . . suggest a procedure to resolve them."  (*Id.* at 3.)

On September 17, 2019, Class Counsel informed the Court that after reviewing the exclusion requests, it "determined that a set of exclusions required further investigation" and that "exclusions may have been filed by members of the National Alliance of Trade Associations ('NATA') and were submitted en masse."  (Letter dated Sept. 17, 2019, Docket Entry No. 7697.) Class Counsel proposed sending curative notice to "several hundred class members who previously sought exclusion," and granting them thirty days to opt back into the settlement.  (*Id.*) The Court approved the curative notice on September 30, 2019.  (Order dated Sept. 30, 2019.)

### e.    Exclusions and objections

#### i.    Exclusions

As of August 6, 2019, the Class Administrator had received 676 exclusion requests. (Class Administrator Report ¶ 11; Azari Suppl. Decl. ¶ 22.)  On November 6, 2019, the Class Administrator submitted an updated report on exclusion requests to the Court, due to the additional opt-out period, described *supra*.  (2019 Suppl. Report of the Class Administrator ("Class Administrator Suppl. Report"), Docket Entry No. 7772-1.)  Pursuant to the updated reports, the Court finds the final number of exclusion requests to be 675.  (*See id.* ¶ 6; *see also* Letter re Exclusion Reqs. in Resp. to Ct.'s Nov. 25, 2019 Order, Docket Entry No. 7795.)

### ii.    Objections

The deadline to file objections to the Superseding Settlement Agreement was July 23, 2019.  (*See* Jan. 24, 2019 Order ¶ 18.)  Several objections were filed shortly after the deadline, which the Court considers.  The Class Administrator stated that as of August 6, 2019, it had received 200 objections.  (Azari Suppl. Decl. ¶ 22.)  The Court notes that several of these may have been attempts at other forms of communication, such as claims filing requests, and both Class Counsel and the Court have tallied the objection count at approximately 176 objections. (Pls. Reply 1.)  Objections were received in a variety of mediums, including short form objections and lengthy briefs.  Substantive objections include objections to the settlement amount, claims release provision, Plan of Administration and Distribution, and a number of objections from the Branded Operators, including as to adequate representation and the class definition.  These objections are considered *infra*.  Objections received as to proposed attorneys' fees, expenses, and class representative service awards are considered in separate opinions.

### 1.    Short and form objections

The majority of the short form objections objected to attorneys' fees, expenses, and class representative service awards.  The Court also received one objection filed in a format suggested in the Long Form Notice, (*see* Class Notices G2-16, G2-17, annexed to Proposed Prelim. Approval Order as Ex. 1, Docket Entry No. 7354-1), objecting to the cash settlement and Plan of Administration and Distribution due to "the fairness of each plan and the length of time involved."  (Statement of Obj., Docket Entry No. 7513.)

### 2.    Nejat Kohan's objections

Objector Nejat Kohan (1) objects to non-payment of settlement funds to putative class members that do not file claims as unfair, (2) states that the Notice "does not contain the full text

of the release," and (3) complains that the Superseding Settlement Agreement contains "an arbitrary or ambiguous clause" as to what will be done with potentially "over a billion dollar[s] of remaining and unclaimed settlement proceeds." (Statement of Obj. of Class Member Nejat Kohan, Esq. ("Kohan Obj.") 6–9, Docket Entry No. 7550.)

Regarding his objection that non-payment to class members that fail to file claims is unfair, Kohan specifically objects to the portions of the Long Form Notice that read: "[i]f you do not file a claim, you cannot get money from this settlement," and "[i]f you do not exclude yourself from the Rule 23(b)(3) Settlement Class, you cannot be part of any other lawsuit against Defendants and other released parties listed in the Rule 23(b)(3) Class Settlement Agreement for released conduct." (Class Notices G2-18.) He states that "the Washington Post reported that approximately 50% of adults can't read at an 8th grade level. That 50% isn't likely to get to page 17 of the notice, if they do . . . , that same 50% likely doesn't function at a high enough level to file a claim." (Kohan Obj. 6.)

### 3. Mattress Firm, Inc., Watsco, Inc., and Easy Breathe, LLC's objections

Objectors Mattress Firm, Inc., Watsco, Inc., and Easy Breathe, LLC (the "Mattress Firm Objectors") argue that the Superseding Settlement Agreement is unfair, unreasonable, and inadequate because (1) "[t]he release unlawfully waives future claims that challenge interchange rules," and (2) "[t]he relief is unfair, inadequate, and unreasonable . . . because it significantly lowers the pro rata share of class members" as compared to the relief from the 2013 Settlement Agreement. (Statement of Obj. of Class Members the Mattress Firm, Inc., Watsco, Inc., and Easy Breathe, LLC ("Mattress Firm Obj.") 1, Docket Entry No. 7558.)

Mattress Firm Objectors argue that the release is impermissible because it "waives damages based on future violations of the antitrust laws." (*Id.* at 3.) Quoting the release

language, they argue that releasing claims "that will accrue between January 14, 2019 and 'five years following the court's approval of the settlement and the resolution of all appeals' necessarily releases future claims for damages, which is in itself impermissible." (*Id.*) They further argue that the Superseding Settlement Agreement "effectively halves the pro rata recovery of the class from the benchmark established under the original settlement agreement and is therefore inadequate." (*Id.*) They write:

> The original settlement agreement provided that [D]efendants would pay a cash award of $7.25 billion (before opt-outs and expenses) to a class of merchants that accepted Visa and/or Mastercard from January 1, 2004 to November 28, 2012, or $2,227,342.55 per day of the class period.

> The [S]uperseding [S]ettlement [A]greement provides that defendants would pay a cash award of as much as $6.26 billion (before opt-outs and expenses) to a class of merchants that accepted Visa and/or Mastercard from January 1, 2004 to January 24, 2019, or $1,137,561.33 per day of the class period.

(*Id.*)

### 4.   Kevan McLaughlin's objections

Kevan McLaughlin objected to the 2013 Settlement Agreement, but states that "[a]lthough many of the issues raised in McLaughlin's original objection have been addressed in the Superseding Settlement [Agreement], the prospective five-year waiver of financial liability for future conduct in the release remains troubling.  It may well be unenforceable but, even if it is not, there is no reason to extend the five-year bar by adding to it the duration of any appeals, as the release purports to do."  (Obj. to Class Action Settlement and Notice of Intent to Appear by Kevan McLaughlin ("McLaughlin Obj.") 2, Docket Entry No. 7571.)  He argues that (1) "there is a strong argument that the proposed waiver of future violations is void as against public policy in antitrust cases"; (2) it is unclear whether releasing claims arising from "related" conduct

comports with Second Circuit law; (3) even if the prospective release is allowable, the "five-year immunity period" should not be extended to the end of the duration of any appeals, and "[t]here is no apparent rationale for extending a term certain during appeals except to penalize class members for taking appeals"; and (4) the length of the release and its "uncertain temporal scope" makes it difficult to assess what class members are giving up in exchange because if appeals are made, it is unclear "how many additional years' worth of 7 class members' damage claims are to be exchanged for that same class fund recovery." (*Id.* at 3–7.)

### 5.  Gnarlywood LLC and Quincy Woodrights, LLC's objections

Objectors Gnarlywood LLC and Quincy Woodrights, LLC (the "Gnarlywood Objectors") argue that (1) the Superseding Settlement Agreement is substantively unfair because it purports to provide Defendants "release against their future misconduct — the value of associated un-accrued claims . . . which is unknown — without corresponding consideration to members of the Rule 23(b)(3) Settlement Class"; (2) the Superseding Settlement Agreement provides for "inequitable distribution" of the fund among class members; and (3) the Notice did not adequately inform class members of the attorneys' fees sought by Class Counsel. (Obj. of Gnarlywood LLC, and Quincy Woodrights, LLC, to Class Pls. Mot. for Final Approval, and Class Pls. Mot. for Attys' Fees and Reimbursement of Expenses ("Gnarlywood and Quincy Woodrights Obj.") 1–2, 14, Docket Entry Nos. 7610, 7617.)

The Gnarlywood Objectors call the release language "severely overbroad" and state that "Defendants are not by the Superseding Settlement Agreement in any way inhibited from persisting in their patterns of antitrust misbehavior," and emphasize that now that the Rule 23(b)(2) injunctive relief class is proceeding separately, guaranteed injunctive relief no longer accompanies the settlement, and it was the Rule 23(b)(2) rule modifications that "made the

release of future claims acceptable in the [2013 Settlement Agreement]." (*Id.* at 7–8, 10.) They note that while class members "are afforded the right to opt-out of the settlement, that right can be practically exercised only by those merchants whose claims can justify the substantial expense of pursuing damages in a separate antitrust litigation against the Defendants — who possess nearly unlimited financial litigation resources." (*Id.* at 9.) They appear to argue that Class Plaintiffs may not be adequate representatives due to the potential for some class members to receive less compensation than others yet still release claims for the same period of time, and write that "[i]f the interest or the injuries are different, then Class Plaintiffs' representation of Class Members with an imbalance between the class period and additional release period is inadequate, and Due Process has been violated." (*Id.* at 14.) They further argue that the distribution is inequitable because, for example, a merchant who was in the class for only the last month of the class period would have to release claims for at least five years, without much compensation, while others might receive proportionally more compensation with the same release. (*Id.* at 11–12.) Finally, they argue that the Notice sent to class members "begs the questions" of whether the percentage of the settlement fund that Class Counsel seeks of attorneys' fees is calculated based on the settlement fund amount before or after reductions for opt-outs. (*Id.* at 16.)

### 6. Objections from the Branded Operators

The majority of objections received — approximately 140 — are from the Branded Operators.

### A. Form mailings

Over 130 of the Branded Operator objections received are identical boilerplate forms. These objections state that "Company is a petroleum marketer engaged in the wholesale and

retail sale of branded motor fuels," and "is concerned that the Court will concur in the arguments of Defendants that certain major oil company branded suppliers are entitled to file claims against the settlement fund for transactions at retail locations where Company accepted the applicable Visa or Mastercard transaction cards and paid the interchange fees." (*See, e.g.*, Statement of Obj. of Class Member Swallow Oil Co. ("Swallow Oil Co. Obj.") 1, Docket Entry No. 7582.) These Branded Operators appear to claim that they are not adequately represented by Rule 23(b)(3) Class Plaintiffs or Class Counsel because "[n]one of the class representatives were branded marketers, and branded marketer interests were not represented when the settlement was negotiated," and Class Counsel is "incapable of asserting branded marketer interests when they conflict with the interests of major oil companies." (*Id.*) The objections assert that "Company is totally in the dark as to whether, having accepted the cards and paid the interchange fees, it is part of the settlement class, whether it is entitled to a full or partial recovery, or whether any mechanism is in place to sort all of this out." (*Id.*) They demand that "Branded [Operators] should be informed now whether a procedural mechanism will be put in place to determine whether, and to what extent, [B]randed [Operators] will participate in the settlement, what evidence they need to present, and whether there will be procedural hurdles they need to overcome to claim their rights as class members." (*Id.* at 2.)

### B. Substantive objections

Branded Operators also filed several non-form objections.

### (1) Castor Oil Co. and Denmar Corporation's objections

Castor Oil Co. states that "[w]hile branded distributors incontrovertibly accepted both VISA and MasterCard cards, [they] are not known to VISA or MasterCard because their branded distributors, in this case Western Refining/Andeavor/Marathon/PSX/Shell, is the one who is on

record with the credit card companies." (Letter from Paul Carter dated July 9, 2019, Docket Entry No. 7527.) Castor Oil Co. has reportedly "been told that other major brand suppliers have pledged to pass through the amounts they receive from the settlement to their branded distributors," and "would like to make sure that Western Refining/Andeavor/Marathon/PSX/Shell (my supplier) will pledge that the portion of the settlement it receives will be passed on." (*Id.*) Denmar Corporation filed an identical objection, but listing their suppliers as Exxon, Shell, and Chevron. (Statement of Obj. of Class Member Denmar Corp., Docket Entry No. 7537.)

### (2)  Jack Rabbit, LLC and Cahaba Heights Service Center, Inc.'s objections

Jack Rabbit, LLC ("Jack Rabbit") and Cahaba Heights Service Center, Inc. (the "Jack Rabbit Objectors") state that they were "petroleum dealers engaged in the retail sale of branded motor fuels" during the class period and have paid interchange fees associated with credit card transactions at their locations.[11] (Obj. to Class Action Settlement and Class Counsel's Req. for Attys' Fees and Notice of Intent to Appear ("Jack Rabbit Obj.") 2, Docket Entry No. 7574.) The Jack Rabbit Objectors assert that even though those transactions "were processed by [an] applicable branded fuel supplier," the suppliers "deducted the interchange (base cost) fees charged by Visa or Mastercard from the Jack Rabbit Objectors' proceeds before remitting those proceeds to the [O]bjectors," and that it is therefore the Jack Rabbit Objectors, and not the

---

[11]  On September 16, 2019, Jack Rabbit filed a motion to intervene in this action, and on October 11, 2019, filed a motion for a pre-final fairness hearing conference. (Mot. to Intervene, Docket Entry No. 7694; Mem. of Law in Supp. of Mot. to Intervene, Docket Entry No. 7730; Mot. for Hearing, Docket Entry No. 7733.) On October 30, 2019, the Court denied both motions. (Order dated Oct. 30, 2019, Docket Entry No. 7755.) On November 27, 2019, Jack Rabbit filed a notice of appeal of the Court's October 30, 2019 decision. (Notice of Appeal, Docket Entry No. 7798.)

branded fuel suppliers, who are "entitled to recover from the settlement." (*Id.*)  In their

objections, the Jack Rabbit Objectors argue that they "and all other class members similarly

situated . . . are members of an unrepresented subclass, whose interests have not been adequately

protected by the proposed settlement." (*Id.* at 2–3.)

### (3)  Fikes Wholesale, Inc., Midwest Petroleum Company, and Slidell Oil Company, LLC's objections

Branded Operators Fikes Wholesale, Inc., Midwest Petroleum Company, and Slidell Oil

Company, LLC (the "Fikes Wholesale Objectors") "own and operate dozens of gas stations and

convenience stores" and argue that "[a]s such, they are entities that accepted Visa- and

MasterCard-branded cards at their stores and paid the alleged overcharges; therefore, they are

quintessential settlement class members." (Obj. to Class Action Settlement filed by Fikes

Wholesale Objectors ("Fikes Wholesale Obj.") 1, Docket Entry No. 7559.)  They argue that a

conflict exists and that "[d]ue to the class definition and broad release that Class Counsel

negotiated, the oil companies that processed certain card transactions for the Objectors also lay

claim to these self-same settlement benefits," and furthermore that "Class Counsel is well aware

of this conflict and should have resolved it during settlement negotiations with the aid of separate

counsel appointed to represent the Branded Operators to whom the settlement promises

benefits." (*Id.*)  Fikes Wholesale Objectors argue that "they should have had separate counsel

strongly advocating that the settlement benefits corresponding to their card transactions belong

solely to them." (*Id.* at 3.)  Ultimately, they contend that "[a] settlement that leads two groups to

think they own a claim for the very same portion of settlement benefits — with both groups

releasing their claims even though one will get no benefits — cannot be approved by the Court."

(*Id.*)

In summary, they argue that the Court should deny final approval and appoint separate counsel to represent the Branded Operators because: (1) the class definition is too broad and therefore creates an intra-class conflict and does not treat all class members equitably relative to one another; (2) the class definition and release are overbroad because they "encompass and release all antitrust claims" but "[D]efendants and the Oil Brands have taken the position that the Branded Operators are not the 'direct payors' and do not have standing to pursue claims under the Sherman Act," and that "[i]f it is ultimately determined that the Branded Operators are not Authorized Claimants (perhaps because a Special Master determines they have no standing under the Sherman Act), the proposed settlement release and class definition are so broad that the Branded Operators' state law indirect purchaser claims would be released, even [though] they would receive no compensation whatsoever"; and (3) "Class Counsel is not protecting the rights of all class members equally and none of the class representatives has interests that are aligned with the Branded Operators." (*Id.* at 3–7.)

In one declaration submitted in support of the Fikes Wholesale objections, the Vice President and General Counsel of Fikes Wholesale, Inc., Tate A. Seidman, appears to argue that the class definition, which simply requires that a class member "accept" Visa- or Mastercard-branded cards, does not account for the payment process that occurs in the relationship between a Branded Operator and a major oil supplier. He describes the payment process that occurs as the following:

> The [major oil suppliers] (or their designees) process all payment card transactions at their respective Fikes Retailer locations, including on all inside sales on things like food, snacks, and drinks and all fuel sales. For example, Shell (or its designee) processes all payment card transactions at Shell-branded Fikes Retailer locations; Chevron (or its designee) processes all payment card transactions at Chevron-branded Fikes Retailer locations, and so on. Regardless of which [major oil supplier] transactions are processed through, and

20

> regardless of which third-party processing company handles the transactions, the mechanics of payment card processing is materially similar at every Fikes Retailer location . . . .
>
> Fikes Retailers are responsible for payment of the entire interchange fee, among other processing fees, on all payment card transactions at their respective retail locations.  The agreements between fuel distributers and various Refiners do not address the unique situation here . . . . While payments may have been processed through the [major oil suppliers], the Fikes Retailers are the ones that actually paid and sustained injury as a result of the overcharge.

(Decl. of Tate A. Seidman ("Seidman Decl.") ¶¶ 5–6, annexed to Fikes Wholesale Obj. as Ex. 1, Docket Entry No. 7559-1.)  Seidman states that he "understand[s] from several sources that many of the [major oil suppliers], including Shell, Chevron, CITGO, Sunoco, and Phillips believe that by virtue of their processing mechanics, they are members of the proposed settlement class and that they are entitled to compensation for any overcharges on the interchange fees paid," and that "[D]efendants have taken the same position and that they believe that the [major oil suppliers], and not the tens of thousands of retail store owners and operators like the Fikes Retailers, are the proper class members who are entitled to relief from the proposed class settlement."  (*Id.* ¶ 7.)  He also fears that he is "being asked by this class settlement to fully settle and release any claims we have for recovery against the [D]efendants, while we are being given no reason to believe that we will be able to obtain any monetary recovery at all for our [major oil supplier]-branded locations."  (*Id.* ¶ 8.)  Finally, Seidman states that the Superseding Settlement Agreement wrongly excludes entities excluded by major oil supplier Valero, and that the "exclusion list purportedly excludes two of our entities, Fikes Wholesale, Inc. and Food Fast Corporation," from the Superseding Settlement Agreement, and that those entities "never authorized their claims to be excluded or released by the [D]efendants or by Valero," and that "[f]rom the face of the proposed settlement, it appears that hundreds of

21

entities who may have operated one or more Valero-branded retail locations during the class period have also purportedly been excluded from the class settlement."  (*Id.* ¶¶ 16–17.)

Fikes Wholesale Objectors note that that this issue has been raised previously in this case. They cite a status report from June of 2014 (the "June 2014 Status Report"), in which Defendants informed the Court that "Defendants seek the Court's assistance to establish a procedure for resolving the question of which entity in a franchise relationship — the franchisor or the franchisee — is a proper claimant to the [settlement fund]."  (June 2014 Status Report 3, Docket Entry No. 6335.)  In the status report, Defendants asked the Court to "determine whether a franchisor who directly pays the merchant discount fee, rather than a franchisee who does not, is the proper entity to recover."  (*Id.*)  Defendants said that there existed situations where:

> [A] franchisor remained a member of the Settlement Class, and its franchisees opted out. As a few examples, numerous franchisees of Exxon, Shell, and Chevron opted out but their franchisors remained in the class.  The opt-out forms submitted by those franchisees purport to be asserting a right to opt out for all Visa- and MasterCard-branded transactions at the franchisee locations, even though the franchisor has stayed in the class, provided a release with respect to these transactions and presumably will seek recovery from the Cash Fund for those same transactions.

(*Id.*)  They also contend that there was the potential for issues to arise due to the number of franchisees that remained in the class.  (*Id.* at 4.)  They emphasized that without deciding the issue, there was "significant potential for increased settlement administration costs and duplicative claims and payments, all of which could frustrate the class settlement," (*id.*), and asked the Court to "schedule a conference to discuss procedures for resolving franchisor-franchisee issues," (*id.* at 7).

At the time, Plaintiffs took the following position on the issue:

> Class Plaintiffs agree that there should be agreed-upon rules for determining who in the franchisee/franchisor relationship "owns"

the claim against the settlement fund and who may opt out of the Rule 23(b)(3) Class but do not believe that this should be addressed prior to the pending appeals being resolved.  Moreover, determining who "paid" the interchange fee or merchant discount fee for a given transaction may raise issues that are not as "predictable" as Defendants seem to suggest and instead may need to be resolved on a case-by-case basis.  Class Counsel understand that this issue did not present serious difficulties in the administration of the *In re Visa Check* settlement . . . .  The parties have discussed this issue, however, and are working together and with the Claims Administrator to arrive at a method for identifying franchisor/franchisee relationships in filed claims and then determining which entity has the right to opt out of and be compensated from the fund.

(*Id.*)

Fikes Wholesale Objectors argue that at the time, Defendants took the position that the franchisors were the entities with the relationship with the acquiring bank, and should therefore be the class member to recover, that "Class Counsel did not appear concerned about the harm to class members," and that despite knowledge of this issue, "Class Counsel and the [D]efendants again did nothing to address these issues after Objectors brought them to light."  (Fikes Wholesale Obj. 9–10.)  They note that at one point, the parties drafted a proposed notice to allow class members that opted out of the settlement the opportunity to opt back into the class, and that at the time, Defendants suggested including language relating to the franchisor/franchisee issue in the notice, which Class Counsel opposed.  (*See id.* at 10–11; Letter Providing Ct. with Proposed Notice and Proposed Form, Docket Entry No. 6346.)  Fikes Wholesale Objectors further point to a pre-motion conference request to support their arguments that "[D]efendants and the Oil Brands have taken the position that the Branded Operators are not the 'direct payors' and do not have standing to pursue claims under the Sherman Act."  (Fikes Wholesale Obj. 6 & n.13.)  In that request, Defendants stated their intent to move, in a certain subset of MDL cases, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, "to dismiss all claims

23

plaintiffs assert on behalf of their subsidiaries, affiliates, and franchisees in the captioned cases." (Mot. for Pre-Mot. Conference 1, Docket Entry No. 7271.)  They stated that plaintiffs in certain actions "expressly seek to recover damages not only on their own behalf but also on behalf of their subsidiaries, affiliates, or franchisees that are not themselves plaintiffs — and that in many cases are not identified in any manner," but argued that "[u]nder well-established Second Circuit law, plaintiffs lack standing to assert claims for injuries allegedly sustained by related entities." (*Id.*)  On February 1, 2019, after several extension requests, the Court granted a request to withdraw the pre-motion conference request without prejudice.  (Order dated Feb. 1, 2019.)

Fikes Wholesale Objectors argue that "[a]n administrative procedure cannot solve the conflicts here, which go to the very definition of class membership and define the parameters of the class. The settlement and notice can be read to advise both Branded Operators and Oil Brands that they are proper claimants to the same portion of settlement funds corresponding to the same transactions."  (Fikes Wholesale Obj. 12.)

> ### (4) National Association of Shell Marketers, the Petroleum Marketers Association of America, and the Society of Independent Gasoline Marketers of America's objections

National Association of Shell Marketers, the Petroleum Marketers Association of America, and the Society of Independent Gasoline Marketers of America (the "Association Objectors") argue that they have concern for their Branded Operator members that they risk losing legal claims without compensation, and that the Branded Operators "cannot properly evaluate the relative benefits and risks of participating in the settlement or opting out."  (Obj. to Class Action Settlement filed by Association Objectors ("Association Obj.") 1, Docket Entry No. 7561.)  They join the arguments of the Fikes Wholesale Objectors and underscore certain other issues.  (*Id.* at 2.)

(5)    **Coulson Oil Company, Inc., Diamond State Oil, LLC, and Port Cities Oil, LLC's objections**

Coulson Oil Company, Inc., Diamond State Oil, LLC, and Port Cities Oil, LLC (the "Coulson Objectors") are "the owners of numerous physical locations doing business as branded operators of the Valero Energy Corporation," and join in the objections of the Association Objectors. (Obj. to Class Action Settlement filed by the Coulson Objectors ("Coulson Obj.") 1, Docket Entry No. 7572.) They state that "by way of a confusing and ambiguous Notice, the Coulson Objectors believe they have been informed that the Settlement Administrator will reject their claims to receive proceeds from the Settlement . . . because Valero, through a separate and independent settlement agreement with Defendants, has purported to waive the rights of Valero's branded operators, including the Coulson Objectors, to participate in the Superseding Settlement." (*Id.* at 1–2.) They argue that "Valero had no right to take this action" and that Valero is not the direct purchaser and "did not pay the swipe fees incurred and which were actually paid by the Coulson Objectors." (*Id.* at 2, 5.)

The Coulson Objectors object to the Notice as follows:

> The Notice received by each of the Coulson Objectors indicates that it has been "excluded from the Class" and "will not be eligible to receive Settlement funds" because of a "relat[ion]" to Valero. This threatened "exclusion" from the Settlement is addressed to each of the Coulson Objectors as an integrated business entity, even though each Objector also operates locations unrelated to Valero. So, even though the Notice states that the addressee "will not be eligible to receive Settlement funds," the Coulson Objectors are left to speculate whether the Notice intends to invalidate claims for stores operating under something other than the Valero brand. The Notice is confusing and ambiguous on this point.

(*Id.* at 4.) They state that not all class members are able to determine whether their claims are allowed, and therefore "Rule 23's requirement that a proposed settlement 'treat[] class members equitably relative to each other'" is violated. (*Id.* at 6 (citing Fed. R. Civ. P. 23(e)(2)(D)).)

### f.    Final fairness hearing

On December 7, 2019, the Court held a final fairness hearing to hear arguments from the parties and multiple objectors on Rule 23(b)(3) Class Plaintiffs' motions for final approval of the Superseding Settlement Agreement, attorneys' fees and reimbursement of expenses, and class representative service awards.  (Min. Entry dated Nov. 11, 2019; Final Approval Hr'g Tr. ("Hr'g Tr.").)

The Court discussed with the parties and objectors, *inter alia*, the concerns regarding the release provision, the Branded Operators' objections, concerns as to the Valero settlement and franchisor/franchisee issues generally, the terms of the class definition, the adequacy of representation, and the claims administration process.  (*See generally* Hr'g Tr.)  The Court reserved decision.  (*Id.* at 137:3.)

### g.    Final approval

On December 13, 2019, the Court finally approved the Superseding Settlement Agreement as fair, reasonable, and adequate, including the Notice Plan, Class Notices, and Plan of Administration and Distribution, and finally certified, for settlement purposes only, a Rule 23(b)(3) settlement class.  (Final Approval Order.)

## II.   Discussion

### a.    Standard of review

#### i.    Class action settlement

Rule 23(e) of the Federal Rules of Civil Procedure sets forth the standards and procedures that apply to class action settlements.  Under Rule 23(e), a court may grant final approval of a proposed settlement "only after a hearing and only on finding that it is *fair, reasonable, and adequate* after considering" the Rule 23(e)(2) factors.  Fed. R. Civ. P. 23(e)(2) (emphasis added);

*see also Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013).  A class action settlement approval procedure typically occurs in two stages: (1) preliminary approval — where "prior to notice to the class, a court makes a preliminary evaluation of fairness," and (2) final approval — where "notice of a hearing is given to the class members, [and] class members and settling parties are provided the opportunity to be heard on the question of final court approval."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-CV-5450, 2016 WL 7625708, at *2 (S.D.N.Y. Dec. 21, 2016) (citing *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997)).

> Rule 23(e)(2) requires courts to consider whether:
>
> > (A) the class representatives and class counsel have adequately represented the class;
> > (B) the proposal was negotiated at arm's length;
> > (C) the relief provided for the class is adequate, taking into account:
> > > (i) the costs, risks, and delay of trial and appeal;
> > > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;
> > > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > > (iv) any agreement required to be identified under Rule 23(e)(3); and
> > (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  Paragraphs (A) and (B) constitute the "procedural" analysis factors, and examine "the conduct of the litigation and of the negotiations leading up to the proposed settlement."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  Paragraphs (C) and (D) constitute the "substantive" analysis factors, and examine "[t]he relief that the settlement is expected to provide to class members."  *Id.*

In addition, courts in the Second Circuit have traditionally considered the nine factors listed in *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974)

("*Grinnell*"), *abrogated on other grounds by Goldberger v. Integrated Resources, Inc.*, 209 F.3d

43 (2d Cir. 2000), known as the *Grinnell* factors, to assist in weighing final approval and

determining whether a settlement is substantively "fair, reasonable, and adequate." Those

factors are:

> (1) the complexity, expense and likely duration of the litigation; (2)
> the reaction of the class to the settlement; (3) the stage of the
> proceedings and the amount of discovery completed; (4) the risks of
> establishing liability; (5) the risks of establishing damages; (6) the
> risks of maintaining the class through the trial; (7) the ability of the
> defendants to withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the best possible
> recovery; and (9) the range of reasonableness of the settlement fund
> to a possible recovery in light of all the attendant risks of litigation.

*In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 88 (S.D.N.Y. 2009) (citing *Grinnell*, 495

F.2d at 463; *D'Amato v. Deutsche Bank*, 236 F.3d 78, 86 (2d Cir. 2001)). There is significant

overlap between the Rule 23(e)(2) and *Grinnell* factors, which complement, rather than displace

each other. *Interchange Fees III*, 330 F.R.D. at 29.

### ii. Class certification

"The ultimate decision to certify the class for purposes of settlement cannot be made until

the hearing on final approval of the proposed settlement." Fed. R. Civ. P. 23 advisory

committee's note to 2018 amendment. "Before approving a class settlement agreement, a district

court must first determine whether the requirements for class certification in Rule 23(a) and (b)

have been satisfied." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 238 (2d Cir. 2012).

"This applies even to conditional certification for settlement purposes only." *See Tart v. Lions

Gate Entm't Corp.*, No. 14-CV-8004, 2015 WL 5945846, at *1 (S.D.N.Y. Oct. 13, 2015) (citing

*Long v. HSBC USA Inc.*, No. 14-CV-6233, 2015 WL 5444651, at *5 (S.D.N.Y. Sept. 11, 2015)).

"To obtain certification of a class action for money damages, a plaintiff must satisfy

prerequisites of numerosity, commonality, typicality, and adequacy of representation," pursuant to Rule 23(a), and "must also establish that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," pursuant to Rule 23(b)(3). *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013); *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015). In addition to the explicit requirements of Rule 23(a), the class must satisfy the implied requirement of ascertainability. *In re Petrobras Sec.*, 862 F.3d 250, 266 (2d Cir. 2017). "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "The party seeking class certification must affirmatively demonstrate . . . compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met." *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d at 237–38 (quotation marks and citations omitted); *see also Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) ("The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." (citations omitted)).

Assessment of class certification in the settlement context invokes a "responsibility imposed upon [the courts] to exercise independent judgment for the protection of class absentees." *In re Traffic Exec. Ass'n-E. Railroads*, 627 F.2d 631, 634 (2d Cir. 1980) (citation omitted). Under Supreme Court guidance, consideration of problems that would occur in managing the class are relaxed in the settlement context, while the other requirements of Rule 23 must receive undiluted, if not heightened, scrutiny, even where a proposed settlement has been deemed fair, reasonable, and adequate:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.  But other specifications of the Rule — those designed to protect absentees by blocking unwarranted or overbroad class definitions — demand undiluted, even heightened, attention in the settlement context.  Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (citations omitted); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011) ("When a court is asked to certify a class and approve its settlement in one proceeding, the class-certification rule requirements designed to protect absent class members demand undiluted, even heightened, attention." (internal citation and quotation marks omitted)); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 270 (2d Cir. 2006) ("Before certification is proper for any purpose — settlement, litigation, or otherwise — a court must ensure that the requirements of Rule 23(a) and (b) have been met.  These requirements should not be watered down by virtue of the fact that the settlement is fair or equitable." (citing *In re Ephedra Prods. Liab. Litig.*, 231 F.R.D. 167, 169–70 (S.D.N.Y. 2005))); *see also Amchem Prod.*, 521 U.S. at 620 n.16 (disapproving a settlement class in a multi-party asbestos litigation and noting that "[s]ettlement, though a relevant factor, does not inevitably signal that class-action certification should be granted more readily than it would be were the case to be litigated.").  Nevertheless, "[t]he Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction, and it seems beyond peradventure that the Second Circuit's general preference is for granting rather than denying class certification."  *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011) (quoting *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009)), *aff'd*, 568 F. App'x 78 (2d Cir. 2014)).

### b.    Approval of the Superseding Settlement Agreement

For the reasons explained below and in the Preliminary Approval Order, the Court approves the Superseding Settlement Agreement as fair, reasonable, and adequate.

Under recent amendments to Rule 23, when weighing a grant of preliminary approval of a class settlement, district courts must now determine whether "giving notice is justified by the parties' showing that the court *will likely be able to*: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B)(i)–(ii) (emphasis added). As stated in the Preliminary Approval Order, this "likelihood" standard is more exacting than prior preliminary approval requirements, *Interchange Fees III*, 330 F.R.D. at 30 n.4, and in response, the Court engaged in a lengthy and robust analysis of the class settlement and class certification factors at the preliminary approval stage to assess how it might weigh each factor at the final approval stage. Therefore, because a detailed analysis already exists for many factors and to avoid duplicity, the Court at times refers to its reasoning as set forth in the Preliminary Approval Order where it finds that the reasoning still stands after having considered the motions papers and objections. In general, the Court adopts its prior reasoning, but offers additional analysis and consideration to those factors that class members have raised concern about in their objections.

### i.    The reaction of the class to the settlement

"It is well settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy. In fact, the lack of objections may well evidence the fairness of the Settlement."[12] *In re MetLife Demutualization Litig.*, 689 F.

---

[12]  This is the only final approval factor that the Court did not consider at length in the Preliminary Approval Order.

31

Supp. 2d 297, 333 (E.D.N.Y. 2010) (quoting *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 362 (S.D.N.Y. 2002)).  "A favorable reception by the class constitutes "'strong evidence' that a proposed settlement is fair."  *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 382 (S.D.N.Y. 2013) (quoting *Grinnell*, 495 F.2d at 462).  "[A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members."  4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41, at 108 (4th ed. 2002).  "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (quoting Conte & Newberg, *Newberg on Class Actions* § 11.41, at 108).

As summarized *supra*, the Court has received 675 exclusion requests and approximately 176 objections.  (Class Administrator Suppl. Report ¶ 6; Class Administrator Report ¶ 11; Pls. Reply 1.)  The Court notes that the Class Administrator reported dramatically fewer exclusion requests to the Superseding Settlement Agreement than to the 2013 Settlement Agreement, likely due in part to the fact that the injunctive relief and the inability to opt out of the Rule 23(b)(2) class led to much of the dissatisfaction with the 2013 Settlement Agreement.  (*Compare* Class Administrator Report ¶ 11 (noting receipt of 676 exclusion requests), *with* 2013 Class Administrator Report ¶ 7, Docket Entry No. 5783 (noting receipt of 7807 exclusion requests).)  The Court finds that, while it has received hundreds of exclusion requests and objections, the numbers are still relatively small when compared to the over 16 million long form notices that were sent to merchants, and the over 12 million estimated class members.  While the percentage of objections and exclusions is not as low as some class settlements, *see Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 239 (E.D.N.Y. 2010) ("Of the 11,800,514 class members,

32

only 127 opted out and 24 objected."); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d at

333 ("Five objections . . . were submitted by six of the approximately 11 million members of the

federal and state classes."), it is in line with cases where courts have found this factor to weigh in

favor of final approval, and is equivalent to a similar ratio of objections and exclusions to those

cases, *see, e.g.*, *D'Amato*, 236 F.3d at 86–87 (finding that district court properly found that

eighteen objections and seventy-two exclusions out of 27,883 notices weighed in favor of

settlement); *Ferrick v. Spotify USA Inc.*, No. 16-CV-8412, 2018 WL 2324076, at *4 (S.D.N.Y.

May 22, 2018) (approving settlement where court received 1224 exclusions outs of 535,380

notices mailed and noting that "[d]espite the exclusions and objections . . . the vast majority of

class members did not object to the settlement or opt out of it, which indicates that the settlement

is fair"), *appeal dismissed sub nom. Ferrick v. Diable*, No. 18-1702, 2018 WL 6431410 (2d Cir.

Oct. 9, 2018); *Simerlein v. Toyota Motor Corp.*, No. 17-CV-1091, 2019 WL 2417404, at *19–20

(D. Conn. June 10, 2019) (finding that receiving sixty-eight exclusions out of 1,299,946 class

members strongly supported approval); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d at 382

(finding that the reaction of the class overwhelmingly supported approval of the settlement

where 2.5 million notices generated 134 exclusion requests); *In re Initial Pub. Offering Sec.

Litig.*, 671 F. Supp. 2d 467, 485 (S.D.N.Y. 2009) (discussing and responding to the "valid

concerns" raised by objectors but ultimately granting final approval where seven million notices

were sent and the court received 371 requests for exclusion and approximately 140 objections,

which constituted "less than a hundredth of one percent").  In addition to the relatively small

objection and opt-out percentage when compared to the size of the class, the Court further notes

that it is difficult to weigh the approximately 130 boilerplate objections filed by Branded

Operators.

In evaluating this factor, the Court considers the substantive objections *infra*. *See Simerlein*, 2019 WL 2417404, at *19 (noting that courts consider not only quantity of objections and opt outs, but "quality" as well) (quoting 4 Newberg on Class Actions § 13:54 (5th ed.)). Moreover, as observed by Judge Gleeson in approving the 2013 Settlement Agreement, in addition to raw numbers of objectors and opt-out merchants, it is important to also assess the percentage of the class by transaction volume, i.e., based on Mastercard and Visa sales volume. *See Interchange Fees I*, 986 F. Supp. 2d at 223–24 (Judge Gleeson noting, with a much larger percentage of the class objecting, that "[g]iven the transaction volume represented by the objectors, it would be facile to conclude that the reaction of the class strongly favors approval of the settlement simply because substantially less than one-tenth of one percent of the merchants have objected"). Based on transaction volume, those that have opted out of the Superseding Settlement Agreement represent over 28%, which is a significant percentage of the class. (*See* Letter from Rule 23(b)(3) Class Counsel and Defs. dated Nov. 21, 2019 ("Nov. 2019 Letter") 4, Docket Entry No. 7791 ("Defendants calculated a Total Opt Out Percentage of 28.55%.").) Although when looking at the opt-out percentage by transaction volume as opposed to percentage of the number of entities that have excluded themselves, the Court cannot conclude that this factor weighs strongly in favor of approval, the Court finds that the reaction of the class does not weigh *against* approval given the relatively small number of exclusion requests. This is especially so when compared with the number of exclusions in the prior settlement and the size and sophistication of many of the class members, and the fact that fewer major retailers object to the Superseding Settlement Agreement as compared to the 2013 Settlement Agreement. *See In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 485 ("The Second Circuit has . . . previously provided guidance as to what percentage of the class must object before a settlement

would be rendered unfair, indicating that an otherwise fair settlement should not be deemed unfair because of opposition by thirty-six percent of the total class." (citing *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987)); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118–19 (3d Cir. 1990) (directing approval where "only" twenty-nine out of 281 class members objected to the settlement); *see also Interchange Fees I*, 986 F. Supp. 2d at 223 (Judge Gleeson noting that "because the roster of objectors includes some of the nation's largest retailers, the objectors in the aggregate represent 19% of the total transaction volume").

> ii. **Adequate representation by class representatives and class counsel**

The Branded Operators argue, as they did at the preliminary approval stage, that they are inadequately represented by Rule 23(b)(3) Class Plaintiffs and Class Counsel.  In their form objections, the Branded Operators appear to claim that they are not adequately represented by Rule 23(b)(3) Class Plaintiffs or Class Counsel because "[n]one of the class representatives were branded marketers, and branded marketer interests were not represented when the settlement was negotiated," and Class Counsel is "incapable of asserting branded marketer interests when they conflict with the interests of major oil companies."  (Swallow Oil Co. Obj. 1.)  The Jack Rabbit Objectors argue that they "and all other class members similarly situated . . . are members of an unrepresented subclass, whose interests have not been adequately protected by the proposed settlement."  (Jack Rabbit Obj. 2–3.)  Fikes Wholesale Objectors argue that "Class Counsel is well aware of th[e intra-class] conflict," i.e., that the major oil suppliers lay claim to the same benefits as the Branded Operators "and should have resolved it during settlement negotiations with the aid of separate counsel appointed to represent the Branded Operators to whom the settlement promises benefits."  (Fikes Wholesale Obj. 1.)  They argue that "they should have had separate counsel strongly advocating that the settlement benefits corresponding to their card

transactions belong solely to them." (*Id.* at 3.) They state that "Class Counsel is not protecting

the rights of all class members equally and none of the class representatives has interests that are

aligned with the Branded Operators," (*id.* at 7), and furthermore, "neither they nor any other

'franchisee' has any representation in the class," (*id.* at 19).

"Determination of adequacy typically 'entails inquiry as to whether: (1) plaintiff's

interests are antagonistic to the interest of other members of the class and (2) plaintiff's attorneys

are qualified, experienced and able to conduct the litigation.'" *Cordes & Co. Fin. Servs. v. A.G.*

*Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007) (quoting *Baffa v. Donaldson, Lufkin &*

*Jenrette Sec. Corp*., 222 F.3d 52, 60 (2d Cir. 2000)). In the Preliminary Approval Order, the

Court found that the Branded Operators had not shown that Class Plaintiffs could not fairly and

adequately protect the interests of the Branded Operators. *Interchange Fees III*, 330 F.R.D. at

32–33. The Court noted that the named Rule 23(b)(3) Class Plaintiffs seek to represent a finite

class that desires and will receive the same type of relief — damages for past harm — and that

therefore all Rule 23(b)(3) Class Plaintiffs and members of the Rule 23(b)(3) class will have the

same incentive to "maximize cash compensation for past harm." *Id.* at 31 (first citing

Superseding Settlement Agreement ¶¶ 4, 27–28; and then quoting *Interchange Fees II*, 827 F.3d

at 233). At the time, the Court distinguished cases that the Branded Operators relied upon,

including the Second Circuit's remand decision in this case, and *Amchem*. *Id.* at 33. Branded

Operators make nearly identical arguments and cite similar cases in their final approval

objections as to adequate representation. The Court remains unpersuaded that Plaintiffs'

interests are antagonistic to the Branded Operators' interests, or that Class Counsel cannot

adequately represent the Rule 23(b)(3) class.

In addition to the Court's reasoning set forth in the Preliminary Approval Order, as stated

at the final approval hearing, the dispute over who has a claim to a share of the settlement fund, Branded Operators or major oil suppliers, franchisees or franchisors, is a dispute that needs to be resolved, but need not be resolved through creation of subclasses or appointing new class representatives or counsel.  At the hearing, the Court stated:

> [P]art of the argument that's been made by [B]randed [O]perators is that this is a class counsel conflict . . . [but] Class Counsel here is representing everyone who's in the class.  Anyone who has an interest.  [The] argument to the Court is that the interest is [Branded Operators'], not that of the distributor.  And so, why is that a conflict with [C]lass [C]ousel as opposed to simply a disagreement as to who should collect from the fund[?] . . . [I]f a mechanism is put in place . . . why isn't this a resolvable issue?

(Hr'g Tr. 19:23–20:10.)  In response, counsel for Jack Rabbit suggested that instead of creating a claims administration process mechanism to resolve such disputes, that instead the Court require the parties to "go back" and "[a]dd a presumption" that the Branded Operators own the claim. (*Id.* at 20:12–20.)  The Court understands the request to be that Jack Rabbit would like certainty as to who owns the claim, and that Jack Rabbit argues that because this has not been resolved, representation has been inadequate.  But as Class Counsel stated at the hearing, the issue that Branded Operators raise is "going to come up again like with . . . hotel operators as . . . with the petroleum industry, so it is going to be an issue but it's not an intraclass issue.  Somebody owns the claim and somebody does not."  (*Id.* at 76:23–77:2.)  Further, as the Court elaborated, "if there's a dispute as to [a] claim, if the supplier also submits a claim for th[e] same [Branded Operator] location, whichever way the claim is being administered, then the dispute gets resolved pursuant to the plan or if need be, the Court or a special master."  (*Id.* at 21:24–22:3.) The Court cannot simply presume away legal realities, such as antitrust standing and potential contracts at issue, that may influence who is entitled to a claim.

Class Counsel is advocating for those who have a claim, and after being pressed on the

matter, Class Counsel stated unequivocally that they are "agnostic at this point as to who owns the claim." (*Id.* at 65:15–16.) As one counsel stated as to the Branded Operators, "[i]n fact, I hope they're in the class because we want to give them money if they were the ultimate damaged party." (*Id.* at 66:2–3.)

The Court does not agree with the Branded Operators' argument that because Class Counsel had knowledge that this issue might arise and that it still remains an outstanding issue, that somehow they do not adequately represent the Branded Operators' interests. Issues will arise when settling such a large class that involves a variety of corporate entities and businesses. Waiting to approve a class settlement until each and every issue is resolved would result in an unacceptable delay, especially when there is a claims administration process within which such issues can be addressed. The Court notes that contrary to what Branded Operators argue, Class Counsel do not appear to be ignoring this issue. Indeed, when the issue arose during the claims administration process for the 2013 Settlement Agreement, Class Counsel acknowledged in a joint status report to the Court that steps should be taken to resolve the matter and that they were working to develop a procedure for the Claims Administrator to follow. (June 2014 Status Report 7 ("Class Counsel understand that this issue did not present serious difficulties in the administration of the *In re Visa Check* settlement . . . . The parties have discussed this issue, however, and are working together and with the Claims Administrator to arrive at a method for identifying franchisor/franchisee relationships in filed claims and then determining which entity has the right to opt out of and be compensated from the fund.").) In addition, during the settlement process for the Superseding Settlement Agreement, Class Counsel has actively informed the Court about franchisee-franchisor and association member related matters, and affirmatively suggested curative communications and notices be sent out to franchisees and

association members to permit them to opt back into the class if desired.  (*See* Letter dated July 22, 2019; Letter dated Sept. 17, 2019.)  It appears that Class Counsel has been actively monitoring this issue and is cognizant that a claims administration process will need to be established to resolve these issues.[13]

The Court therefore adopts its reasoning set forth in the Preliminary Approval Order as to the adequacy of representation and finds that this factor weighs in favor of final approval.

### iii.   Arms-length negotiations

For the reasons stated in the Court's Preliminary Approval Order, and because no class member has objected to final approval on this basis, the Court finds that this factor weighs in favor of final approval.  *See Interchange Fees III*, 330 F.R.D. at 34–35.

### iv.   Adequate relief for the class

In assessing whether the settlement provides adequate relief for the putative class under Rule 23(e)(2)(C), the Court must consider:

> (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3).[14]

Fed. R. Civ. P. 23(e)(2)(C)(i)–(iv).  As one district court has noted, "[i]f the class settlement does not provide effectual relief to the class . . . then the class representatives have failed in their duty under Rule 23 to fairly and adequately protect the interests of the class."  *Scott v. Weig*, No. 15-

---

[13]   In addition, as stated at the final approval hearing, the Court notes that at no time has any Branded Operator filed a motion over the issue of whether they own the claim to a *pro rata* share of the settlement, or whether the major oil suppliers own the claim.  (Hr'g Tr. 15:13–14.)

[14]   As to the fourth factor, no such agreements exist.  (Pls. Mem. 29.)

CV-9691, 2018 WL 2254541, at *4 (S.D.N.Y. May 17, 2018) (quoting *In re Subway Footlong Sandwich Mktg. & Sales Practice Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) (citation omitted)).

The first factor — costs, risks, and delay of trial and appeal — subsumes several *Grinnell* factors, which the Court considers. The Court also considers the proposed release from liability as an additional factor under this section, as it affects the determination of the fairness, reasonableness, and adequacy of class relief.

### 1. Costs, risks, and delay of trial and appeal

Under this Rule 23(e)(2) factor, "courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such results." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. This assessment implicates several *Grinnell* factors, including: (i) the complexity, expense and likely duration of the litigation; (ii) the risks of establishing liability; (iii) the risks of establishing damages; and (iv) the risks of maintaining the class through the trial. In the Preliminary Approval Order, the Court used these *Grinnell* factors as a guide in its assessment of whether the Court will likely find that this Rule 23(e)(2) factor will weigh in favor of granting final approval. *See Interchange Fees III*, 330 F.R.D. at 36.

For the reasons stated in the Court's Preliminary Approval Order, and because no class member has objected to final approval on these bases, the Court finds that these factors weigh in favor of final approval. *Interchange Fees III*, 330 F.R.D. at 36–40.[15]

---

[15] In addition to the reasoning set forth in the Preliminary Approval Order, the Court finds the declaration by the Honorable H. Lee Sarokin (ret.) assessing litigation risks to be persuasive, and agrees with his assessment that "[t]he parties faced unusual and numerous risks in this litigation." (*See* Judge Sarokin Decl. 3.) Judge Sarokin's declaration highlights, *inter alia*, the risks that Class Counsel faced, both at the outset of this litigation under the Eleventh Circuit's affirmation of a district court decision, *Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231 (S.D. Fla. 1984), *aff'd* 779 F.2d 592 (11th Cir. 1986), where an interchange fee established by the court had been sought but denied, and pursuant to the "seismic shift in the payment card world" that took place due to the Supreme Court's decision in *Ohio v.*

## 2. Effectiveness of distributing relief to the class, including the method of processing class-member claims, if required

Objector Kohan complains that the Superseding Settlement Agreement contains "an arbitrary or ambiguous clause" as to what will be done with potentially "over a billion dollar[s] of remaining and unclaimed settlement proceeds." (Kohan Obj. 9.) The form submitted by some Branded Operators states that "Company is totally in the dark as to whether . . . any mechanism is in place to sort all of this out." (*See, e.g.*, Swallow Oil Co. Obj. 1.) They demand that "Branded [Operators] should be informed now whether a procedural mechanism will be put in place to determine whether, and to what extent, [B]randed [Operators] will participate in the settlement, what evidence they need to present, and whether there will be procedural hurdles they need to overcome to claim their rights as class members." (*Id.* at 2.) Fikes Wholesale Objectors argue that "[a]n administrative procedure cannot solve the conflicts here, which go to the very definition of class membership and define the parameters of the class. The settlement and notice can be read to advise both Branded Operators and Oil Brands that they are proper claimants to the same portion of settlement funds corresponding to the same transactions." (Fikes Wholesale Obj. 12.)

This factor requires courts to look at "the method of processing class-member claims." Fed. R. Civ. P. 23(e)(2)(C)(ii). "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment. The method used in the present action is set forth primarily in the Plan of Administration and Distribution. (Plan of Administration and Distribution.)

---

*Am. Express Co.*, 585 U.S. ---, 138 S. Ct. 2274, 2285 (2018). (*See* Judge Sarokin Decl. 3–4, 8–9.)

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized — namely, it must be fair and adequate . . . . An allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005) (internal citations and quotation marks omitted). "A district court 'has broad supervisory powers with respect to the . . . allocation of settlement funds.'" *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2016 WL 2731524, at *9 (S.D.N.Y. Apr. 26, 2016) (omission in original) (quoting *In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 146 (2d Cir. 2005)). "[N]umerous courts have held . . . [that] a plan of allocation need not be perfect." *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-CV-10240, 2007 WL 2230177, at *11 (S.D.N.Y. July 27, 2007) (collecting cases).

Class Counsel, experienced and competent complex class action attorneys, prepared the Plan of Administration and Distribution. Under its terms, the Class Administrator will estimate the interchange fees paid by each claimant during the class period, and each claimant will receive a *pro rata* share of the settlement fund based on its interchange fees paid. (Plan of Administration and Distribution I-2.) Claimants will have the opportunity to "contest the accuracy of the statement or estimates" made by the Class Administrator. (*See id.* at I-7, 8, 13.) Once claims are estimated, the Class Administrator will disseminate a claim form. (*Id.* at I-10.) According to Class Counsel, the majority of the claim form can be "pre-populated" with data provided by Visa and potentially other Defendants. (Mem. in Supp. of Prelim. Approval 40.) Once a claim form is received, the Class Administrator will commence its audit, and "[c]laimants whose claims are denied, or who disagree with the final calculation of their claims, may challenge such denials or final calculations in writing, together with supporting documentation,

mailed or emailed to the Class Administrator within thirty days after receipt of the notice of the

denial or final calculation." (*See* Plan of Administration and Distribution I-13.)  A website

containing relevant documents and forms in multiple languages, and telephone support will be

available to "obtain information and request documents related to the claims process." (*See id.* at

I-13, 14.)

The Court finds that the Plan has a "reasonable, rational basis" and therefore approves the

Plan; this factor weighs in favor of granting approval.  Courts frequently approve plans involving

*pro rata* distribution.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503,

519 (E.D.N.Y. 2003) (approving allocation plan where "[c]lass members will receive an award

of money from the [settlement funds] directly proportional to their debit and credit purchase

volume (as well as online debit transactions) during the [c]lass period" in an antitrust action); *In*

*re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018)

(approving distribution plans where they "provide for pro rata distributions of the respective

settlement funds" in an antitrust action); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL

2731524, at *4 (approving distribution plan that "calculate[es] each claimant's recovery based on

its *pro rata* share of the available [s]ettlement [f]unds in relation to the recoveries to which all

claimants who have submitted a valid claim are entitled" in an antitrust action with substantive

objections to the plan); *Shapiro v. JPMorgan Chase & Co.*, No. 11-CV-7961, 2014 WL

1224666, at *13 (S.D.N.Y. Mar. 24, 2014) (approving an allocation plan where the settlement

amount, less administration costs, would be distributed on a *pro rata* basis of net losses); *In re*

*Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 475 (same); *In re Vitamins Antitrust Litig.*,

2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one,

that apportion funds according to the relative amount of damages suffered by class members,

43

have repeatedly been deemed fair and reasonable.").

At this stage in such a complex action, the Court cannot answer all questions about what will happen during the administration process. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. at 496 ("[I]n the case of a large class action the apportionment of a settlement can never be tailored to the rights of each plaintiff with mathematical precision." (alteration in original) (quoting *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. Mar. 20, 1997)), *aff'd*, 117 F.3d 721 (2d Cir. 1997) (per curiam)). However, the Court acknowledges that a process needs to be in place to determine claim ownership in franchisor/franchisee disputes such as those that the Branded Operators have raised, i.e., as to disputes over who has the right to claim settlement funds and will appoint a special master to resolve such disputes.[16] (*See* Hr'g Tr. 21:24–22:3 (the Court stating to counsel for certain Branded Operators that "if there's a dispute as to [a] claim, if the [major oil supplier] also

---

[16] At the request of the Court after the final fairness hearing, the parties submitted the names of three potential special masters — one of whom the Court will appoint to resolve claim dispute issues and other issues referred by the Class Administrator — as well as a proposed order appointing a special master. (*See* Nov. 2019 Letter; Proposed Order Appointing Special Master, annexed to Nov. 2019 Letter as Ex. C, Docket Entry No. 7791-3.) Counsel for Jack Rabbit has also submitted a special master recommendation and requests that:

> [A] separate Special Master be appointed to exclusively handle the resolution of claims made, by any Branded or Unbranded Gas Station Owner versus their distributor. That Special Master would adhere to distinct guidelines including incorporating a rebuttable presumption in favor of the Branded or Unbranded Gas Station Owner, as to any claim for distributed funds. Distributors would be required to present direct evidence of direct purchaser status and actual damages to overcome that presumption.

(Mot. for Leave to File Doc. Letter Mot. in Resp., Docket Entry No. 7807.) The Court denies this application. The Court finds adequate the appointment of one special master to address all issues referred by the Class Administrator. If during the course of the administration of the settlement it becomes apparent that a second special master is needed, the Court will consider appointing one. As for the request that the Court establish a guideline to include a rebuttable presumption in favor of Branded Operators, the Court denies this request as there is no legal basis to do so.

44

submits a claim [in addition to the Branded Operator] for that same location, . . . then the dispute gets resolved pursuant to the [P]lan [of Allocation] or if need be, the Court or a special master").) These issues will likely implicate who in a given situation or within a certain contractual or processing relationship or corporate structure might have standing under federal antitrust laws.[17] The Court is confident that such a plan can be appropriately developed, and notes that a nearly identical issue arose in *In re Visa Check/Mastermoney Antitrust Litigation*, 297 F. Supp. 2d 503. There, the court appointed a special master to resolve disputes over claims that did "not fit within the category of challenges contemplated by the Settlement Agreement and Plan of Allocation." (*See In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-CV-5238 (E.D.N.Y.), Order dated Jan. 19, 2006, Docket Entry No. 1242.) Class Counsel argue that "[t]o the extent that contractual relationships between a Branded Operator and its supplier influence which party properly has a claim to a given set of funds, the parties to the dispute can provide that information to the Administrator, Class Counsel, or a special master, with the Court having ultimate authority to adjudicate disputes." (Pls. Reply 19.) In addition, the Plan of Administration and Distribution anticipates a process "to challenge decisions by the Class Administrator regarding the . . . denial of any claim." (Plan of Administration and Distribution I-13.) The Plan also provides that "[i]f a Claimant's data is not located in the Visa databases and cannot otherwise be located with

---

[17] At certain times during the final fairness hearing, Class Counsel stated that "based upon what [they had] seen to date," the major oil suppliers appeared to be the first payor of the interchange fee, and not the Branded Operators, thereby suggesting that the major oil suppliers and not the Branded Operators would be able to file claims. (*See* Hr'g Tr. 9:24–10:3; *see also id.* at 8:20–21; 11:2–11.) After being pressed by the Court as to whether Class Counsel was actually taking a position on the matter, Class Counsel assured the Court that if a Branded Operator is ultimately deemed to own a claim, they would be represented by Class Counsel and would be able to file a claim. (*See, e.g., id.* at 79:22–25; *id.* at 81:5–7 ("If we think that they were improperly included on th[e] [Dismissed Plaintiffs] list . . . I'll tell you we're going to fight for them.").)

reasonable effort,[18] the Class Administrator will request and consider information provided by the Claimant in conjunction with other available information to make reasonable estimates of Visa-Branded Card Interchange Fees Paid," and "Claimants will be given the opportunity to contest the accuracy of the statement or estimates of Interchange Fees Paid determined by the Class Administrator." (*Id.* at I-5, I-6.)  If there is a challenge from a Claimant, "the Class Administrator will make a determination whether the Interchange Fees Paid estimate should be adjusted and will notify the Claimant of its determination, together with information about how the Claimant can appeal such determination to Rule 23(b)(3) Class Counsel, and subsequently the Court." (*Id.* at I-9.)  Additional claims and dispute resolution procedures may be put in place with the appointment of a special master.

Finally, Kohan appears to argue that the Superseding Settlement Agreement contains "an arbitrary or ambiguous clause" as to what will be done with potentially "over a billion dollar[s] of remaining and unclaimed settlement proceeds." (*See* Kohan Obj. 9.)  To the extent Kohan is questioning how any remaining settlement funds will be disbursed, the relevant procedures as set forth in the Plan are neither arbitrary nor ambiguous.  The Plan dictates that after initial distribution, any remaining balance will be distributed to Claimants following certain restrictions, and that after that subsequent distribution, "any remaining balance shall be

---

[18] According to the Plan of Administration and Distribution,

> [t]he Class Administrator may also use the transactional database maintained by Mastercard and additional available data to determine a Claimant's Interchange Fees Paid.  The Class Administrator may well determine that due to limitations in available data, many Claimants' Interchange Fees Paid on Mastercard-Branded Card transactions will need to be estimated using data from Visa databases and reasonable assumptions concerning Mastercard-Branded Card transaction volume relative to Visa-Branded Card transaction volume and other pertinent information.

(Plan of Administration and Distribution I-4.)

distributed as the Court may direct in accordance with Paragraph 28 of the Superseding and Amended Class Settlement Agreement." (Plan of Administration and Distribution I-11, I-12.) There is nothing unusual about provisions which allow for *cy pres* or court-ordered instructions for how to distribute remaining unclaimed funds. *See In re Holocaust Victim Assets Litig.*, 311 F. Supp. 2d 407, 416 (E.D.N.Y. 2004) ("[W]hen a balance of a class recovery remains following individual distribution . . . the court may direct that such undistributed funds be applied prospectively to the indirect benefit of the class . . . [via] [the] cy pres approach." (citation omitted)).

### 3.    The terms of any proposed award of attorneys' fees

The Court has separately considered Class Counsel's request for attorneys' fees and expenses, and all objections to the request. For the reasons set forth in the Preliminary Approval Order, *see Interchange Fees III*, 330 F.R.D. 41–42, and in the separate attorneys' fees and expenses opinion filed simultaneously with this Memorandum and Order, the Court finds that this factor weighs in favor of final approval.

### 4.    Release from liability

The Court received several objections related to the release provision of the Superseding Settlement Agreement. The Mattress Firm Objectors argue that "[t]he release unlawfully waives future claims that challenge interchange rules," and that it is impermissible to "waive damages based on future violations of the antitrust laws." (Mattress Firm Obj. 1, 3.) Quoting the release language, they argue that releasing claims "that will accrue between January 14, 2019 and 'five years following the court's approval of the settlement and the resolution of all appeals' necessarily releases future claims for damages, which is in itself impermissible." (*Id.* at 3.) Kevan McLaughlin similarly argues that the "five-year waiver of financial liability for future

conduct in the release remains troubling.  It may well be unenforceable but, even if it is not, there is no reason to extend the five-year bar by adding to it the duration of any appeals, as the release purports to do."  (McLaughlin Obj. 2.)  Gnarlywood Objectors also argue that "release against their future misconduct — the value of associated un-accrued claims . . . which is unknown — without corresponding consideration to members of the Rule 23(b)(3) Settlement Class," should be disallowed.  (Gnarlywood and Quincy Woodrights Obj. 1.)

"The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct."[19] *Wal-Mart Stores*, 396 F.3d at 107 (citing *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)); *see also TBK Partners, Ltd.*, 675 F.2d at 460 (setting forth the "identical factual predicate" standard and noting that the Court had "previously 'assume(d) that a settlement could properly be framed so as to prevent class members from subsequently asserting claims relying on a legal theory different from that relied upon in the class action complaint but depending upon the very same set of facts.'" (alteration in original) (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981))).

"Broad class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country." *Wal-Mart Stores*, 396 F.3d at 106.  However, releases cannot be boundless; "'[p]laintiffs in a class action may release claims that were or could have been pled in exchange

---

[19]  Although this is not an official Rule 23(e)(2) or *Grinnell* factor, analysis of the release provision of the Superseding Settlement Agreement will assist in determining whether relief is adequate for the class.  The Court also separately discusses the release provision because of the concerns raised by the Second Circuit in its decision to vacate the prior settlement approval.

for settlement relief' . . . [but] this authority 'is limited by the "identical factual predicate" and "adequacy of representation" doctrines.'" *Interchange Fees II*, 827 F.3d at 236–37 (quoting *Wal-Mart Stores*, 396 F.3d at 106). Courts have denied preliminary approval where releases from liability are deemed to be overly broad. *See, e.g.*, *Oladapo v. Smart One Energy, LLC*, No. 14-CV-7117, 2017 WL 5956907, at *15 (S.D.N.Y. Nov. 9, 2017) (taking issue with the release for using the phrase "similar conduct" and finding it unacceptable that "the proposed release would extend to all claims that arise out of or relate to 'the conduct alleged in the Complaints or similar conduct.'" (quoting the release)), *report and recommendation adopted*, 2017 WL 5956770 (S.D.N.Y. Nov. 30, 2017); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 88 (E.D.N.Y. 2007) (expressing dismay that "[a]s written, the release would constitute a waiver of claims completely unrelated to this action that could be brought under any of the statutes or common-law theories that are alleged in the Second Amended Complaint").

The Court considered the release provision at length in the Preliminary Approval Order, *see Interchange Fees III*, 330 F.R.D. at 42–47, and after lengthy discussions with the parties during the preliminary approval hearing to clarify the scope of the release and the parties' intent, the Court granted preliminary approval after ensuring that the Second Circuit's prior concerns were not implicated in the new release, the release comported with the Second Circuit's "identical factual predicate" test, and instructed the parties to include new language in the Class Notices to clarify the scope of the Release Provision and to clarify that it comports with the identical factual predicate test to ensure that putative class members understand what rights they are releasing, (Revised Class Notices G1-3, G1-4, G2-10; *see also* Prelim. Approval Hr'g Tr. 23:8–24:17, 26:13–26:16, 28:9–28:11). However, the Court did not specifically address the release of future claims, which the Court now addresses.

49

The release from liability in the Superseding Settlement Agreement Release and Covenant Not to Sue (the "Release Provision") reads in pertinent part:

> The Rule 23(b)(3) Settlement Class Releasing Parties hereby expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Rule 23(b)(3) Settlement Class Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, parens patriae, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Rule 23(b)(3) Settlement Class Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the Settlement Preliminary Approval Date or accrue no later than five years after the Settlement Final Date arising out of or relating to any conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act of any Rule 23(b)(3) Settlement Class Released Party that are or have been alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act.  For avoidance of doubt, this release shall extend to, but only to, the fullest extent permitted by federal law.

(Superseding Settlement Agreement ¶ 31(a).)

The Release Provision broadly releases claims arising out of certain rules challenged in the litigation and other rules that are substantially similar.  It specifies that the (b)(3) class members agree to release "any claims arising out of or relating to" the allegations of the (b)(3) class including "any interchange fees, interchange rates, or any Rule of any Visa Defendant or MasterCard Defendant relating to interchange fees," (*id.* ¶ 31(b)(i)), "any . . . 'honor all cards' rules . . . [or] rules or conduct relating to routing options regarding acceptance technology for mobile, e-commerce, or online payments, or development and implementation of tokenization

standards," (*id.* ¶ 31(b)(iii)).  It further specifies that references to these rules "mean those rules

as they are or were in place on or before the Settlement Preliminary Approval Date and rules in

place thereafter that are *substantially similar*."  (*Id.* ¶ 31(c) (emphasis added).)

In addition, although the Release Provision releases class members' ability to seek

injunctive relief generally, it does not release a Rule 23(b)(3) class member's participation in the

(b)(2) injunctive action, "solely as to injunctive relief claims alleged" in that action.  (*Id.*

¶ 34(a).)  Specifically, the Release Provision does not release:

> [a] Rule 23(b)(3) [class member's] continued participation, as a
> named representative or non-representative class member, in
> *Barry's Cut Rate Stores, Inc., et al. v. Visa, Inc., et al.*, MDL No.
> 1720 Docket No. 05-md-01720-MKB-JO ("*Barry's*"), solely as to
> injunctive relief claims alleged in *Barry's*.  As to all such claims for
> injunctive relief in *Barry's*, the Rule 23(b)(3) [class members] retain
> all rights pursuant to Rule 23 of the Federal Rules of Civil Procedure
> which they have as a named representative plaintiff or absent class
> member in *Barry's* except the right to initiate a new separate action
> before five years after the Settlement Final Date.  Nothing in this
> Paragraph shall be read to enlarge, restrict, conflict with, or affect
> the terms of any release or judgment to which any Rule 23(b)(3)
> Settlement Class Releasing Party may become bound in *Barry's*,
> and nothing in the release in Paragraphs 29–33 above shall be
> interpreted to enlarge, restrict, conflict with, or affect the request for
> injunctive relief that the plaintiffs in *Barry's* may seek or obtain in
> *Barry's*.

(*Id.*)

Unlike the (b)(3) release in the 2013 Settlement Agreement, which "fully, finally, and

forever settle[d], discharge[d] and release[d]" Defendants from claims, (2013 Settlement

Agreement ¶ 33), the Release Provision of the Superseding Settlement Agreement "is limited in

duration" as it only bars "claims that have accrued within five years following the Court's

approval of the settlement and the exhaustion of all appeals," (Mem. in Supp. of Prelim.

Approval 23; *see also* Superseding Settlement Agreement ¶ 31(a)).

The release is also limited in scope as it extinguishes claims based on conduct or acts "that are or have been alleged or otherwise raised in the Action, or that could have been alleged or raised in the Action relating to the subject matter thereof, or arising out of or relating to a continuation or continuing effect of any such conduct."  (Superseding Settlement Agreement ¶ 31(a).)

While the Court sympathizes with objectors' concerns about the release of claims that accrue in the future, especially five years after the finalization of all appeals, which may be many years into the future, it does not appear that the law restricts how far into the future claims can be released, as long as the released claims are based on the "identical factual predicate" of the action at issue, as in this case.  *See Wal-Mart Stores*, 396 F.3d at 107 ("The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." (citation omitted)).  Because there is no limit on the language allowing for release of claims other than that it must be based on an "identical factual predicate," it does not appear that there is any prohibition on the release of *future* claims, as long as those claims fall within the identical factual predicate test.[20]  *See, e.g.*, *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d at 247–48 (noting that "[p]arties often reach broad settlement agreements encompassing claims not presented in the

_____

[20]  For this reason, the Court is not persuaded by McLaughlin's arguments that (1) even if the prospective release is allowable, the "five-year immunity period" should not be extended to the end of the duration of any appeals, and "[t]here is no apparent rationale for extending a term certain during appeals except to penalize class members for taking appeals," and (2) the length of the release and its "uncertain temporal scope" makes it difficult to assess what class members are giving up in exchange because if appeals are made, it is unclear "how many additional years' worth of class members' damage claims are to be exchanged for that same class fund recovery." (McLaughlin Obj. 3–7.)

complaint in order to achieve comprehensive settlement of class actions, particularly when a defendant's ability to limit his future liability is an important factor in his willingness to settle," and upholding release language where the settlement prohibited claimants (freelance authors) from barring future use of their works, including selling and licensing to third parties, "unless the class member either opts out of the [s]ettlement altogether or exercises his right to bar future use") (citation omitted)); *Blessing v. Sirius XM Radio Inc.*, No. 09-CV-10035, 2011 WL 3739024, at *3 (S.D.N.Y. Aug. 24, 2011) (approving a release that "releases [d]efendant from all claims by class members 'arising out of, based on or relating to the merger that formed Sirius XM'" (citation omitted)), *aff'd*, 507 F. App'x 1 (2d Cir. 2012); *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'" (citation omitted)); *see also In re Facebook, Inc., Initial Pub. Offerings Sec. & Derivative Litig.*, 343 F. Supp. 3d 394, 411 (S.D.N.Y. 2018).

Such releases are acceptable where the future claims releases are those based on a continuation of conduct at issue and underlying the original claims. *See Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 95 (2d Cir. 2019) (rejecting objector's critique of the district court "for accepting a settlement that purports to release liability for claims accruing after the class period" because "the law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct" and concluding that spam text messages sent after the class period were no different than text

messages sent prior to settlement (alteration omitted) (citation omitted)); *VKK Corp. v. NFL*, 244 F.3d 114, 126 (2d Cir. 2001) ("It is not uncommon, we assume, for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution.").

The Court is also not persuaded by the argument that the release is void due to public policy protection of antitrust cases. Multiple objectors cite cases for the proposition that "[r]eleases may not be executed which absolve a party from liability for future violations of our antitrust laws." *Redel's Inc. v. Gen. Elec. Co.*, 498 F.2d 95, 99 (5th Cir. 1974); (*see also* McLaughlin Obj. 4 (citing *Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir. 1967) (agreement "executed in a fashion calculated to waive damages arising from future violations of the antitrust laws[] would be invalid on public policy grounds")); *Fox Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955) ("Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy.")); Mattress Firm Obj. (citing *Redel's*, 498 F.2d 95; *Virginia Impression Prods. Co. v. SCM Corp.*, 448 F.2d 262 (4th Cir. 1971); *Gaines*, 386 F.2d 757; *Duffy Theatres, Inc. v. Griffith Consol. Theatres, Inc.*, 208 F.2d 316 (10th Cir. 1953); *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561 (E.D. Pa. 2001))).

However, these cases largely contemplate impermissibly broad releases that released all types of claims, including "future" entirely unrelated antitrust claims not circumscribed to an identical factual predicate or to claims that arose out of the alleged conduct or related conduct that could have been alleged, as the Release Provision does in this case. *See, e.g.*, *Schwartz*, 157 F. Supp. 2d at 575−76, 578 (finding release too broad because it released claims against

54

defendant regarding "NFL television programming, whether by broadcast, television, cable television, satellite television," and noting that "[a]lthough the law permits a release to bar future claims based on the past conduct of the defendant, this release would bar later claims based not only on past conduct but also future conduct," and that,"[f]or example, while the release properly bars future claims regarding the bundling of NFL games on satellite television, which forms the basis of this litigation, it also bars future claims for conduct such as the future bundling of games on cable television and the Internet," which did not form the basis of the litigation (internal citation omitted)); *see also Madison Square Garden, L.P. v. Nat'l Hockey League*, No. 07-CV-8455, 2008 WL 4547518, at *8–9 (S.D.N.Y. Oct. 10, 2008) (rejecting defendants' argument that enforcement of the release would violate public policy surrounding antitrust claims "where the cases on which [the party] relies to support its public policy argument . . . involve either releases that purport to bar claims based on future violations, i.e., truly 'new and distinctive incidents', or subsequent conduct by the defendant that goes beyond what was released in the first instance," and finding "considerable support in the caselaw for the distinction relied upon here, namely that the public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint" (internal citation omitted)).

In *Redel's Inc. v. General Electric Corp.*, 498 F.2d 95, the Fifth Circuit held that the district court had erred in finding that a general release, executed in March of 1961, barred claims accruing through February of 1971 where the release language explicitly only released claims accruing "as of the date of the execution of this agreement." *Id.* at 98. In support of its reasoning, the Fifth Circuit emphasized that "[t]he interpretation of any release of antitrust liability must be governed by the intent of the parties," and stated that "[r]eleases may not be executed which absolve a party from liability for future violations of our antitrust laws" where

the release broadly released "all claims, demands, contracts, and liabilities" without narrowing the scope to antitrust violations alleged or that could have been alleged or those based on continuing conduct.  *Id.* at 98–99.  Thus, it does not appear that the court set forth a general prohibition of release of antitrust claims in the future where those claims were or could have been alleged as opposed to claims based on new conduct.  In addition, the court noted that policy "requires us to respect the amicable settlement and release of antitrust claims by the parties themselves."  *Id.* at 100.  The court highlighted the problem "whereby the draftsman of a general release fails to disclose to the releasing party the factual predicate for an antitrust claim or indeed, the fact that antitrust claims are even embraced by the release, and thus attempts forever to bar the unsuspecting victim of antitrust violations from his statutorily granted recourse to the federal courts."  *Id.* (citation omitted).  That problem does not exist in the release before the Court.

The Court also notes that in *Mitsubishi Motors Corporation v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985), cited by McLaughlin, the Supreme Court noted in dicta that if choice-of-forum and choice-of-law clauses in an *arbitration* agreement "operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations," such an agreement would violate public policy.  *Id.* at 637 n.19.  For many reasons, waiver in the context of arbitration agreements differs significantly from the provisions of a jointly negotiated release.  The Court is not persuaded that this dicta in the context of an arbitration agreement somehow invalidates the Release Provision before the Court.

The Court finds the cases relied on by objectors to be inapposite, and therefore, in addition to the reasoning set forth in the Preliminary Approval Order, further finds that this factor weighs in favor of final approval.

###### v.    Equitable treatment of class members relative to one another

The Gnarlywood Objectors argue that the Superseding Settlement Agreement provides for "inequitable distribution" of the fund among class members.  (Gnarlywood and Quincy Woodrights Obj. 2.)  They argue that the distribution is inequitable because, for example, a merchant who was in the class for only the last month of the class period would have to release claims for at least five years, without much compensation, while others might receive proportionally more compensation with the same release.  (*Id.* at 11–12.)  They also argue that "distribution can be made equitable by a variety of means, e.g. disallowing the additional five-year release period, extending the claims period to make it co-extensive with the release period, or delaying final approval pending resolution of the Rule 23(b)(2) claims in Barry's Cut Rate Stores, etc."  (*Id.* at 13.)  Fikes Wholesale Objectors argue that the class definition is too broad and therefore creates an intra-class conflict and does not treat all class members equitably relative to one another, because it "gives rise to the notion that there are class members at different levels of the payment chain, which has engendered conflicts."  (Fikes Wholesale Obj. 14.)

Consideration under this Rule 23(e)(2) factor "could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

For the reasons set forth *supra*, the Court finds that the *pro rata* distribution scheme is sufficiently equitable.  *See also Christine Asia Co. v. Yun Ma*, No. 15-MD-02631, 2019 WL 5257534, at *15 (S.D.N.Y. Oct. 16, 2019) (finding this factor satisfied where claimants would each "receive their *pro rata* share" of the settlement fund); *Meredith Corp. v. SESAC, LLC*, 87 F.

Supp. 3d 650, 667 (S.D.N.Y. 2015) (finding that a *pro rata* allocation plan "appear[ed] to treat the class members equitably . . . and has the benefit of simplicity").  Further, the scope of the release applies uniformly to putative class members, and does not appear to affect the apportionment of the relief to class members, apart from securing the opportunity to participate in the Rule 23(b)(2) action.

The Court acknowledges the Gnarlywood Objectors' frustration that a class member that became a merchant for only the last several months would receive very small remuneration but have to release claims for a number of years.  For those merchants, they may have assessed that it is not worthwhile to join the class.  The Court also notes that for such large class action settlements that involve releases, it would be nearly administratively unfeasible to tailor a release to match the duration that a member had been in the class.  For the reasons set forth *supra* and in the Preliminary Approval Order, the Court rejects the Branded Operators' contention that an intra-class conflict exists.  Accordingly, the Court finds that this factor weighs in favor of final approval.

### vi.   The ability of Defendants to withstand a greater judgment

For the reasons stated in the Court's Preliminary Approval Order, the Court finds that this factor weighs against final approval, but does not necessarily preclude a finding that the settlement is fair.  *Interchange Fees III*, 330 F.R.D. at 47; *see also Charron v. Pinnacle Grp. N.Y. LLC*, 874 F. Supp. 2d 179, 201 (S.D.N.Y. 2012) ("A defendant['s] ability to withstand a greater judgment, standing alone, does not suggest that the settlement is unfair." (citation and internal quotation marks omitted) (alteration in original)), *aff'd sub nom. Charron*, 731 F.3d 241.

### vii.    The range of reasonableness of the settlement in light of the best possible recovery and all the attendant risks of litigation

The Mattress Firm Objectors argue that "[t]he relief is unfair, inadequate, and unreasonable . . . because it significantly lowers the pro rata share of class members" as compared to the relief from the 2013 Settlement Agreement.  (Mattress Firm Obj. 1.)  The Gnarlywood Objectors critique the lack of accompanying injunctive relief and rules modifications, as compared with the 2013 Settlement Agreement, and note that "[t]he Rule Modifications were imperfect, but they were substantial and offered protections the Superseding Settlement Agreement completely lacks."  (Gnarlywood and Quincy Woodrights Obj. 10.)  They also appear to critique the fact that the settlement classes are no longer proceeding simultaneously.  (*Id.* at 9.)

The range of reasonableness of the settlement in light of the best possible recovery, and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation, are two *Grinnell* factors that are often combined for the purposes of analysis.  *See, e.g.*, *Interchange Fees I*, 986 F. Supp. 2d at 229–30; *Godson v. Eltman, Eltman, & Cooper, P.C.*, No. 11-CV-764, 2018 WL 5263071, at *12–13 (W.D.N.Y. Oct. 23, 2018); *Ferrick*, 2018 WL 2324076, at *5–6.

"In considering the reasonableness of the settlement fund, a court must compare "the terms of the compromise with the likely rewards of litigation."  *Godson*, 2018 WL 5263071, at *12 (quoting *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d at 384 (citation omitted)).  "In order to calculate the 'best possible' recovery, the Court must assume complete victory on both liability and damages as to all class members on every claim asserted against each defendant in the Action."  *Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.*, No. 01-CV-11814, 2004 WL 1087261, at *5 (S.D.N.Y. May 14, 2004).  The range of reasonableness is "a range which recognizes the

uncertainties of law and fact in any particular case and the concomitant risks and costs

necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119

(quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

As of October 25, 2019, the settlement fund was valued at $5,620,511,120, reflecting the

amount following deductions for takedown payment for opt-out class members.  (Notice re Mot.

for Attys' Fees 2, Docket Entry No. 7752.)  After takedown and other payments were deducted

from the 2013 Settlement Agreement, the settlement totaled $5.3 billion.  (Pls. Mem. 2.)  Under

the Superseding Settlement Agreement, Defendants contributed an additional $900 million

payment to the settlement funds leftover from the 2013 Settlement Agreement, and as of June 6,

2019, the fund stood at $6,322,607,198.34.  (*Id.* at 3 & n.3.)  In its Preliminary Approval Order,

the Court, while acknowledging the inherent difficulty of doing so, instructed Class Counsel to

use its "best efforts" to provide the Court with a best possible recovery figure in order to weigh

this factor.  *Interchange Fees III*, 330 F.R.D. at 48 n.46.  In support of the present motion, Class

Counsel submitted the report of economist Michael A. Williams, Ph.D.  (*See* Williams Report.)

Williams updated the competing damages figures previously provided by Plaintiffs' and

Defendants' experts to account for the longer class period, and estimated that for a class period

from 2004 until 2018, Plaintiffs' experts would have estimated damages at $463.83 billion to

$754.33 billion, while Defendants' expert would have estimated damages at $1.21 billion to

$3.66 billion.  (*Id.* at 5.)  Williams then analyzed through regression analysis seventy-one past

antitrust settlements "to study the relationship between settlements and the magnitude of

damages claimed by the settling plaintiffs," concluding that the settlement fund achieved in this

case is "similar to (although somewhat larger than) the settlement amounts predicted by [his]

regression model for a case with damages in the range of the damages here."  (*Id.* at 4.)

When analyzing the terms of the 2013 Settlement Agreement, Judge Gleeson found that the figure agreed to — $7.25 billion — "represent[ed] approximately 2.5% of total interchange fees paid by class members during the class period, and thus 2.5% of the largest possible estimate of actual damage to merchants." *Interchange Fees I*, 986 F. Supp. 2d at 229. Despite the $7.25 billion figure, objectors argued that the amount represented "only a few months of interchange fee collections" when divided among the millions of merchants that could claim damages. (*See* Report from Ct. Appointed Expert Professor Alan O. Sykes 47, Docket Entry No. 5965) (noting that such a statement "appear[s] to be correct").) The same is true of the Superseding Settlement Agreement, and the Court notes that the percentage calculated by Judge Gleeson is now likely even less due to a longer class period and a larger class membership.

However, "the fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. "There is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2; *see also Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 621 (S.D.N.Y. 2012) ("It is well-settled that a case settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair."); *Davis v. J.P. Morgan Chase & Co.*, 827 F. Supp. 2d 172, 178 (W.D.N.Y. 2011) ("[I]t is more important to assess the judgment in light of plaintiffs' claims and the other factors."); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d at 483 (approving $586-million settlement that represented two percent of aggregate expected recovery).

"Courts in this district have held that 'the question . . . is not whether the settlement represents the highest recovery possible . . . but whether it represents a reasonable one in light of

61

the many uncertainties the class faces." *Hall v. ProSource Techs., LLC*, No. 14-CV-2502, 2016

WL 1555128, at *8 (E.D.N.Y. Apr. 11, 2016) (quoting *Bodon v. Domino's Pizza, LLC*, No. 09-

CV-2941, 2015 WL 588656, at *6 (E.D.N.Y. Jan. 16, 2015)).  In addition to Williams' findings,

the Court's reasoning regarding the significant litigation risks inherent in this action in the

Preliminary Approval Order help support a conclusion that despite the small settlement fund size

in relation to Plaintiffs' estimated damages, this factor nevertheless weighs in favor of final

approval.  *Interchange Fees III*, 330 F.R.D. at 47–50.  In addition, Williams states that "both the

economic literature and the data on prior settlements suggest that an increase in risk of the

litigation has a depressing effect on the size of the settlement amount, all else equal," (Williams

Report 7), which could account for the size of the settlement in this case.

     The Court acknowledges the Gnarlywood Objectors' argument that the settlement

agreement was more valuable when it was accompanied by injunctive relief, which injunctive

relief Class Plaintiffs' expert estimated to be worth at least $26 billion.  (*See* Renfrew Decl. ¶ 17

("[I]n addition to the monetary recovery, the Class Plaintiffs achieved significant modifications

to the existing rules, which according to Plaintiffs' expert Frankel are estimated to be worth at a

minimum $26+ billion.").)  But Class Counsel's duty is to maximize the monetary relief in this

settlement, and, although it is no longer guaranteed, the injunctive relief secured in the 2013

Settlement Agreement still remains in place.  Moreover, members of the Rule 23(b)(3) class that

are also members of the Rule 23(b)(2) injunctive relief class action are not prohibited from

participating in that action to secure injunctive relief.  (*See* Superseding Settlement Agreement

¶ 34(a).)  Thus, the Superseding Settlement Agreement does not prohibit recovery of additional

structural relief in the future.  (Pls. Reply 13.)  Further, courts approve Rule 23(b)(3) damages-

only settlements, even without accompanying injunctive relief.  *See, e.g.*, *In re LIBOR-Based*

*Fin. Instruments Antitrust Litig.*, 327 F.R.D. at 491–92.

Finally, the Court is unpersuaded by the Mattress Firm Objectors' objection that compared to the 2013 Settlement Agreement, the settlement fund has not proportionally increased its per diem rate despite a far lengthier class period, rendering the settlement unreasonable.  (Mattress Firm Obj. 3.)  They state that "[c]ourts in other cases have used prior settlements approved in the same case as a benchmark for determining" whether a settlement is fair, reasonable, and adequate, and cite to *In re High-Tech Employee Antitrust Litigation*, No. 11-CV-02509, 2014 WL 3917126 (N.D. Cal. Aug. 8, 2014), (Mattress Firm Obj. 4), which the Court finds factually distinguishable.  *In re High-Tech Employee Antitrust Litigation*, the plaintiffs had settled with three out of seven defendants, then later settled with other defendants for a proportionally smaller amount.  *Id.* at *9–11.  The latter settlement size was surprising given that the plaintiffs had succeeded at several stages of litigation, indicating that their litigation risk was smaller than it had previously been.  In contrast, there are no separate negotiated Rule 23(b)(3) Class Plaintiffs settlements with any individual Defendant to provide a point of comparison, and litigation risk has continued to increase.

In sum, for the foregoing reasons and the reasoning set forth in the Preliminary Approval Order, and after analyzing the Rule 23(e)(2) and the *Grinnell* factors, the Court finds the Superseding Settlement Agreement to be fair, reasonable, and adequate, and that final approval is warranted.

### c.    Approval of a settlement class

For the reasons explained below and in the Preliminary Approval Order, the Court grants certification for purposes of a settlement class.

Several of the Branded Operator objections critique the class definition, which the Court

interprets to challenge the Rule 23(a) implied factor of ascertainability.  Fikes Wholesale Objectors argue that "[d]ue to the class definition and broad release that Class Counsel negotiated, the oil companies that processed certain card transactions for the Objectors also lay claim to these self-same settlement benefits."  (Fikes Wholesale Obj. 1.)  They argue that (1) the class definition is too broad and therefore creates an intra-class conflict and does not treat all class members equitably relative to one another, and (2) the class definition and release are overbroad because they "encompass and release all antitrust claims" but "[D]efendants and the Oil Brands have taken the position that the Branded Operators are not the 'direct payors' and do not have standing to pursue claims under the Sherman Act."  (*Id.* at 3–6.) They further argue that "[i]f it is ultimately determined that the Branded Operators are not Authorized Claimants (perhaps because a Special Master determines they have no standing under the Sherman Act), the proposed settlement release and class definition are so broad that the Branded Operators' state law indirect purchaser claims would be released, even though they would receive no compensation whatsoever."  (*Id.* at 6.)  The Vice President and General Counsel of Fikes Wholesale, Inc., Tate A. Seidman, appears to argue that the class definition, which simply requires that a class member "accept" Visa- or Mastercard-branded cards, does not account for the payment process that occurs in the relationship between a Branded Operator and a major oil supplier.  (Seidman Decl. ¶ 5.)  Overall, Fikes Wholesale Objectors argue that "[a]n administrative procedure cannot solve the conflicts here, which go to the very definition of class membership and define the parameters of the class."  (Fikes Wholesale Obj. 12.)

Rule 23(a) contains an implied requirement of ascertainability.  *In re Petrobras Sec.*, 862 F.3d at 266 ("Most circuit courts of appeals have recognized that Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable, often

characterized as an 'ascertainability' requirement.").  Unlike other circuits, the Second Circuit

does not have a "heightened" requirement of ascertainability — it only requires that a "class be

defined using objective criteria that establish a membership with definite boundaries," and does

not require "administrative feasibility" of identifying each class member based on that objective

criteria.  *Id.* (distinguishing the Second Circuit's approach to ascertainability from circuits with a

heightened ascertainability requirement); *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561,

567 (S.D.N.Y. 2014) ("The standard for ascertainability is 'not demanding' and is 'designed only

to prevent the certification of a class whose membership is truly indeterminable.'" (quoting

*Gortat v. Capala Bros., Inc.*, 2010 WL 1423018, at *2 (E.D.N.Y. Apr. 9, 2010))); *Charron v.*

*Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) ("To be ascertainable, the class

must be 'readily identifiable, such that the court can determine who is in the class and, thus,

bound by the ruling.'" (quoting *McBean v. City of New York*, 260 F.R.D. 120, 132–33 (S.D.N.Y.

2009))); *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y.

2002).  "The ascertainability requirement, as defined in this Circuit, asks district courts to

consider whether a proposed class is defined using objective criteria that establish a membership

with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d at 269.

The Superseding Settlement Agreement binds a class of "[a]ll persons, businesses, and

other entities that have accepted any Visa-Branded Cards and/or Mastercard-Branded Cards in

the United States at any time from January 1, 2004 to the Settlement Preliminary Approval

Date."  (Superseding Settlement Agreement ¶ 4.)  There appears to be debate and confusion over

certain franchisor-franchisee relationships, such as those the Branded Operators present to the

Court, in terms of who "accepts" payments cards and are therefore part of the class and has the

right to a claim, although the Court notes that the Branded Operators themselves admit that based

on the class definitions they are "undeniably class members given that they accept [payment] cards from customers at the gas stations and convenience stores they operate." (Fikes Wholesale Obj. 4.)

The Court finds that the settlement class as defined is not "truly indeterminable." *Petrobras* specifically distinguished the Second Circuit's approach from the "heightened ascertainability test" found in other circuits, noting that ascertainability presents only a "modest threshold" that "does not concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition." *In re Petrobras Sec.*, 862 F.3d at 269; *cf. Mullins v. Direct Digital, LLC*, 795 F.3d 654, 662 (7th Cir. 2015) (describing those courts that have adopted a heightened ascertainability requirement, and noting that "some courts have used this requirement to erect a nearly insurmountable hurdle at the class certification stage in situations where a class action is the only viable way to pursue valid but small individual claims"). The term "accepts" is objective enough by its plain English usage to satisfy the ascertainability requirement. The fact that disputes will inevitably arise and proof of who holds a claim may ultimately need to be analyzed during a claims administration process is not a sufficient basis to reject class certification. The class definition is not so vague as to make it such that the Court cannot ultimately determine who is a class member. It provides a timeframe for a particular group that was allegedly harmed. *See id.* at 660 ("To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way." (citations omitted)). As identified by the Seventh Circuit, which has also declined to adopt a heightened ascertainability requirement, "[i]mposing a stringent version of ascertainability because of concerns about administrative inconvenience renders the manageability criterion of the superiority requirement superfluous. It

66

also conflicts with the well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Id.* at 663 (first citing Daniel Luks, Note, *Ascertainability in the Third Circuit: Name That Class Member*, 82 Fordham L. Rev. 2359, 2395 (2014); and then citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001), *overruled on other grounds by In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)). Imposing a stringent version of ascertainability in the class settlement context would be even more superfluous because, as recognized in the Preliminary Approval Order, manageability concerns need not be considered to the same extent for a settlement class. *Interchange Fees III*, 330 F.R.D. at 51; *see also Amchem Prod.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." (citations omitted)).

In addition to the modest standards that apply when assessing a class definition under the ascertainability standard in the Second Circuit, and as discussed at the final fairness hearing, the class definition is also objectively guided by federal antitrust standards, and Class Counsel has stated that in line with federal antitrust law, they represent "only the first payer, [they] sued for the first payer, the direct purchaser," and not every entity in the payment chain. (*See* Hr'g Tr. 78:9–79:15.)

For these reasons, the Court finds that the class definition is objectively defined and declines to create subclasses as suggested by the Branded Operators, and grants certification for the purposes of a settlement class.

#### d.    Additional objections

The Court also considers several objections that do not fit neatly into the Rule 23(e), *Grinnell*, or Rule 23(a) and 23(b)(3) factors.

#### i.    Valero objections

Multiple Branded Operators raised objections regarding a settlement agreement between "Valero," an entity and major oil supplier,[21] and Defendants.  During the preliminary approval phase for the Superseding Settlement Agreement, Branded Operators complained that some portion of Branded Operators, or some portion of the product that Branded Operators sell, had been excluded from the settlement class, or from being claim-worthy.  (*See* Mem. in Opp'n to Prelim. Approval 19 ("[T]he Defendants have been allowing the Oil Brands to negotiate opt-out settlement agreements on behalf of all of their branded operators without the consent of the operators.").)  The Branded Operators referred to a list submitted by Valero, which "identifies more than 400 branded operators that are now purportedly excluded from the [Superseding Settlement Agreement]."  (*Id.* at 19–20.)  In order to address the concern that these and other entities excluded from the class as "Dismissed Plaintiffs" would not know that they had been excluded, and pursuant to the Court's request and discussions at the preliminary approval

---

[21]  Valero Energy Corporation and Valero Marketing and Supply Company are listed as Dismissed Plaintiffs in the Superseding Settlement Agreement.  (*See* Dismissed Plaintiffs, annexed to Superseding Settlement Agreement as App. B.)  "Dismissed Plaintiffs," as defined in the Superseding Settlement Agreement, means:

> the individual plaintiffs and former opt-out plaintiffs that have dismissed with prejudice an action against any Defendant and that are listed in Appendix B [of the Superseding Settlement Agreement], and any additional persons, businesses, or other entities included in an exclusion request that those plaintiffs previously submitted to the Class Administrator in connection with the [Original] Settlement Agreement.

(Superseding Settlement Agreement ¶ 3(t).)

hearing, Class Counsel sent Notice of Exclusion to Dismissed Plaintiffs — i.e., entities and their affiliates that have previously dismissed their lawsuits against Defendants — in order to notify the Dismissed Plaintiffs that they would be ineligible to receive settlement funds.  (*See* Notice of Exclusion from Class Action Settlement ("Notice of Exclusion"), annexed to Proposed Prelim. Approval Order as Ex. 2, Docket Entry No. 7354-1.)

At the final approval stage, several Branded Operators have complained that the Superseding Settlement Agreement wrongly excludes entities excluded by major oil supplier Valero, for example, that the "exclusion list purportedly excludes . . . Fikes Wholesale, Inc. and Food Fast Corporation" from the Superseding Settlement Agreement, and that those entities "never authorized their claims to be excluded or released by the defendants or by Valero," and that "[f]rom the face of the proposed settlement, it appears that hundreds of entities who may have operated one or more Valero-branded retail locations during the class period have also purportedly been excluded from the class settlement."  (Seidman Decl. ¶¶ 16–17.)  The Coulson Objectors argue that "Valero had no right to take this action" and that Valero is not the direct purchaser and "did not pay the swipe fees incurred and which were actually paid by the Coulson Objectors."  (Coulson Oil Obj. 2, 5.)

Class Counsel argues that "in this situation, a Branded Operator's dispute is not with Class Counsel or this settlement but with the oil company that settled the Branded Operator's claims."  (Pls. Reply 21.)

At the final fairness hearing, the Court questioned Class Counsel over whether, if the Branded Operators that were excluded from the Superseding Settlement Agreement by Valero were ultimately deemed to be members of the class, Class Counsel could adequately represent those Branded Operators without conflict given that under the current class definition, they are

technically excluded from the class as "Dismissed Plaintiffs," and therefore unrepresented by Class Counsel.  (*See, e.g.*, Hr'g Tr. 51:25–55:19.)

Although in their final approval reply brief Class Counsel stated its position that "to the extent that a Branded Operator — or any other merchant — had their claims released by another entity's prior settlement, the Branded Operator is not a class member and has no standing to object," (Pls. Reply 20–21 (citations omitted)), at the final fairness hearing, Class Counsel assured the Court that if a Branded Operator was ultimately deemed to be able to make a claim, Class Counsel would represent them.  (Hr'g Tr 66:1–4 (Class Counsel stating that they were "agnostic" to whether the Branded Operators could in fact be class members but stating that "I hope they're in the class because we want to give them money if they were the ultimate damaged party").)  Class Counsel further assured the Court that any ultimate addition of Branded Operators that had previously been listed as excluded pursuant to the Valero settlement would not dilute the already agreed-upon settlement fund amount, because the amount was negotiated not based upon number of class members *per se*, but instead upon the "overall volume and interchange volume" paid to Defendants nationwide by all merchants.  (*Id.* at 87:4–12, 88:2–9.)

Pursuant to the discussions held at the final fairness hearing, the Court is satisfied that any Branded Operator that believes it has been wrongly excluded as a result of the Valero settlement, or more broadly, any entity in a franchisee-franchisor relationship that believes it has been wrongly excluded, may file a claim, which can be assessed for validity through a claims administration process, and will be competently represented by Class Counsel.  (*See, e.g.*, *id.* at 95:19–25 (Defendants stating that if such a party "comes in and submits a claim and that claim is accepted by the claims administrator, the [D]efendants are not going to stop that party from being paid if they can prove they own the claim[] and Valero was wrong").)  In addition, a

supplemental notice will be sent to any entity excluded through the Valero settlement, informing the entity that it may be eligible to file a claim, as further described *infra*.

### ii.   Adequacy of notice

The Coulson Objectors state that "by way of a confusing and ambiguous Notice, the Coulson Objectors believe they have been informed that the Settlement Administrator will reject their claims to receive proceeds from the Settlement . . . because Valero, through a separate and independent settlement agreement with Defendants, has purported to waive the rights of Valero's branded operators, including the Coulson Objectors, to participate in the Superseding Settlement."  (Coulson Oil Obj. 1–2.)

The Coulson Objectors object to the Notice as follows:

> The Notice received by each of the Coulson Objectors indicates that it has been "excluded from the Class" and "will not be eligible to receive Settlement funds" because of a "relat[ion]" to Valero.  This threatened "exclusion" from the Settlement is addressed to each of the Coulson Objectors as an integrated business entity, even though each Objector also operates locations unrelated to Valero.  So, even though the Notice states that the addressee "will not be eligible to receive Settlement funds," the Coulson Objectors are left to speculate whether the Notice intends to invalidate claims for stores operating under something other than the Valero brand.  The Notice is confusing and ambiguous on this point.

(*Id.* at 4.)

Gnarlywood Objectors further argue that the Notice sent to class members "begs the question" of whether the percentage of the settlement fund that Class Counsel seeks for attorneys' fees is calculated based on the settlement fund amount before or after reductions for opt-outs.  (Gnarlywood and Quincy Woodrights Obj. 16.)

"The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness."  *Wal-Mart Stores*, 396

71

F.3d at 113–14 (citations omitted).  "[N]otice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceeding."  *Id.* at 114 (citation and internal quotation marks omitted).  In addition, notice "is adequate if it may be understood by the average class member."  *Id.* (citation and internal quotation marks omitted).  "There are no rigid rules for determining whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements."  *Charron*, 874 F. Supp. 2d at 191.

For the reasons set forth in the Preliminary Approval Order, the Court finds that the notices that were sent to putative class members were the best practicable notices under the circumstances.  *Interchange Fees III*, 330 F.R.D. at 58–60.  Moreover, and since approving the original notices, Class Counsel has been diligent in notifying the Court when additional information should be sent to potentially affected class members, and proposing draft language to send to those members.  (*See, e.g.*, Letter dated July 22, 2019; Letter dated Sept. 17, 2019.)

Regarding the Coulson Objectors' concerns, pursuant to discussions at the final fairness hearing regarding entities excluded by Valero, i.e., those entities that previously received a notice of exclusion, the Court instructed the parties to draft an additional notice to be sent to those excluded class members "that tells them they may have a claim and what they need to do to proceed with that claim."  (Hr'g Tr. 97:5–7.)  The notice, approved by the Court on December 9, 2019, (Order dated Dec. 9, 2019), informs recipients that they "may be eligible to make a claim for class settlement funds," and specifically states:

> [I]f you believe that [Name of Dismissed Plaintiff from Appendix B] did not have authority to settle and release your claims in its individual lawsuit, this Notice applies to you. This Notice is to inform you that you can make a claim for class settlement funds if [Name of Dismissed Plaintiff from Appendix B] did not have authority to settle and release your claims.

(Notice Regarding Class Action Settlement 1–2, annexed to Nov. 2019 Letter as Ex. A, Docket

Entry No. 7791-1.)  The Court finds that this additional notice is reasonable and sufficient to

inform those excluded pursuant to the Valero settlement, and others similarly situated, that they

may have a claim. [22]

Regarding the Gnarlywood Objectors' objection to the notice, and as set forth in a

separate opinion on attorneys' fees and expenses, attorneys' fees will be granted as a percentage

of the settlement fund after reductions for opt-outs have been accounted for.  "Courts in this

Circuit have explained that a Rule 23 Notice will satisfy due process when it 'describe[s] the

terms of the settlement generally,'" "inform[s] the class about the allocation of attorneys' fees,

---

[22] At the final fairness hearing during the discussions surrounding Valero, counsel for Fikes Wholesale Objectors expressed concern that allowing previously excluded entities to rejoin the class would require an adjustment of the class exclusion takedown payment of $700 million. (*See, e.g.*, Hr'g Tr. 109:16–110:3.)  Class Counsel responded that "if any Valero [B]randed [O]perators or other 'Dismissed Plaintiffs' can show that their claims were settled without authority, . . . there should be no effect on the takedown calculation." (Nov. 2019 Letter 3.)  Class Counsel further explained that "[w]hile it is unclear exactly how many persons or entities (if any) will fall into the category of Dismissed Plaintiffs whose claims were settled without their authorization, our data suggests that they would constitute a tiny percentage of the class and thus have no effect on the takedown payments." (*Id.* at 4.)  The Court agrees that it is extremely unlikely that the inclusion of any, or the majority of Dismissed Plaintiffs into the class would in any way affect the takedown payment amount of $700 million. (*See id.*)  However, out of an abundance of caution, and as agreed to by the parties, the Court included the following paragraph in the Final Approval Order:

> The parties to the Superseding Settlement Agreement have clarified that in the event the claims process under the Plan of Administration and Distribution results in any determinations that would have reduced the Class Exclusion Takedown Payments provided in the preceding paragraph, as calculated pursuant to Paragraph 22 of the Superseding Settlement Agreement, the Visa Defendants shall refund the difference with respect to the Class Exclusion Takedown Payment made to them, and the Mastercard Defendants and the Bank Defendants shall refund the difference with respect to the Class Exclusion Takedown Payment made to them, by wire transfer to the Class Settlement Cash Escrow Account.

(Final Approval Order ¶ 8.)

and provide[s] specific information regarding the date, time, and place of the final approval hearing." *Charron*, 874 F. Supp. 2d at 191 (alteration in original) (first citing *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993); and then citing *Clark v. Ecolab Inc.*, Nos. 07-CV-8623, 04-CV-4488, and 06-CV-5672, 2009 WL 6615729, at *6, 2009 U.S. Dist. LEXIS 108736, at *22 (S.D.N.Y. Nov. 17, 2009)).  The Publication Notice describes basic information in plain, clear terms, including potential attorneys' fees and expense awards.  (*See* Revised Class Notices, G1-2.)  The Publication Notice states that no more than 10% of the settlement fund will be sought for attorneys' fees, (*id.*), and contrary to the Gnarlywood Objectors' expectations, nothing in the case law requires more specificity.

### III.  Conclusion

For the foregoing reasons, on December 13, 2019, the Court finally approved the Superseding Settlement Agreement as fair, reasonable, and adequate, including the Notice Plan, Class Notices, and Plan of Administration and Distribution, and finally certified, for settlement purposes only, a Rule 23(b)(3) settlement class.

Dated:  December 16, 2019
    Brooklyn, New York

                    SO ORDERED:


                    _____s/ MKB_____
                    MARGO K. BRODIE
                    United States District Judge